## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THE CHAMBER OF COMMERCE<br>FOR GREATER PHILADELPHIA,<br>on behalf of its members,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF PHILADELPHIA and<br>PHILADELPHIA COMMISSION ON<br>HUMAN RELATIONS,<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **COMPLAINT**<br><br>Civil Action No.: |

Plaintiff Chamber of Commerce for Greater Philadelphia ("the Chamber"), on behalf of

its member companies, files this Complaint for declaratory and injunctive relief to prevent the

City of Philadelphia ("City") and the Philadelphia Commission on Human Relations from giving

effect to or enforcing an ordinance that violates the First Amendment, the Due Process Clause of

the Fourteenth Amendment, and the Commerce Clause of the United States Constitution, as well

as Pennsylvania's First Class City Home Rule Act and the Pennsylvania Constitution.  The

Chamber hereby alleges as follows:

### INTRODUCTION

1.      The Chamber brings this action to challenge an ordinance that amends the City's

"Fair Practices Ordinance:  Protections Against Unlawful Discrimination," Chapter 9-1100 of the

Philadelphia Code, by adding a new Chapter on wage equity.  *See* Phila. Code §§ 9-1103, 9-1131

("Ordinance") (attached as Exhibit A).  The Ordinance makes it unlawful for employers "[t]o

inquire about a prospective employee's wage history," *id.* § 9-1131(2)(a)(i), or "[t]o rely on the wage history of a prospective employee . . . in determining the wages for such individual" unless the applicant "knowingly and willingly disclosed" that wage history, *id.* § 9-1131(2)(a)(ii). Employers who violate the Ordinance are subject to civil and criminal penalties, including up to $2,000 per violation, *id.* § 9-1105(d), as well as an additional $2,000 and 90 days in jail for a repeat offense, *id.* § 9-1121. The Ordinance was signed into law on January 23, 2017 and is scheduled to take effect on May 23, 2017.

2. As an advocate for economic development, the Chamber—like the business community it represents—strongly supports the goal of eliminating gender-based wage discrimination. In fact, the Chamber has taken a leading role in promoting equality and opportunity for a wide array of diverse populations, including women. Through its Diversity and Inclusion Series, for example, the Chamber has offered practical strategies to members to position diversity at the center of their business growth. Since 2000, the Chamber has offered scholarships to more than 100 women as part of its Paradigm Scholarship for Working Women program, which is designed to ensure that women in Philadelphia can bridge the skill and education gap to increase their incomes. The Chamber also has launched a CEO Access Network to diversify the Chamber's leadership and membership, advance minority and women's entrepreneurship, and improve economic conditions in the City and Greater Philadelphia region.

3. The Ordinance, however, is a demonstrably poor fit for achieving the City's anti-discrimination objective. In its current form, the Ordinance will not advance gender wage equality, but instead will chill the protected speech of employers and immeasurably complicate their task of making informed hiring decisions. The Chamber brings this suit to ensure that the

City pursues its important anti-discrimination objective through effective and lawful means that are actually targeted at the evil the City is seeking to eradicate.

4.       Although the City unquestionably has a strong interest in alleviating gender-based wage disparities that are attributable to discrimination, there is no evidence that the Ordinance's round-about approach will alleviate discriminatory wage disparities: Only Massachusetts has experimented with prohibiting all employers from inquiring about, and relying on, wage history, and that law will not take effect until 2018, well after the effective date of the Ordinance.

5.       What is certain is that the Ordinance will significantly disadvantage Philadelphia businesses—and especially the City's small businesses—by depriving them of important information on which they regularly and appropriately rely to find the right employees. As the Chamber explained to the City Council, employers normally base compensation decisions on a number of factors other than wage history, including market value, funding limitations, competition, and internal equity. Wage history is nevertheless important to the hiring process because employers use it, among other things, to identify job applicants they cannot afford, to set a competitive, market-based salary for their positions, and to assist in evaluating applicants' prior job responsibilities and achievements. By prohibiting employers from inquiring about, or relying on, an applicant's wage history, the Ordinance prevents employers from communicating the message that wage history is important to the job-application process, and from receiving and using information for proper and lawful employment-related reasons. The Ordinance thus is a significant intrusion on how employers make hiring decisions.

6.       In light of the importance of wage history to the hiring process, the Chamber proposed two alternatives that would have furthered the City's interest in eliminating gender-based wage discrimination without prohibiting wage-history inquiries: the City could simply

prohibit employers from relying on wage history as the sole basis for making wage distinctions among employees of different sexes, or the City could encourage employers to conduct voluntary self-evaluations to ensure that all of their employees earn fair market wages. The Chamber also offered several recommended improvements to the Ordinance itself, including reducing the Ordinance's onerous civil and criminal penalties (up to $2,000 per violation as well as 90 days in jail for repeat offenders) so that small businesses would not be forced to close if found in violation of its ambiguously defined prohibitions; and defining the term "knowingly" to avoid any confusion about when an employer can rely on wage-history information disclosed by a job applicant. The City ignored all of these proposals and recommendations.

