**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| THE CHAMBER OF COMMERCE FOR GREATER PHILADELPHIA, on behalf of its members, | |
| Plaintiff, | Civil Action No. 17-01548 |
| v. | |
| CITY OF PHILADELPHIA and PHILADELPHIA COMMISSION ON HUMAN RELATIONS, | **Oral Argument Requested** |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
MOTION FOR A PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

<u>Page</u>

INTRODUCTION ................................................................................................................. 1

BACKGROUND .................................................................................................................. 3

ARGUMENT ....................................................................................................................... 5

    I.    The Chamber Is Likely To Prevail On The Merits Because The Ordinance
        Is Unconstitutional In Numerous Respects .......................................................... 6

        A.    The Ordinance's Content-Based And Speaker-Based Restrictions
              On Employer Speech Cannot Survive Strict Scrutiny ............................... 6

        B.    The Ordinance's Speech Restrictions Also Fail Intermediate
              Scrutiny. ................................................................................................. 10

              1.    *Central Hudson* Is Inapplicable To The Ordinance ..................... 11

              2.    The Ordinance Is Unconstitutional Under *Central Hudson* ......... 12

        C.    The Ordinance Is Unconstitutionally Vague ............................................... 19

        D.    The Ordinance's Extraterritorial Effect Violates The U.S.
              Constitution And Pennsylvania Law ......................................................... 20

        E.    Striking Down The Ordinance Will Not Call Into Question Other
              Laws ......................................................................................................... 22

    II.    The Remaining Factors Weigh Overwhelmingly In Favor Of An
        Injunction ........................................................................................................... 23

CONCLUSION .................................................................................................................. 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACLU* v. *Ashcroft*,
    322 F.3d 240 (3d Cir. 2003)....................................................................................24

*ACLU* v. *Reno*,
    217 F.3d 162 (3d Cir. 2000)....................................................................................24

*Ashcroft* v. *ACLU*,
    542 U.S. 656 (2004)...............................................................................................10

*BMW of N. Am., Inc.* v. *Gore*,
    517 U.S. 559 (1996)..........................................................................................20, 21

*Brown* v. *Entm't Merchs. Ass'n*,
    564 U.S. 786 (2011)...............................................................................................10

*Cent. Hudson Gas & Elec. Corp.* v. *Pub. Serv. Comm'n of N.Y.*,
    447 U.S. 557 (1980)..........................................................................10, 11, 12, 19

*Devlin* v. *City of Philadelphia*,
    862 A.2d 1234 (Pa. 2004).......................................................................................22

*Dunagin* v. *City of Oxford*,
    718 F.2d 738 (5th Cir. 1983) .................................................................................13

*Edenfield* v. *Fane*,
    507 U.S. 761 (1993)......................................................................................13, 15, 17

*Elrod* v. *Burns*,
    427 U.S. 347 (1976)...............................................................................................23

*FCC* v. *Fox Television Stations, Inc.*,
    132 S. Ct. 2307 (2012)...........................................................................................19

*Harris* v. *Quinn*,
    134 S. Ct. 2618 (2014)...........................................................................................11

*B.H. ex rel. Hawk* v. *Easton Area Sch. Dist.*,
    725 F.3d 293 (3d Cir. 2013)...................................................................................23

*Healy* v. *Beer Inst.*,
    491 U.S. 324 (1989)...............................................................................................21

*Holder* v. *Humanitarian Law Project*,
    561 U.S. 1 (2010)....................................................................................................8

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Hoxworth* v. *Blinder, Robinson & Co.*,
   903 F.2d 186 (3d Cir. 1990)......................................................................................24

*Hunt* v. *Wash. State Apple Advert. Comm'n*,
   432 U.S. 333 (1977)..................................................................................................6

*IMDB.com, Inc.* v. *Becerra*,
   No. 3:16-cv-06535-VC (N.D. Cal. Feb. 22, 2017) ................................................10

*Katt* v. *Dykhouse*,
   983 F.2d 690 (6th Cir. 1992) ..................................................................................13

*King* v. *Governor of N.J.*,
   767 F.3d 216 (3d Cir. 2014)...............................................................................11, 15

*Kouba* v. *Allstate Ins. Co.*,
   691 F.2d 873 (9th Cir. 1982) ..................................................................................17

*Linmark Assocs.* v. *Willingboro*,
   431 U.S. 85 (1977)....................................................................................................7

*Lorillard Tobacco Co.* v. *Reilly*,
   533 U.S. 525 (2001)................................................................................................18

*Miller* v. *Mitchell*,
   598 F.3d 139 (3d Cir. 2010)...................................................................................24

*Pitt News* v. *Pappert*,
   379 F.3d 96 (3d Cir. 2004)................................................................................17, 18

*Pittsburgh Press Co.* v. *Pittsburgh Comm'n on Human Relations*,
   413 U.S. 376 (1973)................................................................................................12

*R.A.V.* v. *City of St. Paul*,
   505 U.S. 377 (1992).......................................................................................8, 11, 12

*Reed* v. *Town of Gilbert*,
   135 S. Ct. 2218 (2015).....................................................................................6, 8, 11

*Rhode Island* v. *Innis*,
   446 U.S. 291 (1980)................................................................................................20

*Rubin* v. *Coors Brewing Co.*,
   514 U.S. 476 (1995)................................................................................................17

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Seattle Times Co.* v. *Rhinehart*,
   467 U.S. 20 (1984) ................................................................................................7

*Sorrell* v. *IMS Health, Inc.*,
   564 U.S. 552 (2011) ...........................................................................7, 8, 10, 18, 19

*Stilp* v. *Contino*,
   613 F.3d 405 (3d Cir. 2010) ..............................................................................6

*Swartzwelder* v. *McNeilly*,
   297 F.3d 228 (3d Cir. 2002) ..............................................................................24

*Thompson* v. *W. States Med. Ctr.*,
   535 U.S. 357 (2002) ....................................................................................13, 14

*U.S. Healthcare, Inc.* v. *Blue Cross of Greater Phila.*,
   898 F.2d 914 (3d Cir. 1990) ..............................................................................11

*United States* v. *United Foods, Inc.*,
   533 U.S. 405 (2001) ..........................................................................................11

*Va. State Bd. of Pharm.* v. *Va. Citizens Consumer Council, Inc.*,
   425 U.S. 748 (1976) ..........................................................................................11

*Wernsing* v. *Dep't of Human Servs.*,
   427 F.3d 466 (7th Cir. 2005) ............................................................................16

*Wollschlaeger* v. *Governor of Fla.*,
   848 F.3d 1293 (11th Cir. 2017) ..........................................................7, 15, 18, 20

*Zauderer* v. *Office of Disciplinary Counsel*,
   471 U.S. 626 (1985) ..........................................................................................11