7.       The resulting Ordinance violates the First Amendment free speech rights of employers, including the Chamber's members, by prohibiting them from asking about an applicant's wage history. Rather than directly target the gender discrimination that purportedly causes gender-based wage disparities, the City impermissibly "seeks to achieve its policy objectives through the indirect means of restraining certain speech by certain speakers." *Sorrell* v. *IMS Health, Inc.*, 564 U.S. 552, 577 (2011). Nor is the Ordinance sufficiently tailored to achieving the City's policy objectives. It is vastly overinclusive because it prohibits wage-history inquiries and reliance where inquiring about or relying on wage history (even on the City's own theory) could not possibly perpetuate wage disparities caused by gender discrimination. There simply is no substantial basis for prohibiting wage-history inquiries and reliance when the applicant is, for example, a high-level executive who must be lured away from her current employer, or a partner in a law firm with a lock-step compensation structure. Not even the City contends that *all* applicants (or even most applicants) have wage histories that reflect actual gender discrimination as opposed to differences in experience, training, or hours

worked.  In effect, the City has asserted the authority to restrict employer speech whenever it could *conceivably* perpetuate the effects of past discrimination.  But on that radical and unconstitutional theory, employers could equally be barred from asking applicants about previous positions and responsibilities entirely.  Moreover, the Ordinance is also substantially underinclusive because it permits employers to rely on wage-history information "knowingly and willingly" disclosed by applicants (even if those prior wages were tainted by gender discrimination).  Because the City could have achieved its objectives through other means that were more directly targeted at the problem of gender discrimination and that would have restricted far less employer speech, the Ordinance fails any level of constitutional scrutiny.

8.      The Ordinance also violates the Due Process Clause of the Fourteenth Amendment because it subjects employers to severe penalties—including punitive damages of up to $2,000 and, for a repeat violation, an additional $2,000 fine and 90 days in jail—without ensuring that employers "know what is required of them so they may act accordingly."  *FCC* v. *Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2317 (2012).  Although the Ordinance permits employers to rely on wage-history information that has been "knowingly and willingly disclosed," Phila. Code § 9-1131(2)(a)(ii), employers will rely on this vague and undefined standard at their peril.  For example, if an applicant wishes to disclose her wage history to a prospective employer to substantiate her market value, the employer might nevertheless avoid such a conversation out of fear that the disclosure would be deemed "unwilling" because it occurred in an interview setting.  The Ordinance's imprecise language will thus inevitably chill speech by employers reluctant to run the risk of incurring the measure's significant civil and criminal sanctions.

9.      The Ordinance also is invalid because it applies to the hiring of employees who work outside Philadelphia, or even outside Pennsylvania.  As long as an employer "does business in the City" or "employs one or more employees" in the City, Phila. Code § 9-1102(h), the Ordinance appears to regulate all of that employer's hiring decisions—even if, for example, the employer is making a hiring decision in New Jersey for a position in New Jersey.  By "control[ling] conduct beyond the boundaries of the State," the Ordinance violates the Commerce Clause of the United States Constitution, *Healy* v. *Beer Inst.*, 491 U.S. 324, 336 (1989), as well as the Due Process Clause of the Fourteenth Amendment, *see BMW of N. Am., Inc.* v. *Gore*, 517 U.S. 559, 572 (1996).  And by regulating activity "beyond the city limits" in contravention of the First Class City Home Rule Act, 53 P.S. § 13133 ("Home Rule Act"), the Ordinance violates the Pennsylvania Constitution, *see* Pa. Const. art. IX, § 2.

10.      As the Chamber explained to the City Council, the Ordinance is likely to have a crippling impact on local businesses and hiring.  Ex. B.  The Ordinance will be especially damaging for small businesses and nonprofits without a robust human resources department, who will lose a valuable tool for identifying, early in the application process, whether a candidate is worth pursuing.  And many businesses of all sizes—including employment search firms—will have a more difficult time luring top talent to the City because they will be unable to inquire into the wage history of sought-after candidates when attempting to formalize an attractive compensation package.  Rather than reduce gender-based wage inequities—an outcome that the Chamber contends and the Ordinance's proponents acknowledge is speculative at best—the Ordinance is far more likely to reduce hiring activity in the City as employers seek to avoid the Ordinance's reach.  The Chamber strongly condemns gender-based wage

discrimination, but it would be a cruel irony indeed if the City's chosen remedy had the practical effect of reducing job growth and opportunity for all.

11.     Although the Chamber—like its member businesses—fully supports gender wage equality, the Ordinance is a wholly ineffectual and manifestly unconstitutional means of furthering that important objective.  The Chamber therefore brings this suit, seeking both a declaration that the Ordinance is invalid and temporary and permanent injunctive relief against enforcement of the Ordinance.

## PARTIES

12.     Plaintiff Chamber of Commerce for Greater Philadelphia is a Pennsylvania non-profit organization with its principal place of business in the City.  Dedicated to promoting regional economic growth and advancing business-friendly public policies, the Chamber represents thousands of member companies with approximately 600,000 employees across eleven counties in the three States of the Greater Philadelphia region.

13.     Defendant City of Philadelphia is a political and geographical subdivision of the Commonwealth of Pennsylvania that is subject to the laws of the Commonwealth and the United States Constitution.  *See* U.S. Const. art. VI, cl. 2; Phila. Code § 1-100.

14.     Defendant Philadelphia Commission on Human Relations ("Commission") is generally responsible for enforcing the City's civil rights laws, including by pursuing claims of unlawful discrimination in employment.  *See* Phila. Code § 4-700.

## JURISDICTION AND VENUE

15.     This action arises under and pursuant to the Constitution of the United States and the First and Fourteenth Amendments thereof, 28 U.S.C. §§ 2201 and 2202, 42 U.S.C. § 1983, and the Constitution and laws of the Commonwealth of Pennsylvania.