**Federal Statutes**

29 U.S.C. § 206 ........................................................................................................17

29 U.S.C. § 623 ........................................................................................................22

42 U.S.C. § 2000e ....................................................................................................22

42 U.S.C. § 2000e-2 ................................................................................................22

42 U.S.C. § 12112 ....................................................................................................22

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

**Federal Regulations**

29 C.F.R. § 1604.7 .......................................................................................22

**State Constitutional Provisions**

Penn. Const. art. IX, § 2 ..............................................................................21

**State Statutes**

Colo. Rev. Stat. § 8-2-126 ...........................................................................23

Md. Code Ann., Lab. & Empl. § 3-711 ........................................................23

53 Pa. Stat. § 13133 .....................................................................................22

**Local Ordinances**

Phila. Code § 9-1101 ......................................................................................4

Phila. Code § 9-1102 ...............................................................................5, 20

Phila. Code § 9-1103 ....................................................................................22

Phila. Code § 9-1105 ...............................................................................5, 23

Phila. Code § 9-1121 ...............................................................................5, 23

Phila. Code § 9-1130 ....................................................................................23

Phila. Code § 9-1131 ...............................................................4, 5, 7, 9, 16, 20

Phila. Code § 9-3504 ....................................................................................23

Phila. Code § 9-3505 ....................................................................................23

**Other Authorities**

Council of the City of Phila., Comm. on Law & Gov't
    Hr'g Tr. (Nov. 22, 2016), available at http://bit.ly/2kOuRPp..............3, 4, 9, 14, 16

## INTRODUCTION

A job applicant's wage history has long been an essential tool in the hiring process. Wage history helps employers identify applicants they cannot afford, evaluate the market for comparable positions, and, in some cases, formulate appropriate salary offers.  Until now, asking about and relying on wage history have been almost universally viewed as legitimate employer practices—so much so that reliance on an applicant's wage history is ordinarily treated as an affirmative defense under federal equal-pay laws.  In a recently enacted Ordinance, however, the City of Philadelphia ("City") has staked out a different position.  According to the City, wage history should play no part in salary decisions because it only perpetuates gender-based wage disparities.  Based on that supposition—for which the City cites zero empirical evidence or even reliable anecdotal support—the City has enacted a sweeping Ordinance that prohibits employers from asking about an applicant's wage history and from basing salary decisions on that history unless it is "knowingly and willingly" disclosed.  *See* Ex. A.  In effect, the City has asserted the authority to restrict any speech that it believes could conceivably perpetuate the effects of past discrimination; on that radical and unconstitutional theory, employers could equally be barred from asking applicants about previous job positions and responsibilities entirely.

Plaintiff Chamber of Commerce for Greater Philadelphia (the "Chamber")—like its members—abhors discrimination in any form, and is strongly committed to eliminating artificial barriers to the professional advancement of women.  The Chamber also fully supports equitable pay for women and recognizes the City's unquestionably significant interest in eliminating pay disparities attributable to gender discrimination.  In fact, the Chamber actively participated in the legislative process that led to the Ordinance's enactment and proposed alternatives that would meaningfully address such disparities.  As enacted, however, the Ordinance does not advance the City's interest in remedying gender discrimination; instead, it sacrifices important freedoms to

haphazardly target pay disparities caused by non-discriminatory factors—such as differences in training, skill, and experience—and significantly intrudes on the constitutional rights of Philadelphia employers. Because the Ordinance will have no perceptible effect on gender-based pay discrimination and will substantially impair Philadelphia employers' legitimate business practices, the Chamber seeks a preliminary injunction to prevent enforcement of the Ordinance.

The requirements for a preliminary injunction are plainly met here. Most importantly, the Chamber is likely to succeed on the merits because the Ordinance has serious constitutional flaws. *First*, the Ordinance violates employers' First Amendment rights. Its content- and speaker-based speech restrictions are subject to strict scrutiny, which they cannot conceivably meet. There simply is no substantial basis for prohibiting wage-history inquiries and reliance when the applicant is, for example, a high-level executive who must be lured away from her current employer, a partner in a law firm with a lock-step compensation structure, or a man whose salary (on the City's own theory) reflects the non-discriminatory top of the wage "gap" that the City seeks to "close." The Ordinance fares no better even if intermediate scrutiny applies because, among other reasons, it indirectly targets discriminatory wage disparities without any evidence that its speech restrictions will actually ameliorate those disparities, much less materially so. *Second*, the Ordinance is unconstitutionally vague because it does not clearly define when an employer can safely rely on wage-history information "knowingly and willingly" disclosed by an applicant. And *third*, the Ordinance regulates hiring decisions that occur outside the City (and, indeed, Pennsylvania) in violation of the U.S. Constitution and Pennsylvania law.

The loss of First Amendment rights for even a short time is irreparable injury. Absent an injunction, the Chamber's members thus will suffer irreparable harm because their protected speech will be chilled by the threat of onerous sanctions for violating the Ordinance's ill-defined

2

prohibitions.  Moreover, the balance of harms and the public interest weigh decisively in favor of vindicating employers' First Amendment rights and preventing the City from transgressing the constitutional and statutory limits on its authority.  The Chamber and its members strongly support the City's objective of eliminating wage disparities caused by gender discrimination. But the Ordinance's speech restrictions sweep far too broadly and combat discrimination far too indirectly to achieve the City's remedial objective.  A preliminary injunction is warranted.

## BACKGROUND

**I.**      On November 22, 2016, the City's Committee on Law and Government held a hearing on a proposed bill that would ultimately become the Ordinance.  Although the Chamber has a longstanding commitment to gender wage equality, it opposed the proposal, testifying that the Ordinance's effect was "unknown" and warning that its severe penalties could force small businesses to close.  Ex. B at 2.  The Chamber explained that wage history gives employers "a better understanding of whether a candidate is worth pursuing" and helps employers ascertain "the market value or salaries for comparable positions."  *Id.* at 1.

The Ordinance's supporters acknowledged that it would not solve the problem of gender-based wage inequities, Council of the City of Phila., Comm. on Law & Gov't, Hr'g Tr. 13, 35 (Nov. 22, 2016) ("Hr'g Tr."), available at http://bit.ly/2kOuRPp, but merely "ha[d] the potential to help close the gender gap," *id.* at 11.  Consistent with this testimony, several supporters conceded that not all previous wages reflect discrimination.  Supporters treated the salaries of white males, for example, as the baseline market rate, *see*, *e.g.*, *id.* at 71—the benchmark for the "gap" that they desired to "close"—and there was no testimony that those salaries reflect gender discrimination.  Witnesses further agreed that "compensation decisions are based on a number of different factors, such as market value, internal equity, funding limitations and competition."  Ex.