16.    This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1367.

17.    This Court also has jurisdiction under 28 U.S.C. § 1343(a)(3) to redress deprivations "under color of any State law, statute, [or] ordinance . . . of any right, privilege or immunity secured by the Constitution of the United States."

18.    The Chamber has standing to sue on behalf of its member companies because its members conduct business and hire employees in Philadelphia, and are prohibited by the Ordinance from inquiring into a job applicant's wage history or relying on that history in making salary decisions; the interests that the Chamber seeks to vindicate in this suit are germane to its organizational purposes; and "neither the claim asserted nor the relief requested requires the participation" of the Chamber's members. *Hunt* v. *Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

19.    Declaratory relief is authorized by 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57.

20.    Injunctive relief is authorized by Federal Rule of Civil Procedure 65.

21.    Venue is proper in this district under 28 U.S.C. § 1391(b).

22.    An actual controversy currently exists between the parties concerning the constitutionality and validity of the Ordinance.  A declaration that the Ordinance is invalid and an injunction against its enforcement would resolve this controversy.

23.    A preliminary injunction to enjoin Defendants from enforcing the Ordinance will protect the rights of the Chamber's members during this proceeding, and a permanent injunction will protect their rights after this proceeding concludes.

## FACTUAL ALLEGATIONS

### Legislative History of the Ordinance

24.     On September 29, 2016, the City Council introduced Bill No. 160840 and referred it to the Committee on Law and Government.  On November 22, the Committee on Law and Government held a hearing on the Bill and approved an amended version that was identical to the subsequently enacted Ordinance in all relevant respects.

25.     At the November 22 hearing, the Chamber provided written testimony that the Ordinance constituted government over-reach that would significantly disadvantage small businesses. (Attached as Exhibit B).  Small businesses, the Chamber explained, often rely on wage history to determine whether they can afford a given candidate.  One supporter of the Ordinance agreed that a candidate who made a significantly larger salary at her previous job would be "wasting the time of the hiring officer" by applying to a company that could not afford to pay her salary.  Council of the City of Phila., Comm. on Law & Enf't, Hr'g Tr. 77 (Nov. 22, 2016) ("Hr'g Tr."), available at http://bit.ly/2kOuRPp.  The Chamber further explained that wage history acts as a benchmark that enables companies to determine whether they are meeting or exceeding the market-value wage for any given position.  Ex. B at 1.  The Chamber also cautioned that the severe penalties for violations of the Ordinance could put some small businesses out of business completely.  *Id.* at 2.

26.     Although the Chamber has long supported efforts to eliminate gender-based wage discrimination, the Chamber's testimony explained that it is highly speculative whether the Ordinance will actually ameliorate wage disparities caused by gender discrimination.  Ex. B at 2. A similar law has been passed in Massachusetts, but will not take effect until 2018.  Because the Ordinance will be the first such measure to take effect in the nation, it is "unknown" what effect

it will have. *Id.* In fact, even supporters of the bill unanimously agreed that the Ordinance would not solve the problem of gender-based wage discrimination, Hr'g Tr. 13, 35, but merely "ha[d] the potential to help close the gender gap," *id.* at 11.

        a.      Testimony at the hearing pointed to numerous causes for the gender wage gap. For example, Rue Landau, Executive Director of the Commission, who testified in support of the Ordinance, stated that the recent recession had been a "major hurdle in closing the gap" because it forced "many people . . . to accept jobs at significantly lower wages." Hr'g Tr. 7. She further acknowledged that, in her view, wage-history inquiries were only "one of the factors" contributing to the gender wage gap. *Id.* at 35. Terry Fromson of the Women's Law Project, another supporter of the Ordinance, agreed that there were multiple contributors to the gender wage gap. *Id.* at 65.

        b.      Supporters of the Ordinance also conceded that not all employees' wage history reflects discrimination. For example, supporters treated the wages of white male applicants as the baseline market rate. *See, e.g.*, Hr'g Tr. 71 ("[W]hile there aren't a lot of disparities between men and women within a racial or ethnic group, when compared to white men, . . . women and minorities do much worse."). There was no testimony that the wages of white male applicants reflect discrimination. Even with respect to the wage history of female and minority applicants, Ms. Fromson acknowledged that their wage history only "likely reflects" previous discrimination. *Id.* at 67.

        c.      Hearing testimony also confirmed that employers use wage history as a legitimate and proper "factor" in wage determinations. Hr'g Tr. 49. One supporter testified that "many courts" thus have treated an employer's reliance on wage history as an affirmative defense to liability for wage discrimination under federal equal-pay laws.

*Id.* at 66.  Indeed, supporters provided no evidence that employers actually use wage history to make discriminatory salary offers to women.  On the contrary, Ms. Landau agreed that "[i]t's an economic situation," and acknowledged that in some cases employers "might just for economic reasons" offer an applicant a lower salary based on his or her wage history.  *Id.* at 39.

27.     The Chamber proposed two alternatives that would help eliminate gender-based wage discrimination without restricting nearly as much (if any) employer speech.  First, in its written testimony, the Chamber recommended that the City encourage employers to conduct voluntary self-evaluations—as the Chamber has done—in order to ensure that employees receive fair market wages and to enable employers to identify any adjustments that need to be made.  Ex. B at 2.  Second, before the Ordinance was signed into law, the Chamber submitted an amendment that would have allowed employers to ask job applicants about wage history, but prohibited employers from relying solely on wage history to justify a wage differential between employees.