3

B at 1; *see also* Hr'g Tr. 30, 49.  Although Committee members and the Ordinance's supporters worried that employers might lower a salary offer based on an applicant's wage history, *see*, *e.g.*, Hr'g Tr. 7-8, 35, 39, no witness provided any statistics, studies, or even anecdotes to substantiate this presumed practice.

During the legislative process, the Chamber proposed two alternative measures to narrow the gender wage gap without restricting employers' speech.  In written testimony, the Chamber described its success in conducting a self-evaluation to ensure that its employees receive fair market wages and recommended that the City encourage other employers to do the same.  Ex. B at 2.  And before the Ordinance was signed into law, the Chamber offered an amendment that would have allowed wage-history inquiries but barred employers from relying solely on that history to make a salary determination.

II.    Notwithstanding the equivocal legislative record, the City enacted the Ordinance and, in so doing, rejected both of the Chamber's alternative proposals without explanation.  The Ordinance, which will take effect on May 23, 2017, amends the City's "Fair Practices Ordinance: Protections Against Unlawful Discrimination," Phila. Code § 9-1101 *et seq*.

The Ordinance relies on the City Council's "[f]indings" that women in Pennsylvania "are paid 79 cents for every dollar a man makes"; "[s]ince women are paid on average lower wages than men, basing wages upon a worker's wage at a previous job only serves to perpetuate gender wage inequalities"; and "[s]alary offers should be based upon the job responsibilities of the position sought and not based upon the [applicant's] prior wages."  Phila. Code §§ 9-1131(1)(a), (d), (e).  No empirical studies or even anecdotal evidence is cited in support of these "findings."

On the basis of these unsubstantiated findings, the Ordinance establishes two new prohibitions.  *First*, an employer may not "inquire about a prospective employee's wage history,

require disclosure of wage history, or condition employment or consideration for an interview or employment on disclosure of wage history." Phila. Code § 9-1131(2)(a)(i). To "inquire" is defined as "to ask a job applicant in writing or otherwise." *Id.* § 9-1131(2)(c). *Second*, an employer may not "rely on the wage history of a prospective employee . . . in determining the wages for such individual" unless the applicant "knowingly and willingly disclosed" that history to the employer. *Id.* § 9-1131(2)(a)(ii). The phrase "knowingly and willingly disclosed" is not defined. These prohibitions apply to any "employer"—*i.e.*, "[a]ny person who does business in the City . . . through employees" or "employs one or more employees" in the City—and, by their terms, are not limited to hiring activity in the City. *Id.* § 9-1102(h).[1] Employers who violate the Ordinance face significant penalties, including compensatory damages, *id.* § 9-1105(1)(c), punitive damages of up to $2,000 per violation, *id.* § 9-1105(1)(d), and—for a repeat offense— an additional fine of up to $2,000 and imprisonment for up to 90 days, "or both," *id.* § 9-1121(2).

## ARGUMENT

The Court should enjoin enforcement of the Ordinance because it would severely burden the constitutional rights of the Chamber's members without meaningfully advancing the City's interest in eliminating wage disparities caused by gender discrimination. Each requirement for a preliminary injunction is met here: The Chamber is likely to succeed on the merits because the Ordinance violates the First Amendment, due process, the Commerce Clause, and Pennsylvania law; absent an injunction, the Chamber's members will be irreparably harmed by the deprivation

---

[1] The Ordinance's prohibitions also apply to any "employment agency." For simplicity, the Chamber refers to the objects of the Ordinance's prohibitions collectively as "employers."

of their constitutional rights; and neither the City nor the public has an interest in enforcing this unconstitutional measure.  *See Stilp* v. *Contino*, 613 F.3d 405, 409 (3d Cir. 2010).[2]

## I.    THE CHAMBER IS LIKELY TO PREVAIL ON THE MERITS BECAUSE THE ORDINANCE IS UNCONSTITUTIONAL IN NUMEROUS RESPECTS.

For multiple reasons, the Chamber is likely to prevail on the merits of its challenges. *First*, the Ordinance violates the First Amendment by prohibiting employers from inquiring about, or relying on, an individual's wage history and thereby communicating the message that wage history is important to the job-application process.  The Ordinance's content-based and speaker-based provisions plainly cannot withstand First Amendment scrutiny because, among other flaws, they restrict far more speech than necessary to serve the City's interests.  *Second*, the Ordinance is unconstitutionally vague because it does not provide fair notice of when an employer can safely rely on an applicant's disclosure of wage-history information.  And *third*, the Ordinance's extraterritorial reach beyond the bounds of the City and Commonwealth violates due process, the Commerce Clause, and Pennsylvania law.

### A.    The Ordinance's Content-Based And Speaker-Based Restrictions On Employer Speech Cannot Survive Strict Scrutiny.

The Ordinance imposes content-based and speaker-based restrictions on employer speech that are "presumptively unconstitutional" and can be upheld only if they satisfy strict scrutiny. *Reed* v. *Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015).  Application of that most demanding standard of First Amendment scrutiny is fatal here.

---

[2]  The Chamber has associational standing:  Its membership includes Philadelphia employers who individually have standing because they are directly subject to the Ordinance; the interests the Chamber seeks to vindicate are germane to its organizational interests; and neither the claims asserted nor the declaratory and injunctive relief requested requires the participation of the Chamber's individual members.  *See Hunt* v. *Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *see also* Decl. of Robert C. Wonderling (attached as Ex. C).

1.    The Ordinance restricts speech in two ways:  employers cannot "inquire about" wage history with the applicant, Phila. Code §§ 9-1131(2)(a)(i), (2)(c), and they cannot "rely on" wage history "in determining . . . wages" unless that history is "knowingly and willingly disclosed" by the applicant, *id.* § 9-1131(2)(a)(ii).  Both prohibitions burden speech because they "restrict [the] ability to communicate and/or convey a message."  *Wollschlaeger* v. *Governor of Fla.*, 848 F.3d 1293, 1307 (11th Cir. 2017) (en banc) (holding that a law "expressly limit[ing]" doctors' ability to inquire about and use a patient's firearm ownership information restricted speech).  The inquiry provision is an outright prohibition on employer speech that "act[s] to prevent [employers] from obtaining [wage history] information."  *Linmark Assocs.* v. *Willingboro*, 431 U.S. 85, 96 (1977).  And even if employers succeed in obtaining that information from another source, they are prohibited from *using* that information in communicating their salary expectations to the applicant, which is itself protected speech.  By imposing "'restraints on the way in which the information might be used' or disseminated," the reliance provision squarely "implicate[s]" employers' "right to speak."  *Sorrell* v. *IMS Health, Inc.*, 564 U.S. 552, 568 (2011) (quoting *Seattle Times Co.* v. *Rhinehart*, 467 U.S. 20, 32 (1984)).