28.     In its written testimony, the Chamber recommended further amendments to improve the Ordinance.  *See* Ex. B at 2.  The Chamber suggested that the City revise the Ordinance's safe-harbor provision to clarify when wage-history information has been "knowingly and willingly disclosed" because these inherently vague terms provide insufficient guidance to employers.  The Chamber also recommended reducing the penalties imposed by the Ordinance so that small businesses would not be forced to shut down if found to have violated its provisions.

29.     In enacting the Ordinance, the City did not adopt any of these proposed alternatives or recommendations.

**The Wage History Ordinance**

30.     As enacted, the Ordinance sets forth several findings by the City Council.  Among

other things, the City Council found that in Pennsylvania "women are paid 79 cents for every

dollar a man makes"; "[s]ince women are paid on average lower wages than men, basing wages

upon a worker's wage at a previous job only serves to perpetuate gender wage inequalities"; and

"[s]alary offers should be based upon the job responsibilities of the position sought and not based

upon the prior wages earned by the applicant."  Phila. Code §§ 9-1131(1)(a), (d), (e).  The

Ordinance does not identify any data, studies, or reports to support these findings.

31.     In a section entitled "Prohibition on Inquiries into Wage History," the Ordinance

defines two unlawful employment practices for "an employer, employment agency, or employee

or agent thereof."  Phila. Code § 9-1131(2).  Chapter 9-1100 defines "employer" as "[a]ny

person who does business in the City of Philadelphia through employees or who employs one or

more employees."  *Id.* § 9-1102(h).[1]

      a.     The Ordinance first makes it an unlawful employment practice "[t]o

      inquire about a prospective employee's wage history, require disclosure of wage history,

      or condition employment or consideration for an interview or employment on disclosure

      of wage history."  Phila. Code § 9-1131(2)(a)(i).  The phrase "to inquire" is defined as

      "to ask a job applicant in writing or otherwise."  *Id.* § 9-1131(2)(c).  The term

      "prospective employee" is not defined.

      b.     The Ordinance also makes it an unlawful employment practice "[t]o rely

      on the wage history of a prospective employee from any current or former employer of

---

[1] For simplicity, the Chamber refers to "employers" and "employment agencies"—the objects
of the Ordinance's prohibitions—collectively as "employers."

the individual in determining the wages for such individual at any stage in the

employment process . . . unless such applicant knowingly and willingly disclosed his or

her wage history to the employer, employment agency, employee or agent thereof."

Phila. Code § 9-1131(2)(a)(ii).  The phrase "knowingly and willingly" is not defined.

32.     Chapter 9-1100 also governs enforcement of the Ordinance.  The Commission is

"vested with the authority to administer and enforce this Chapter," Phila. Code § 9-1111, and can

order various penalties for a violation, including compensatory damages, *id.* § 9-1105(1)(c), and

punitive damages of up to $2,000 per violation, *id.* § 9-1105(1)(d).  Any person who violates the

Ordinance more than once "shall be guilty of a separate offense of repeat violation" and subject

to a fine of up to $2,000 "or imprisonment for not more than ninety (90) days, or both." *Id.* § 9-

1121(2).

33.     If the Commission does not pursue a complaint alleging a violation of the

Ordinance, the complainant may bring an action in state court, and the state court "may grant any

relief it deems appropriate," including compensatory damages and punitive damages.  Phila.

Code § 9-1122(3).

**The Ordinance Violates The First Amendment**

34.     The Ordinance imposes content- and speaker-based restrictions on employers'

speech.  The Ordinance prohibits employers—but not job applicants seeking to substantiate their

market value, financial institutions evaluating whether to make a loan, or a landlord considering

a rental applicant—from inquiring into wage history.  Thus, under the Ordinance, employers—

and employers alone—are prohibited from communicating the message, "I think your prior

salary would help us understand if we are a good fit for each other.  Please tell it to me."

Because there is nothing "constitutionally proscribable" about wages or wage history, the First

13

Amendment fully protects that message. *R.A.V.* v. *City of St. Paul*, 505 U.S. 377, 383 (1992) (emphasis omittted).

35.     The Ordinance's prohibition on relying on wage history in making salary decisions, Phila. Code § 9-1131(2)(a)(ii), similarly implicates employers' First Amendment rights.  Employers still can try to communicate with a previous or current employer to obtain an applicant's wage history, but, if they are successful, the reliance provision prohibits them from using that information when engaging in the protected speech of communicating their salary expectations to the applicant.  By imposing "'restraints on the way in which the information might be used' or disseminated," the reliance provision "implicate[s]" employers' "right to speak." *Sorrell*, 564 U.S. at 568 (quoting *Seattle Times Co.* v. *Rhinehart*, 467 U.S. 20, 32 (1984)).  Moreover, even if viewed as a regulation of employers' conduct, the provision impairs employers' First Amendment rights by using content- and speaker-based restrictions to target expressive conduct that seeks out relevant information or communicates the importance of wage history to the job-application process.  "The government may not regulate use based on hostility—or favoritism—towards the underlying message expressed." *R.A.V.*, 505 U.S. at 386.

36.     The Supreme Court has emphasized that "[i]t is rare that a regulation restricting speech because of its content will ever be permissible." *Brown* v. *Entm't Merchs. Ass'n*, 564 U.S. 786, 799 (2011) (internal quotation marks and citation omitted).  Yet the Ordinance does precisely that: It prohibits employers (and only employers) from inquiring into or relying on wage history, but permits them to inquire into and rely on other information when making hiring and salary decisions.  And it permits other persons—such as credit agencies or banks—to request and rely on the same information.  Accordingly, the Ordinance is "presumptively unconstitutional" and can be upheld only if it satisfies strict scrutiny, which requires it to be

"narrowly tailored to serve [a] compelling state interest[ ]." *Reed* v. *Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015).