These content- and speaker-based restrictions prohibit employers—and employers alone—from communicating a disfavored message.  Employers can disseminate the City's message that "[s]alary offers should . . . not [be] based upon the [applicant's] prior wages," Phila. Code § 9-1131(e), but they cannot communicate the message that "your prior salary is important to see if we are a good fit for each other" by inquiring into an applicant's wage history.  And while reliance on wage history in determining a salary is permitted if *applicants* communicate this message by volunteering their wage history, *id.* § 9-1131(2)(a)(ii), reliance is prohibited if the employer seeks to communicate the same message in the absence of such a

voluntary disclosure.  In fact, anyone other than a prospective employer—including financial institutions processing a loan application, apartment leasing offices evaluating a rental application, and unemployment agencies setting the amount of unemployment benefits—can inquire about and rely on an individual's salary history.  Thus, like the pharmaceutical marketers in *Sorrell*, who alone were prohibited from obtaining and using prescriber-identifying information (absent the prescriber's consent), *see* 564 U.S. at 559, 564, employers are uniquely prohibited from inquiring about and using an applicant's wage history for salary purposes (absent the applicant's consent).[3]

    **2.**    Because the Ordinance's speech restrictions are content-based and speaker-based, they can be upheld only if they satisfy strict scrutiny, which requires that they be "narrowly tailored to serve [a] compelling state interest[]."  *Reed*, 135 S. Ct. at 2226.  Even assuming that the City has a compelling interest in remedying gender-based pay disparities *caused by discrimination*, the Ordinance plainly is not narrowly tailored to serve that interest.[4]

    *First*, the Ordinance prohibits wage-history inquiries and reliance even where neither activity could possibly perpetuate gender-based wage discrimination.  When an employer seeks

---

[3]  For that reason, even if the reliance provision is viewed in isolation as regulating conduct, it still would impair employers' First Amendment rights by using content- and speaker-based restrictions to target conduct that is wholly derivative of expressive activity (communicating with others to learn the applicant's wage history) and that, in any event, independently communicates a message about the importance of wage history to the job-application process.  The First Amendment is squarely implicated where "the conduct triggering [liability] consists of communicating a message."  *Holder* v. *Humanitarian Law Project*, 561 U.S. 1, 28 (2010); *see also R.A.V.* v. *City of St. Paul*, 505 U.S. 377, 386 (1992) ("The government may not regulate use based on hostility—or favoritism—towards the underlying message expressed.").

[4]  Although the City also asserts an interest in alleviating poverty, that interest is ultimately no different from the City's anti-discrimination interest because the City aims to alleviate poverty solely by reducing gender wage disparities.  Moreover, the Ordinance is not narrowly tailored to alleviating poverty because, for example, prohibiting inquiries into, and reliance on, the prior wages of applicants with a history of high-paying jobs does not remotely further that interest.

to lure a high-level executive away from her current employer by offering a premium on her current salary, for example, or when the applicant's salary is based on a lock-step compensation system, there is no substantial basis for assuming that wage-history inquiries or reliance would perpetuate gender discrimination. Giving the most charitable reading to the legislative record, moreover, the wages of women are, at most, only "likely" to reflect inequities due to discrimination, Hr'g Tr. 67, which means that the wages of a significant number of women reflect no gender disparity at all or, at most, a disparity caused by gender-neutral factors—such as experience, training, and hours worked. And on the City's own theory, the salaries of male employees are not tainted by gender discrimination at all, but instead establish the baseline rate for measuring the "wage gap" that the City hopes to close. *See, e.g.*, Phila. Code § 9-1131(1)(a) (comparing wages of women and minorities to "every dollar a [white] man makes"). Accordingly, with respect to a sizeable plurality (if not majority) of the workforce, the Ordinance does not serve the City's interest in eliminating *discriminatory* pay disparities. The inquiry provision likewise fails to serve that interest when the employer intends to use wage history for non-salary purposes, such as to identify unaffordable applicants or evaluate the market for comparable positions.

*Second*, in addition to being vastly overinclusive, the Ordinance is severely underinclusive because it *permits* employers to rely on wage history that has been "knowingly and willingly disclosed," Phila. Code § 9-1131(2)(a)(ii)—even where doing so would perpetuate discriminatory wage disparities. Even crediting the City's theory that female applicants' wages reflect past discrimination, the record provides no basis for concluding that voluntarily disclosed wage history is somehow less likely to reflect gender discrimination. The Ordinance is therefore drawn both too broadly and too narrowly to achieve its asserted objectives. *See Brown* v. *Entm't*

9

*Merchs. Ass'n*, 564 U.S. 786, 802-04 (2011) (striking down a statute prohibiting the sale of violent video games to minors that was "seriously underinclusive" in protecting minors because it permitted such sales if the parent consented, and was "vastly overinclusive" in aiding parental authority because it prohibited such sales even if parents did not care about the sale).

*Finally*, the City cannot "expla[in] why remedies other than content-based rules would be inadequate," *Sorrell*, 564 U.S. at 575, or demonstrate that the Ordinance is the "least restrictive means" of achieving the City's interests, *Ashcroft* v. *ACLU*, 542 U.S. 656, 666 (2004). One content-neutral alternative, successfully undertaken by the Chamber, would be to encourage employers to conduct self-evaluations to ensure their employees receive a fair market wage. Ex. B at 2. The City also could provide more training for women to improve on-the-job skills and outcomes in the application process, or more aggressively enforce existing equal-pay laws. *See*, *e.g.*, *IMDB.com, Inc.* v. *Becerra*, No. 3:16-cv-06535-VC, Dkt. 54, at 2 (N.D. Cal. Feb. 22, 2017) (preliminarily enjoining a law prohibiting a website from publishing actors' birthdates because "the government fail[ed] to explain why more vigorous enforcement of [anti-discrimination] laws would not be at least as effective"). And even if the City retained the Ordinance's general framework, it could adopt a less restrictive alternative by, for example, permitting wage-history inquiries while prohibiting employers from relying solely on wage history (as opposed to other neutral factors) to justify a wage differential. For all of these reasons, the Ordinance does not come close to satisfying the exacting requirements of strict scrutiny.

**B.      The Ordinance's Speech Restrictions Also Fail Intermediate Scrutiny.**

The City will likely argue that the Ordinance should be examined, instead, under *Central Hudson*'s intermediate-scrutiny test for restrictions on commercial speech. *Cent. Hudson Gas & Elec. Corp.* v. *Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 566 (1980). The *Central Hudson*

framework does not apply to the Ordinance; but, even if it did, the Ordinance would still violate the First Amendment because it is supported only by speculation, rather than concrete evidence and analysis, and is insufficiently tailored.