37.     The Chamber agrees that the City has a compelling interest in eradicating wage disparities caused by gender discrimination; that interest does not extend, however, to wage disparities that are attributable to differences in skill, training, experience, and other legitimate factors.

38.     The Ordinance is not narrowly tailored to ameliorate gender-based wage discrimination.  The Ordinance sweeps far more broadly than necessary to accomplish that objective because it prohibits wage-history inquiries and reliance even where inquiring about or relying on wage history could not perpetuate wage disparities caused by gender discrimination. There is no substantial basis for the Ordinance's prohibitions where the applicant receives a lock-step salary or the employer tries to lure a talented employee away from her current employer by, for example, offering to double her salary.  Moreover, not even the City contends that the previous wages of *every* applicant—or even most applicants who receive the forbidden inquiry— reflect actual gender discrimination, as opposed to differences in experience, training, or hours worked.  To take one salient example, on the City's own theory, the salaries of male applicants do not reflect gender-based wage discrimination at all but instead establish the baseline for measuring whether a wage gap even exists.  The Ordinance is also underinclusive because it *permits* employers to rely on wage-history information that has been "knowingly and willingly" disclosed by the applicant—even where doing so could perpetuate wage disparities caused by discrimination.  In addition, the City ignored several alternatives that would have targeted gender-based wage discrimination without restricting nearly as much employer speech (or, in some cases, any at all).  As the Chamber proposed, the City simply could have prohibited

employers from relying on wage history as the sole basis for making wage distinctions among employees of different sexes, or encouraged employers to conduct voluntary self-evaluations to identify where wage adjustments are needed.  The Ordinance therefore cannot satisfy strict scrutiny.

39.     While strict scrutiny is the appropriate standard for evaluating the Ordinance's content- and speaker-based speech restrictions, the Ordinance would fail even the intermediate-scrutiny standard for restrictions on commercial speech.  *See Cent. Hudson Gas & Elec. Corp.* v. *Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 566 (1980).  Specifically, the City cannot show that the prohibition on inquiries into, and reliance on, wage history both "directly" and "materially" advances its interest in eliminating wage disparities caused by gender discrimination.  *Id.*  Rather than *directly* target gender discrimination in employment, the Ordinance targets speech that is, at most, only tenuously and indirectly related to perpetuating possible effects of past discrimination.  Moreover, the City offers "mere speculation or conjecture" that the Ordinance would, in fact, alleviate gender-based wage discrimination.  *Rubin* v. *Coors Brewing Co.*, 514 U.S. 476, 487 (1995).  As even proponents of the Ordinance acknowledged, an applicant's wage history is no more than one factor among many that is used in setting a salary, not all applicants' wages reflect discrimination, and there is no evidence that employers *actually* reduce their salary offers based on applicants' salary history.

40.     The Ordinance also would fail *Central Hudson* review because its speech restrictions are far "more extensive than is necessary to serve [the City's] interest."  447 U.S. at 566.  The same over- and underinclusivity and panoply of less restrictive alternatives that doom the Ordinance under strict scrutiny are also fatal under *Central Hudson*.

41.     The City can and should address gender-based wage discrimination.  But the City's inartfully tailored speech restrictions are a demonstrably poor means and fit for achieving that objective.  The Ordinance's content- and speaker-based restrictions target speech that is only distantly related to the underlying discrimination, and the City can only guess whether its untested measure will advance its antidiscrimination objective.  The Ordinance reflects an unproven predicate that all wage histories, regardless of the occupation, the compensation model, or the identity of the employer (private, public, or even self-employed) reflect unlawful discrimination.  On the City's reasoning, it could just as easily prohibit all inquiries into applicants' prior positions and responsibilities because that employment history also could theoretically reflect the effects of previous gender discrimination.  The Constitution simply does not permit the City to embark on such an uncertain venture when First Amendment freedoms are at stake.  "If the First Amendment means anything, it means that regulating speech must be a last—not first—resort."  *Thompson* v. *W. States Med. Ctr.*, 535 U.S. 357, 373 (2002).

**The Ordinance Violates The Due Process Clause Of The Fourteenth Amendment**

42.     Because a "fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required," due process "requires the invalidation of laws that are impermissibly vague."  *Fox Television Stations, Inc.*, 132 S. Ct. at 2317.  "[R]igorous adherence to [this requirement] is necessary" where the regulation of speech is at issue "to ensure that ambiguity does not chill protected speech."  *Id.*; *see also Reno* v. *ACLU*, 521 U.S. 844, 871-72 (1997) ("The vagueness of [speech regulation] raises special First Amendment concerns because of its obvious chilling effect.").