### 1.    *Central Hudson* Is Inapplicable To The Ordinance.

For at least two reasons, the Ordinance must meet strict scrutiny, rather than be examined under *Central Hudson*'s standard for commercial speech. *First*, wage-history inquiries are not "commercial speech." Commercial speech is *advertising*, *i.e.*, "speech that does no more than propose a commercial transaction." *Harris* v. *Quinn*, 134 S. Ct. 2618, 2639 (2014) (quoting *United States* v. *United Foods, Inc.*, 533 U.S. 405, 409 (2001)). The commercial-speech doctrine thus distinguishes between "speech proposing a commercial transaction" and all "other varieties of speech." *U.S. Healthcare, Inc.* v. *Blue Cross of Greater Phila.*, 898 F.2d 914, 933 (3d Cir. 1990) (quoting *Zauderer* v. *Office of Disciplinary Counsel*, 471 U.S. 626, 637 (1985)). Wage-history inquiries and reliance do not advertise anything, let alone propose a commercial transaction. Because inquiring about information *related* to a commercial transaction simply is not a case of "'I will sell you . . . X . . . at the Y price,'" it is not commercial speech. *Va. State Bd. of Pharm.* v. *Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 761 (1976).

*Second*, even if the Ordinance restricted commercial speech, strict scrutiny still would apply because "content-based regulations are . . . subjected to strict scrutiny . . . even when the law in question regulates . . . lesser protected speech." *King* v. *Governor of N.J.*, 767 F.3d 216, 236 (3d Cir. 2014); *see also Reed*, 135 S. Ct. at 2226 (requiring strict scrutiny for laws "that target speech based on its communicative content"). Intermediate scrutiny applies to content-based restrictions of commercial speech only where "the basis for the content discrimination consists entirely of the very reason the entire class of speech at issue is proscribable." *King*, 767 F.3d at 236 (quoting *R.A.V.*, 505 U.S. at 388). Commercial speech is proscribable because of its

"risk of fraud," *R.A.V.*, 505 U.S. at 388, and protected because of its "informational function," *Cent. Hudson*, 447 U.S. at 563. Yet the Ordinance *proscribes* wage-history inquiries because they might inform employers and *protects* applicants who might mislead employers by not revealing the market value of their labor. By turning the commercial-speech doctrine on its head, the Ordinance eviscerates "the First Amendment['s] presum[ption] that some accurate information is better than no[ne]." *Cent. Hudson*, 447 U.S. at 562. Strict scrutiny thus applies.

### 2.  The Ordinance Is Unconstitutional Under *Central Hudson*.

In any event, the Ordinance fails *Central Hudson* scrutiny. Because the speech restricted by the Ordinance (1) concerns lawful conduct and is non-misleading, the City must show that its restrictions (2) further a substantial government interest, (3) directly and materially advance that interest, and (4) are "not more extensive than is necessary to serve that interest." *Cent. Hudson*, 447 U.S. at 566. The City cannot meet its burden on the third and fourth elements of *Central Hudson* for many of the same reasons that the Ordinance fails strict scrutiny.

### a.  Wage History Concerns Lawful Activity And Is Not Misleading.

Wage-history inquiries and reliance undisputedly are not misleading. And while the City can prohibit commercial speech about a commercial transaction "when the commercial activity itself is illegal," *Pittsburgh Press Co.* v. *Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 389 (1973), hiring employees obviously is not illegal in Philadelphia.

Wage-history inquiries do not pertain to an unlawful activity simply because the Ordinance bars employers from using wage history to make a salary offer. Were that the case, the City could censor commercial speech at will simply by declaring the discussion of certain subjects "illegal." The "proper inquiry . . . is whether the *underlying* commercial transaction is lawful"—*i.e.*, entering into an employment agreement with an applicant—not whether the City

12

has outlawed one step in the process that precedes the transaction. *Katt* v. *Dykhouse*, 983 F.2d 690, 697 (6th Cir. 1992). Regardless, that information *might* be used for an unlawful purpose does not warrant prohibiting inquiries made for all other purposes. *See Dunagin* v. *City of Oxford*, 718 F.2d 738, 743 (5th Cir. 1983) (en banc) ("The commercial speech doctrine would disappear if its protection ceased whenever the advertised product might be used illegally. Peanut butter advertising cannot be banned just because someone might someday throw a jar at the presidential motorcade."). Thus, if the *Central Hudson* framework applies here, the City must show that the Ordinance satisfies each element of *Central Hudson*.

### b.    The City's Anti-Discrimination Interest Is Substantial.

The Chamber acknowledges the City's substantial interest in reducing discriminatory wage disparities and fully supports measures—such as equal-pay laws—that advance that objective.[5] The City's substantial interest in reducing wage disparities *caused by discrimination* does not extend, however, to eliminating disparities caused by legitimate factors such as seniority, training, experience, or quality of work. Those legitimate distinctions among employees are essential in an economy where the market, not the government, sets salaries.

### c.    The Ordinance's Speech Restrictions Do Not Directly And Materially Advance The City's Interests.

To satisfy *Central Hudson*'s third element, the City must show that the Ordinance advances its interests "in a direct and material way." *Edenfield* v. *Fane*, 507 U.S. 761, 767 (1993). The City cannot make either showing.

---

[5]  Unlike with rational basis review, a court applying the *Central Hudson* test (or strict scrutiny) cannot "sustain[] statutes on the basis of hypothesized justifications" and can rely only on the government's asserted interests. *Thompson* v. *W. States Med. Ctr.*, 535 U.S. 357, 373 (2002).

i.      It is a fundamental First Amendment principle that the government cannot
"achieve its policy objectives through the indirect means of restraining certain speech by certain
speakers." *Sorrell*, 564 U.S. at 577.  Yet, the Ordinance does just that.  As the legislative record
makes clear, the City enacted the Ordinance not to prevent employers from discriminating in
making salary offers, but to reduce the alleged effects of *previous* discrimination.  Employers'
speech inquiring into, and relying on, wage history is only remotely and indirectly related to that
aim.  As Councilman Oh explained, the Ordinance would not "very much narrow the disparity
between equal workers who are being discriminated [against] . . . .  and I [say] that from the
experience of being an employer for 18 years."  Hr'g Tr. 26.

*Sorrell* lays bare the deficiencies in the City's roundabout approach to remedying
discriminatory wage disparities.  There, Vermont enacted a measure that barred pharmacies from
marketing prescriber-identifying information to pharmaceutical manufacturers and barred
manufacturers from using that information when marketing their products to doctors because it
worried that the manufacturers might "influence prescription decisions" and thereby jeopardize
public health.  *Sorrell*, 564 U.S. at 577.  The Supreme Court struck down the Vermont law,
reasoning that "the 'fear that people would make bad decisions if given truthful information[]'
cannot justify content-based burdens on speech."  *Id.* (quoting *Thompson*, 535 U.S. at 374).  So
too here: the City cannot restrict employers' constitutionally protected speech merely because it
fears that female applicants' previous salaries *might* be depressed by the effects of discrimination
and that employers *might* inadvertently perpetuate that discrimination by relying in part on wage
history.