43.     The Ordinance transgresses these constitutional requirements by failing to define several key terms.  For example, the Ordinance prohibits an employer from relying on an

17

applicant's wage history unless the "applicant knowingly and willingly disclosed his or her wage history to the employer." Phila. Code § 9-1131(2)(a)(ii). The Ordinance does not define the phrase "knowingly and willingly," which leaves employers to guess whether they can safely rely on wage-history information disclosed by a job applicant. If an employer guesses wrong, it will be subject to punitive damages of up to $2,000, *see id.* § 9-1105(d), and even more severe civil and criminal penalties for a repeat offense, *see id.* § 9-1121(2). The Ordinance's ambiguity—coupled with its sizeable sanctions—will impermissibly chill employers from relying on an applicant's wage history, even if the applicant voluntarily disclosed the information and would benefit from the employer's consideration of that history. *See Wollschlaeger* v. *Governor of Fla.*, 848 F.3d 1293, 1319 (11th Cir. 2017) (en banc) (invalidating a Florida statute because its prohibition on "unnecessarily" harassing patients about firearm ownership was "incomprehensibly vague").

44.     Independent of these vagueness concerns, the Ordinance also violates the Due Process Clause of the Fourteenth Amendment because it textually applies beyond Pennsylvania's borders. It is a bedrock principle of due process that a State—let alone a municipality—"may not impose economic sanctions on violators of its laws with the intent of changing . . . lawful conduct in other States." *BMW of N. Am.*, 517 U.S. at 572. When a State or municipality attempts to regulate speech or conduct within another State's lawful jurisdiction, regulated parties are deprived of fair notice that their activities are unlawful. *Id.* at 574.

45.     The Ordinance deprives regulated parties in other States of such fair notice. By its terms, the Ordinance applies to wage-history inquiries by any "employer," which includes "[a]ny person who does business in the City of Philadelphia through employees or who employs one or more employees." Phila. Code § 9-1102(h). Thus, as long as an employer satisfies this

minimal connection to the City, the Ordinance governs that employer's hiring practices—no matter where the employer makes its hiring decisions or where the new employee is located. For example, a number of the Chamber's New Jersey-based members satisfy the Ordinance's definition of "employer" because they do business in the City. Even though it is lawful for private employers in New Jersey to inquire into a prospective applicant's wage history, these employers will be required to comply with the Ordinance wherever they make hiring decisions and will lack fair notice that those decisions—whether made in New Jersey or any other State—could trigger significant sanctions and potential imprisonment under the Ordinance. In fact, the Ordinance applies to companies with *no* permanent employees in the City and to companies who conduct *no* hiring activity within the City—as long as these companies meet the Ordinance's expansive definition of "employer."

**The Ordinance Violates The Commerce Clause**

46.     For similar reasons, the Ordinance's extraterritorial effect violates the Commerce Clause of the United States Constitution. "[A]t a minimum," the Commerce Clause "precludes the application of a state statute to commerce that takes place wholly outside the State's borders" and prohibits "a statute that directly controls commerce occurring wholly outside the boundaries of a State." *Healy*, 491 U.S. at 336 (internal quotation marks and citation omitted). The key inquiry is whether the "practical effect of the regulation"—meaning, the effect that would arise "if not one, but many or every, State adopted similar legislation"—"is to control conduct beyond the boundaries of the State." *Id.*

47.     The Ordinance's extraterritorial effect violates these requirements of the Commerce Clause. As long as an employer employs at least one employee in the City or transacts some minimal amount of business in the City, the Ordinance applies to every hiring

decision by that employer—even where the employer conducts a job interview in another State

for a position located in another State.  Such extraterritorial regulation penalizes speech

"occurring wholly outside the boundaries" of Pennsylvania.  *Healy*, 491 U.S. at 336.  And if

"many or every" State adopted the same legislation, the practical effect would be to burden

interstate commerce by subjecting employers who do business across state lines to multiple

penalties for making a single wage-history inquiry or salary determination.

**The Ordinance Violates The Pennsylvania Constitution And The Home Rule Act**

48.    The Ordinance's extraterritorial effect also violates the Pennsylvania Constitution

and the Home Rule Act.  Under the Pennsylvania Constitution, a municipality with a home rule

charter "may exercise any power or perform any function not denied by this Constitution, by its

home rule charter or by the General Assembly at any time." Art. IX, § 2.  Pennsylvania's Home

Rule Act is the enabling legislation for this constitutional provision.  *City of Philadelphia* v.

*Schweiker*, 858 A.2d 75, 84 (Pa. 2004).  The Home Rule Act, in turn, grants cities "all powers

and authority of local self-government." 53 P.S. § 13131.  However, "[n]o city shall exercise

any powers or authority beyond the city limits except such as are conferred by an act of the

General Assembly." *Id.* § 13133.

49.    The Home Rule Act prohibits a city from exercising its power with respect to

individuals "who neither live nor work in the City," *Devlin* v. *City of Philadelphia*, 862 A.2d

1234, 1248 (Pa. 2004), or conduct that occurs outside the city, *Commonwealth* v. *Ray*, 272 A.2d

275, 278 (Pa. Super. Ct. 1970).

50.    The Ordinance violates both principles by regulating all hiring activity by any

"employer" who does business in the City.  The Ordinance thus would apply even if the

employer is interviewing an applicant who neither lives nor is seeking work in the City, in

contravention of *Devlin*, 862 A.2d at 1248, and even if the hiring decision occurs outside the City, in contravention of *Ray*, 272 A.2d at 278.

## COUNT I
### Declaratory Relief: Violation of the First Amendment as Applied to the States and Their Local Governments Through the Due Process Clause of the Fourteenth Amendment

51.     The Chamber incorporates and realleges each and every allegation contained in Paragraphs 1 through 50 of this Complaint, as though fully set forth herein.