In the City's view, the possibility of gender-based wage discrimination justifies
restricting any speech that could conceivably perpetuate that discrimination.  But on that

reasoning, the City could prohibit inquiries into previous job positions and responsibilities entirely because that information, too, presumably could reflect the effects of gender discrimination.  The City "may generally believe that [employers] should not ask about" wage history, "but it 'may not burden the speech of others in order to'" further its policy preferences. *Wollschlaeger*, 848 F.3d at 1313-14 (quoting *Sorrell* 564 U.S. at 578-79).  In short, the City has failed to "advance [its interests] in a permissible way."  *Sorrell*, 564 U.S. at 577.

      **ii.**      The City is also unable to satisfy the third element of *Central Hudson* because it has failed to show that the Ordinance "will *in fact* alleviate [the asserted harms] to a material degree."  *Edenfield*, 507 U.S. at 770-71 (emphasis added).  "[M]ere speculation or conjecture" is not enough, the Supreme Court has cautioned, lest government "eas[ily] restrict commercial speech in the service of other objectives" that could not justify the restriction.  *Id.*

      Although the City need not adduce "conclusive empirical evidence" to satisfy its First Amendment burden, *King*, 767 F.3d at 238-39, it must cite at least *some* concrete evidence, *see Edenfield*, 507 U.S. at 771-72 (striking down a ban on in-person CPA solicitation because the State had adduced only "conclusory statements" that such solicitation actually results in fraud, overreach, or compromised independence).  The en banc Eleventh Circuit recently struck down a law for precisely this reason:  In restricting doctors' ability to inquire about or rely on a patient's firearm ownership information, the Florida legislature had relied on "six anecdotes and nothing more.  There was no other evidence, empirical or otherwise, presented to or cited by the Florida Legislature."  *Wollschlaeger*, 848 F.3d at 1312.  If six anecdotes are not enough, then *a fortiori* the total absence of anecdotal or any other evidence presented by the City fatally undermines the Ordinance.

In fact, neither the Ordinance nor its legislative history identifies *any* studies, reports, or anecdotes indicating that the Ordinance will alleviate discriminatory wage disparities, which should come as no surprise because the Ordinance makes no attempt to curb the discrimination that the City believes may explain such disparities.  Witnesses were thus compelled to concede that the Ordinance would not solve gender-based wage inequities, Hr'g Tr. 13, 35, but had, at most, merely "*the potential* to help close the gender gap," *id.* at 11 (emphasis added), or to make it so that women "will *maybe* be able to get a higher salary," *id.* at 56 (emphasis added).  Even those forecasts are speculative.  There is no finding on how often Philadelphia employers rely on wage history to set salaries, or, more importantly, to what extent (if any) that practice perpetuates discriminatory wage disparities.  Nor is there any empirical evidence or even anecdotes that employers actually rely on wage history to reduce a salary below what they otherwise would offer; one witness's *conjecture* on this point is insufficient.  *See id.* at 39.  And if that practice does in fact occur, it can continue any time an applicant volunteers her wage history.  *See* Phila. Code § 9-1131(2)(a)(ii).  Thus, it is anybody's guess how much the Ordinance will reduce discriminatory wage disparities (if at all).

The City Council found that relying on wage history "only serves to perpetuate gender wage inequalities."  Phila. Code § 9-1131(1)(d).  But no evidence supports that finding.  That women's wages are "on average" lower than men's does not mean that any particular disparity between employees was caused by discrimination rather than legitimate factors such as education, training, hours worked, or years of experience.  In fact, courts have repeatedly rejected this assumption of discrimination in concluding that wage history is a legitimate "factor other than sex" under the Equal Pay Act and hence a permissible basis for salary differentials. 29 U.S.C. § 206(d)(1)(iv); *see also*, *e.g.*, *Wernsing* v. *Dep't of Human Servs.*, 427 F.3d 466, 470

(7th Cir. 2005); *Kouba* v. *Allstate Ins. Co.*, 691 F.2d 873, 876 (9th Cir. 1982). If the City

disagrees with these courts' assessments and seeks to override an affirmative defense under

federal law, it needs to offer concrete evidence, not merely its own *ipse dixit*. It has not done so.

Courts have not hesitated to strike down well-intentioned laws that were likewise

supported by nothing more than speculation and conjecture. In *Rubin* v. *Coors Brewing Co.*, 514

U.S. 476 (1995), for example, the Supreme Court rejected the government's reliance on

"common sense," "anecdotal evidence[,] and educated guesses" that prohibiting the display of

alcohol content on beer labels would prevent brewers from engaging in a "strength war" by

increasing the alcohol content of their beers. *Id.* at 487, 490. The Court reasoned that there was

"little evidence that American brewers intend to increase alcohol content." *Id.* at 489 n.4.

Similarly, in *Pitt News* v. *Pappert*, 379 F.3d 96 (3d Cir. 2004) (Alito, J.), the Third Circuit struck

down a ban on alcohol advertising in on-campus media because Pennsylvania "ha[d] not pointed

to any evidence that eliminating ads in this narrow sector will do any good." *Id.* at 107.

Rejecting the Commonwealth's speculation that the rate of underage and abusive drinking would

fall if there were no alcoholic beverage ads in campus publications, the court emphasized that

students still could be exposed to similar ads in many other publications and still could locate

places to purchase alcoholic beverages near campus. *Id.*

As in *Wollschlaeger*, *Rubin*, and *Pitt News*, there is no evidence to substantiate the City's

assumption that prohibiting inquiries into, and reliance on, wage history will eliminate wage

disparities that are the product of gender discrimination. The "'mere speculation [and]

conjecture'" that the City has mustered fall well short of its First Amendment burden. *Rubin*,

514 U.S. at 487 (quoting *Edenfield*, 507 U.S. at 770-71).

**d.    The Ordinance's Blanket Restriction Of Speech Is Far More Extensive Than Necessary.**

The Ordinance also fails the fourth element of *Central Hudson* because its speech restrictions are far "more extensive than necessary" to serve the City's stated purposes. *Lorillard Tobacco Co.* v. *Reilly*, 533 U.S. 525, 556 (2001) (internal quotation marks omitted).