52.     The First Amendment to the United States Constitution provides: "Congress shall make no law . . . abridging the freedom of speech." The First Amendment's free speech guarantees apply to the City as a political subdivision of the Commonwealth of Pennsylvania by incorporation through the Fourteenth Amendment to the United States Constitution.

53.     The Ordinance's prohibitions on inquiring into and relying on a prospective employee's wage history restrict employers' communications with prospective employees and the use of information they possess, cannot be justified under the Supreme Court's free speech jurisprudence, and thus violate the First and Fourteenth Amendments to the United States Constitution, both facially and as applied to the Chamber's members.

54.     The Chamber's members have no adequate remedy at law.

55.     Accordingly, the Chamber respectfully requests that, pursuant to 28 U.S.C. §§ 2201 and 2202, the Court declare that the Ordinance violates the First Amendment, rendering the Ordinance unenforceable.

## COUNT II
### Declaratory Relief: Violation of the Due Process Clause of the Fourteenth Amendment (Vagueness)

56.     The Chamber incorporates and realleges each and every allegation contained in Paragraphs 1 through 55 of this Complaint, as though fully set forth herein.

57.     The Due Process Clause of the Fourteenth Amendment to the United States Constitution prohibits unconstitutionally vague prohibitions.  Such concerns are particularly acute where, as here, the law infringes on free speech and provides for criminal penalties.

58.     The Ordinance relies on the terms "knowingly and willingly," among other key terms.  The Ordinance does not define "knowingly and willingly" or other terms.

59.     The Ordinance's reliance on these vague, undefined terms, and other ambiguous language, to prohibit an "employer" from inquiring into the wage history of a "prospective employee" or relying on that wage history unless it was "knowingly and willingly disclosed" violates the Due Process Clause of the Fourteenth Amendment, as well as the First Amendment, both on its face and as applied to the Chamber's members.

60.     The Chamber's members have no adequate remedy at law.

61.     Accordingly, the Chamber respectfully requests that, pursuant to 28 U.S.C. §§ 2201 and 2202, the Court declare that the Ordinance violates the Due Process Clause of the Fourteenth Amendment, as well as the First Amendment, rendering the Ordinance unenforceable.

## COUNT III
### Declaratory Relief:  Violation of the Due Process Clause of the Fourteenth Amendment (Extraterritoriality)

62.     The Chamber incorporates and realleges each and every allegation contained in Paragraphs 1 through 61 of this Complaint, as though fully set forth herein.

63.     The Due Process Clause of the Fourteenth Amendment to the United States Constitution prohibits States and localities from regulating activity within other States' lawful jurisdiction.  A State or locality may not impose sanctions in order to change conduct in another State that is lawful where it occurred.

64.     The Ordinance's expansive definition of "employer" and lack of a definition of "employee" sweep into its regulatory ambit activity taking place wholly outside Pennsylvania.

65.     The Ordinance's coverage of activity occurring outside Pennsylvania subjects the Chamber's members to the risk of liability for speech that was lawful in the State in which it occurred, as well as the risk of duplicate liability in multiple jurisdictions for the same activity. The Ordinance therefore violates the Due Process Clause of the Fourteenth Amendment both on its face and as applied to the Chamber's members.

66.     The Chamber's members have no adequate remedy at law.

67.     Accordingly, the Chamber respectfully requests that, pursuant to 28 U.S.C. §§ 2201 and 2202, the Court declare that the Ordinance violates the Due Process Clause of the Fourteenth Amendment, rendering the Ordinance unenforceable.

## COUNT IV
### Declaratory Relief:  Violation of the Commerce Clause of the United States Constitution

68.     The Chamber incorporates and realleges each and every allegation contained in Paragraphs 1 through 67 of this Complaint, as though fully set forth herein.

69.     The Commerce Clause of the United States Constitution grants Congress the power "[t]o regulate Commerce . . . among the several States."  Art. I, § 8, cl. 3.  The Commerce Clause preempts state and local laws that discriminate against interstate commerce, burden interstate commerce, or otherwise exceed the limits of state authority.

70.     The Ordinance's expansive definition of "employer" and lack of a definition of "employee" sweep into its regulatory ambit activity taking place wholly outside Pennsylvania.

71.     The Ordinance's coverage of activity occurring outside Pennsylvania subjects the Chamber's members to the risk of liability for speech that was lawful in the State in which it occurred, as well as the risk of duplicate liability in multiple jurisdictions for the same activity.

72.     The Chamber's members have no adequate remedy at law.

73.     Accordingly, the Chamber respectfully requests that, pursuant to 28 U.S.C.

§§ 2201 and 2202, the Court declare that the Ordinance contravenes the Commerce Clause of the

United States Constitution, rendering the Ordinance unenforceable.

## COUNT V
### Declaratory Relief:  Civil Rights Violations Under 42 U.S.C. § 1983

74.     The Chamber incorporates and realleges each and every allegation contained in

Paragraphs 1 through 73 of this Complaint, as though fully set forth herein.

75.     By enacting and threatening to enforce the Ordinance, Defendants have

unlawfully and substantially deprived the Chamber's members of rights, privileges, and

immunities secured by the First and Fourteenth Amendments to the United States Constitution,

the Commerce Clause of the United States Constitution, and 42 U.S.C. § 1983.

76.     Defendants are "persons" under 42 U.S.C. § 1983 who have acted under color of

state law to deprive the Chamber's members of rights, privileges, and immunities secured by the

United States Constitution.