In this respect, the Ordinance shares the same deficiencies as other statutes that courts have found to be inadequately tailored to satisfy *Central Hudson*. In *Sorrell*, for example, the Supreme Court concluded that the Vermont prohibition on the marketing of prescriber-identifying information failed both "heightened judicial scrutiny" and *Central Hudson* because it was not narrowly tailored to ensure physician confidentiality and protect doctors from harassing sales behaviors. *See* 564 U.S. at 573-76. In particular, pharmacies could still share prescriber-identifying information "with anyone for any reason" except marketing purposes, *id.* at 572-73, and Vermont had offered "no explanation" why less restrictive alternatives—such as posting "No Solicitation" signs in doctors' offices—would have been inadequate to prevent harassment, *id.* at 575. Likewise, in *Pitt News*, the Third Circuit concluded that the Commonwealth's ban on alcohol advertising in on-campus media was both "severely over- and under-inclusive" in combating underage and abusive drinking because most students lawfully could purchase alcohol, students would "still be exposed to a torrent of beer ads" from other sources, and the Commonwealth had not shown that it "engage[d] in aggressive enforcement" of existing laws against underage drinking. 379 F.3d at 107-08; *see also Wollschlaeger*, 848 F.3d at 1313 (explaining that it is "problematic" when a blanket prohibition does not create exceptions where restricting speech would not serve the government's interests).

Like those unconstitutional measures, the Ordinance is both overinclusive and underinclusive because, among other reasons explained above, it prohibits wage-history inquiries

18

and reliance that could not possibly perpetuate discriminatory wage disparities. There is no substantial basis for the Ordinance's prohibitions where the applicant receives a lock-step salary or the employer tries to lure a talented employee away from her current employer by, for example, offering to double her salary. And here again, the fact that the Ordinance restricts wage-history inquiries even as to male applicants shows that it restricts vastly more speech than necessary to advance the City's asserted interest. The City also has not explained why "remedies other than content-based rules"—such as encouraging employers to conduct voluntary self-evaluations, providing job training for women, or more aggressively enforcing existing equal-pay laws—"would be inadequate." *Sorrell*, 564 U.S. at 575. The First Amendment requires the City to deploy a more precisely tailored alternative when restricting constitutionally protected speech. *See Cent. Hudson*, 447 U.S. at 570-71 (striking down a ban on all advertising that promoted the use of electricity during an energy crisis because the State could have adopted a more targeted ban that did not "suppress[] information about electric devices or services that would cause no net increase in total energy use").

The Ordinance therefore fails multiple elements of the *Central Hudson* standard.

### C.    The Ordinance Is Unconstitutionally Vague.

The Ordinance further violates the First Amendment and due process because it subjects employers to significant civil and criminal penalties without giving them "fair notice of conduct that is forbidden." *FCC* v. *Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2317 (2012). "[C]larity in regulation is essential" so that regulated parties "know what is required of them." *Id.* "When speech is involved, rigorous adherence to th[is] requirement[] is necessary to ensure that ambiguity does not chill protected speech." *Id.*

The Ordinance does not provide fair notice of the activity it prohibits. Although it includes a safe-harbor permitting employers to rely on wage-history information "knowingly and willingly disclosed," Phila. Code § 9-1131(2)(a)(ii), it provides no guidance, let alone clarity, on when the safe-harbor is satisfied. Employers are left to guess from whose perspective this standard is evaluated, and whether a disclosure is "knowing[] and willing[]" if it is made during a job interview—rather than on a resume or application—or in response to a question that may be "likely to elicit" disclosure. *Cf. Rhode Island* v. *Innis*, 446 U.S. 291, 301 (1980). Employers who guess wrong face compensatory and punitive damages and even imprisonment for a repeat violation. The chilling effect of these potential penalties—significant enough to "force[]" some small businesses "to close if found in violation," Ex. B at 2—is unconstitutional. *See Wollschlaeger*, 848 F.3d at 1319, 1322 (holding that a ban on "unnecessarily" harassing patients about firearm ownership was "incomprehensibly vague" for failing to specify "[w]ho is to know—and who is to decide—when good-faith persistence devolves into unnecessary harassment").

> **D.    The Ordinance's Extraterritorial Effect Violates The U.S. Constitution And Pennsylvania Law.**

The Ordinance is also unlawful because it applies to activity outside the geographical bounds of the City (and the Commonwealth). As long as an "employer" merely "does business in the City" or "employs one or more employees" in the City, Phila. Code § 9-1102(h), the Ordinance appears to govern all of the employer's hiring practices—no matter where it makes its hiring decisions or where the prospective employee will work. The Ordinance's staggering extraterritorial reach violates bedrock principles of the U.S. Constitution and Pennsylvania law.

Due process prohibits a State or municipality from "impos[ing] economic sanctions on violators of its laws with the intent of changing . . . lawful conduct in other States." *BMW of N.*

*Am., Inc.* v. *Gore*, 517 U.S. 559, 572 (1996). This principle follows from concerns about comity, which "constrain[]" localities "to respect the interests of other States," *id.* at 571, and fair notice, *id.* at 574. The Ordinance disregards both of these interests by purporting to restrict employers' right to make, and rely on, wage-related inquiries anywhere in the country as long as they have one employee in Philadelphia or transact some business in the City. This extraterritorial power grab neither "respect[s] the interests of other States" in regulating hiring practices, *id.* at 571, nor provides fair notice to employers who are based in other jurisdictions but whose operations across the country are now subject to the Ordinance's prohibitions.

The Ordinance similarly violates the Commerce Clause of the U.S. Constitution, which "precludes the application of a state statute to commerce that takes place wholly outside the State's borders." *Healy* v. *Beer Inst.*, 491 U.S. 324, 336 (1989) (internal quotation marks omitted). The relevant inquiry is whether the "practical effect" that would arise "if not one, but many or every, State adopted similar legislation" "is to control conduct beyond the boundaries of the State." *Id.* Here, the Ordinance regulates activity "occurring wholly outside the boundaries" of Pennsylvania, *id.*, by prohibiting an employer with Philadelphia employees or business ties from inquiring into, or relying on, wage history in any hiring setting—even where the job interview occurs in or is for a job located in another State. If "many or every" State adopted the same measure, the practical effect would be to burden interstate commerce by imposing redundant penalties on employers who do business in more than one State. *Id.*

Finally, for similar reasons, the Ordinance violates Pennsylvania law. The Pennsylvania Constitution authorizes a municipality with a home rule charter—such as Philadelphia—to "exercise any power . . . not denied by . . . the General Assembly." Penn. Const. art. IX, § 2. The General Assembly, in turn, has prohibited the City from "exercis[ing] any powers or

authority beyond the city limits." 53 Pa. Stat. § 13133; *see also Devlin* v. *City of Philadelphia*, 862 A.2d 1234, 1248 (Pa. 2004). The Ordinance violates these provisions by regulating all hiring activity by an employer who employs at least one person, or conducts the slightest amount of business, in the City—even if the prohibited activity occurs outside the City and the prospective employee neither lives nor works in the City.