77.     The Chamber's members have no adequate remedy at law.

78.     Accordingly, the Chamber respectfully requests that, pursuant to 28 U.S.C.

§§ 2201 and 2202, the Court declare that the Ordinance deprives the Chamber's members of

their civil rights secured by the First and Fourteenth Amendments to the United States

Constitution, the Commerce Clause of the United States Constitution, and 42 U.S.C. § 1983,

rendering the Ordinance unenforceable.

## COUNT VI
### Declaratory Relief:  Violation of the Pennsylvania Constitution and the Home Rule Act

79.    The Chamber incorporates and realleges each and every allegation contained in Paragraphs 1 through 78 of this Complaint, as though fully set forth herein.

80.    The Home Rule Act prohibits the City from "exercis[ing] any powers or authority beyond the city limits except such as are conferred by an act of the General Assembly."  53 P.S. § 13133.

81.    A violation of the Home Rule Act is a violation of Article IX, § 2 of the Pennsylvania Constitution.

82.    The Ordinance's expansive definition of "employer" and lack of a definition of "employee" sweep into its regulatory ambit activity taking place wholly outside Philadelphia.

83.    The Ordinance's coverage of activity beyond the City limits violates the rights of the Chamber's members to conduct business outside the City free from the regulation of local laws that contravene the Home Rule Act and the Pennsylvania Constitution.

84.    The Chamber's members have no adequate remedy at law.

85.    Accordingly, the Chamber respectfully requests that, pursuant to 28 U.S.C. §§ 2201 and 2202, the Court declare that the Ordinance is invalid under the Pennsylvania Constitution and the Home Rule Act, rendering the Ordinance unenforceable.

## COUNT VII
### Injunctive Relief

86.    The Chamber incorporates and realleges each and every allegation contained in Paragraphs 1 through 85 of this Complaint, as though fully set forth herein.

87.    The Ordinance will cause the Chamber's members immediate injury for which there is no adequate remedy at law because the Ordinance (1) chills the free speech rights of the

Chamber's members, who otherwise would inquire into and rely on prospective applicants' wage history; and (2) forces members to incur compliance costs, such as by retraining staff and developing new policies regarding salary determinations and hiring.

88.     These injuries are a direct result of the Ordinance's prohibitions on inquiring into and relying on the wage history of job applicants, cannot be adequately compensated by money damages, and will be irreparable absent preliminary and permanent injunctive relief. Accordingly, these injuries are redressable by the granting of appropriate injunctive relief preventing Defendants from giving effect to or enforcing the Ordinance.

89.     The balance of harms weighs in favor of injunctive relief because the City cannot "claim an interest in the enforcement of an unconstitutional law." *ACLU* v. *Ashcroft*, 322 F.3d 240, 251 n.11 (3d Cir. 2003) (internal quotation marks and citation omitted), *aff'd*, 542 U.S. 656 (2004). An injunction likewise "is in the public interest because the enforcement of an unconstitutional law vindicates no public interest." *K.A. ex rel. Ayers* v. *Pocono Mountain Sch. Dist.*, 710 F.3d 99, 114 (3d Cir. 2013).

## **PRAYER FOR RELIEF**

Actual controversies have arisen between the parties entitling the Chamber to a declaration and injunctive relief.

WHEREFORE, the Chamber prays that this Court order appropriate relief, including, but not limited to, the following:

1.     Enter a judgment declaring that the Ordinance infringes on the free speech rights of the Chamber's members in violation of the First Amendment of the United States Constitution, as incorporated by the Fourteenth Amendment, and is, therefore, of no force;

2.      Enter a judgment declaring that the Ordinance is unconstitutionally vague in violation of the rights of the Chamber's members under the First and Fourteenth Amendments of the United States Constitution and is, therefore, of no force;

3.      Enter a judgment declaring that the Ordinance's extraterritorial effect on activity and persons outside the Commonwealth of Pennsylvania violates the due process rights of the Chamber's members under the Fourteenth Amendment of the United States Constitution and that the Ordinance is, therefore, of no force;

4.      Enter a judgment declaring that the Ordinance's extraterritorial effect on activity and persons outside the Commonwealth of Pennsylvania violates the Commerce Clause of the United States Constitution and that the Ordinance is, therefore, of no force;

5.      Enter a judgment declaring that the civil rights of the Chamber's members were violated under 42 U.S.C. § 1983;

6.      Enter a judgment declaring that the Ordinance's extraterritorial effect on activity and persons outside the City violates Pennsylvania's Home Rule Act and the Pennsylvania Constitution and that the Ordinance is, therefore, of no force;

7.      Enter a preliminary injunction, pending final resolution of this action, enjoining Defendants from taking any action to enforce the Ordinance;

8.      Enter a permanent injunction enjoining Defendants from taking any action to enforce the Ordinance;

9.      Grant the Chamber an award of reasonable attorney's fees under 42 U.S.C. § 1988;

10.      Grant the Chamber such additional or different relief as it may deem just and proper.

Dated: April 6, 2017

Respectfully submitted,

Marc J. Sonnenfeld (PA Bar #17210)
Franco A. Corrado (PA Bar #91436)
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-5000
Fax: (215) 963-5001
marc.sonnenfeld@morganlewis.com
franco.corrado@morganlewis.com

Miguel A. Estrada*
Amir C. Tayrani*
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 955-8500
Fax: (202) 467-0539
mestrada@gibsondunn.com
atayrani@gibsondunn.com

*Attorneys for Plaintiff The Chamber of Commerce for Greater Philadelphia*

*Applications for admission *pro hac vice* forthcoming