### E.    Striking Down The Ordinance Will Not Call Into Question Other Laws.

Invalidating the Ordinance will not threaten the validity of other, appropriate hiring laws. Many employment laws do not prohibit employers from inquiring into a protected status, *see*, *e.g.*, 29 U.S.C. § 623(a) (age); 42 U.S.C. §§ 2000e, 2000e-2(a) (race); Phila. Code § 9-1103 (age, race, and sex, among others), and the Ordinance is readily distinguishable from those that do.

Laws such as the Age Discrimination in Employment Act, the Americans with Disabilities Act, and Title VII all include exceptions for legitimate business-related inquiries unrelated to discrimination. *See* 29 U.S.C. § 623(f)(1) (permitting consideration of age where it is "a bona fide occupational qualification reasonably necessary to . . . the particular business"); 42 U.S.C. § 12112(d)(2)(B) (permitting inquiries "into the ability of an applicant to perform job-related functions"); 29 C.F.R. § 1604.7 (permitting inquiries about sex "made in good faith for a nondiscriminatory purpose"). The Ordinance, in stark contrast, imposes an across-the-board prohibition on all wage-history inquiries to an applicant regardless of the purpose of the inquiry.

Laws prohibiting inquiries into credit history or criminal-conviction history are also unlike the Ordinance because they create clear exceptions for certain employers and jobs where an inquiry would serve a legitimate business purpose. The City, for example, permits credit-history inquiries by law-enforcement agencies and financial institutions, as well as by employers filling a job that is managerial or involves significant financial responsibility, among other

exceptions. *See* Phila. Code § 9-1130(2). Other laws carve out similar bright-line exceptions. *See*, *e.g.*, Colo. Rev. Stat. § 8-2-126(3)(a) (2016); Md. Code Ann., Lab. & Empl. §§ 3-711(a)(2), (c)(1) (West 2016). The City also permits inquiries into criminal convictions by a Criminal Justice Agency, Phila. Code § 9-3505(2), and after a conditional employment offer has been made, *id.* § 9-3504(2). As explained above, however, the Ordinance does not create any exceptions for the legitimate use of wage history by specific types of employers or with respect to specific types of jobs—let alone a clear safe-harbor that employers can easily follow.

Because the Ordinance's far-reaching speech restrictions are not nearly as tailored or as clear as any of these laws, invalidating the Ordinance would not call into question their validity.

## II. THE REMAINING FACTORS WEIGH OVERWHELMINGLY IN FAVOR OF AN INJUNCTION.

In the First Amendment setting, a likelihood of success on the merits leads virtually inexorably to a preliminary injunction because, in the absence of relief, the plaintiff will suffer an irremediable deprivation of its First Amendment rights. That is precisely the case here.

Absent a preliminary injunction, the Chamber's members will suffer irreparable harm. It is well-settled that the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod* v. *Burns*, 427 U.S. 347, 373 (1976) (plurality opinion); *see also B.H. ex rel. Hawk* v. *Easton Area Sch. Dist.*, 725 F.3d 293, 323 (3d Cir. 2013) ("Prevent[ing] [a person] from exercising their right to freedom of speech . . . unquestionably constitutes irreparable injury." (internal quotation marks omitted)). The Ordinance will indisputably chill speech by forcing members—on pain of substantial civil and criminal penalties—to refrain from inquiring about or relying on wage history. *See* Phila. Code §§ 9-1105(c)-(d), 9-1121; Wonderling Decl. ¶¶ 16-19. To ensure that they adhere to the Ordinance and avoid the risk of significant sanctions, members will need to incur substantial

compliance costs, such as retraining staff and developing new policies regarding salary determinations and hiring. *See* Wonderling Decl. ¶ 21. These harms to the constitutional rights and financial interests of the Chamber's members plainly warrant a preliminary injunction. *See Miller* v. *Mitchell*, 598 F.3d 139, 147 n.8 (3d Cir. 2010) ("Because . . . the Does have shown a likelihood of success on the merits of their [First Amendment] claim, they have necessarily shown that irreparable harm would result absent an injunction."); *Hoxworth* v. *Blinder, Robinson & Co.*, 903 F.2d 186, 206 (3d Cir. 1990) ("[T]he unsatisfiability of a money judgment can constitute irreparable injury . . . .").

The final two prerequisites are also met because granting a preliminary injunction will not harm the City or the public. "[N]either the Government nor the public generally can claim an interest in the enforcement of an unconstitutional law." *ACLU* v. *Ashcroft*, 322 F.3d 240, 251 n.11 (3d Cir. 2003) (quoting *ACLU* v. *Reno*, 217 F.3d 162, 181 (3d Cir. 2000)). While the public clearly has an interest in combatting gender discrimination, that "interest is best served by eliminating the unconstitutional restrictions imposed by [the Ordinance] while at the same time permitting the City to attempt, if it wishes, to frame a more tailored regulation that serves its legitimate interests." *Swartzwelder* v. *McNeilly*, 297 F.3d 228, 242 (3d Cir. 2002) (Alito, J.).

## CONCLUSION

For the foregoing reasons, this Court should enter a preliminary injunction preventing Defendants from giving effect to or enforcing the Ordinance pending resolution of the merits of the Chamber's claims.

Dated:  April 6, 2017                                Respectfully submitted,

/s/ Marc J. Sonnenfeld
Marc J. Sonnenfeld (PA Bar #17210)                  Miguel A. Estrada*
Franco A. Corrado (PA Bar #91436)                   Amir C. Tayrani*
MORGAN, LEWIS & BOCKIUS LLP                         GIBSON, DUNN & CRUTCHER LLP
1701 Market Street                                  1050 Connecticut Avenue, N.W.
Philadelphia, PA  19103                             Washington, D.C.  20036
Telephone:  (215) 963-5000                          Telephone:  (202) 955-8500
Fax:  (215) 963-5001                                Fax:  (202) 467-0539
marc.sonnenfeld@morganlewis.com                     mestrada@gibsondunn.com
franco.corrado@morganlewis.com                      atayrani@gibsondunn.com


*Attorneys for Plaintiff The Chamber of Commerce for Greater Philadelphia*

*Applications for admission pro hac vice forthcoming*

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of April, 2017, true and correct copies of the

foregoing **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR A**

**PRELIMINARY INJUNCTION** was filed pursuant to the Court's electronic filing procedures

using the Court's CM/ECF system and was served via hand delivery on the following:

> City of Philadelphia
> Law Department
> One Parkway Building
> 17th Floor
> 1515 Arch Street
> Philadelphia, PA 19102
>
> Philadelphia Commission on Human Relations
> 601 Walnut Street
> Suite 300 South
> Philadelphia, PA 19106

/s/ Marc J. Sonnenfeld
Marc J. Sonnenfeld