**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| THE CHAMBER OF COMMERCE FOR GREATER PHILADELPHIA, individually and on behalf of its members, | |
| Plaintiff, | Civil Action No. 17-1548 |
| v. | |
| CITY OF PHILADELPHIA and PHILADELPHIA COMMISSION ON HUMAN RELATIONS, | **Oral Argument Requested** |
| Defendants. | |

**PLAINTIFF'S REPLY MEMORANDUM OF LAW
IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION AND
IN OPPOSITION TO THE CITY'S REQUEST
FOR AN EVIDENTIARY HEARING**

## TABLE OF CONTENTS

**Page**

ARGUMENT ................................................................................................................. 1

I.    The Chamber Is Likely To Prevail On The Merits Because The Ordinance Is Unconstitutional ................................................................................. 2

    A.    The Ordinance Fails Strict Scrutiny ............................................................ 2

    B.    The Ordinance Fails *Central Hudson* ....................................................... 9

        1.    Wage-History Inquiries Do Not Concern Unlawful Activity ......... 9

        2.    The Ordinance's Speech Restrictions Do Not Directly And Materially Advance The City's Interests ...................................... 11

        3.    The Ordinance's Speech Restrictions Extend More Broadly Than Necessary ............................................................................ 18

    C.    The Ordinance Is Unconstitutionally Vague And Its Extraterritorial Effect Violates The U.S. Constitution And Pennsylvania Law ............... 21

    D.    Striking Down The Ordinance Will Not Call Into Question Other Laws .......................................................................................................... 22

II.    The Remaining Factors Weigh Overwhelmingly In Favor Of An Injunction ........................................................................................................ 23

III.    The City's Request for a "Full Hearing" Is Baseless ......................................... 24

CONCLUSION ........................................................................................................... 28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACLU* v. *Ashcroft*,
  322 F.3d 240 (3d Cir. 2003)...........................................................................24

*AFDI* v. *SEPTA*,
  92 F. Supp. 3d 314 (E.D. Pa. 2015) ...............................................................24

*Angove* v. *Williams-Sonoma, Inc.*,
  70 F. App'x 500 (10th Cir. 2003) ...................................................................16

*ASI Bus. Solutions, Inc.* v. *Otsuka Am. Pharm., Inc.*,
  233 F. Supp. 3d 432 (E.D. Pa. 2017) .............................................................26

*Bd. of Trs. of the State Univ. of N.Y.* v. *Fox*,
  492 U.S. 469 (1989)..........................................................................................7

*BMW of N. Am., Inc.* v. *Gore*,
  517 U.S. 559 (1996)........................................................................................22

*Bolger* v. *Youngs Drug Prods. Corp.*,
  463 U.S. 60 (1983)............................................................................................6

*Bradley* v. *Pittsburgh Bd. of Educ.*,
  910 F.2d 1172 (3d Cir. 1990)..........................................................................25

*Cent. Hudson Gas & Elec. Corp.* v. *Pub. Serv. Comm'n of N.Y.*,
  447 U.S. 557 (1980)...............................................................................2, 9, 13

*City of Cincinnati* v. *Discovery Network, Inc.*,
  507 U.S. 410 (1993)..........................................................................................7

*Commonwealth* v. *Ray*,
  272 A.2d 275 (Pa. Super. Ct. 1970)................................................................22

*Drake* v. *Filko*,
  724 F.3d 426 (3d Cir. 2013).....................................................................12, 13

*Dunagin* v. *City of Oxford*,
  718 F.2d 738 (5th Cir. 1983) ..........................................................................10

*Edenfield* v. *Fane*,
  507 U.S. 761 (1993)...........................................................................12, 13, 16, 17

**TABLE OF AUTHORITIES** *(continued)*

**Page(s)**

*Educ. Media Co. at Va. Tech. Inc.* v. *Swecker*,
  602 F.3d 583 (4th Cir. 2010) ................................................................10

*Elrod* v. *Burns*,
  427 U.S. 347 (1976)........................................................................24, 27

*Glenn* v. *Gen. Motors Corp.*,
  841 F.2d 1567 (11th Cir. 1988) ............................................................16

*Greater New Orleans Broad. Ass'n* v. *United States*,
  527 U.S. 173 (1999)...............................................................................12

*Harris* v. *Quinn*,
  134 S. Ct. 2618 (2014)........................................................................6, 7

*Harvey* v. *Plains Twp. Police Dep't*,
  421 F.3d 185 (3d Cir. 2005)...................................................................25

*Healy* v. *Beer Inst.*,
  491 U.S. 324 (1989)...............................................................................22

*Hill* v. *Colorado*,
  530 U.S. 703 (2000)...............................................................................21

*Holder* v. *Humanitarian Law Project*,
  561 U.S. 1 (2010).....................................................................................4

*Hoxworth* v. *Blinder, Robinson & Co.*,
  903 F.2d 186 (3d Cir. 1990)...................................................................24

*IMDB.com, Inc.* v. *Becerra*,
  -- F. Supp. 3d --, 2017 WL 2859063 (N.D. Cal. June 27, 2017) ......................27, 28

*Katt* v. *Dykhouse*,
  983 F.2d 690 (6th Cir. 1992) ................................................................10

*King* v. *Governor of N.J.*,
  767 F.3d 216 (3d Cir. 2014)...............................................7, 8, 9, 13, 14, 17, 26

*Kos Pharms., Inc.* v. *Andrx Corp.*,
  369 F.3d 700 (3d Cir. 2004)...................................................................25

*Lorillard Tobacco Co.* v. *Reilly*,
  533 U.S. 525 (2001)...........................................................................18, 20

**TABLE OF AUTHORITIES** *(continued)*

**Page(s)**

*Nat'l Ass'n of Tobacco Outlets, Inc.* v. *City of Providence*,
    731 F.3d 71 (1st Cir. 2013) ....................................................................11

*In re Niaspan Antitrust Litig.*,
    42 F. Supp. 3d 735 (E.D. Pa. 2014) ......................................................25

*Phillips* v. *Borough of Keyport*,
    107 F.3d 164 (3d Cir. 1997) ..................................................................14

*Pitt News* v. *Pappert*,
    379 F.3d 96 (3d Cir. 2004) .............................................................12, 20

*Pittsburgh Press Co.* v. *Pittsburgh Comm'n on Human Relations*,
    413 U.S. 376 (1973) .......................................................................10, 11

*Pregnancy Concerns, Inc.* v. *Mayor of Balt.*,
    721 F.3d 264 (4th Cir. 2013) ................................................................14

*R.A.V.* v. *City of St. Paul*,
    505 U.S. 377 (1992) ..........................................................................7, 8

*Ragin* v. *N.Y. Times Co.*,
    923 F.2d 995 (2d Cir. 1991) ..................................................................11

*Reed* v. *Town of Gilbert*,
    135 S. Ct. 2218 (2015) ......................................................................8, 27

*Reilly* v. *City of Harrisburg*,
    858 F.3d 173 (3d Cir. 2017) .............................................................24, 26

*Rubin* v. *Coors Brewing Co.*,
    514 U.S. 476 (1995) ..................................................9, 11, 12, 17, 27

*Sorrell* v. *IMS Health, Inc.*,
    564 U.S. 552 (2011) ..............................................4, 9, 17, 18, 20

*Thompson* v. *W. States Med. Ctr.*,
    535 U.S. 357 (2002) ................................................................9, 12, 20

*Turner Broad. Sys., Inc.* v. *FCC*,
    520 U.S. 180 (1997) ...............................................................................13

*Valle Del Sol Inc.* v. *Whiting*,
    709 F.3d 808 (9th Cir. 2013) ..................................................................7

**TABLE OF AUTHORITIES** *(continued)*

**Page(s)**

*Vill. of Hoffman Estates* v. *Flipside, Hoffman Estates, Inc.*,
     455 U.S. 489 (1982).................................................................................................11, 21

*Wollschlaeger* v. *Governor of Fla.*,
     848 F.3d 1293 (11th Cir. 2017) ...................................................5, 13, 14, 19, 21

**Federal Statutes**

29 U.S.C. § 206.............................................................................................................5

**Local Ordinances**

Phila. Code § 9-1103....................................................................................................5

Phila. Code § 9-1131................................................................................................3, 20, 21

**Other Authorities**

Council of the City of Phila., Comm. on Law & Gov't
     Hr'g Tr. (Nov. 22, 2016), *available at* http://bit.ly/2kOuRPp................................3, 15, 16, 19

Council of the City of Phila., Comm. on Law & Gov't
     Hr'g Tr. (Dec. 8, 2016), *available at* http://bit.ly/2xeNo0E ....................................3

EEOC, Compliance Manual, No. 915.003 (Dec. 2000),
     *available at* https://www.eeoc.gov/policy/docs/compensation.html ......................................16

## ARGUMENT

According to the City of Philadelphia ("City"), it can restrict any speech that conceivably could perpetuate the effects of past discrimination based on nothing more than speculative assumptions—unsupported by any concrete evidence—that the restriction will materially advance the City's interests.  Before the City can silence speech, however, the First Amendment demands more than mere speculation or good intentions:  the City must show that its Ordinance's prohibitions on wage-history inquiries and reliance will *actually* reduce discriminatory gender- or race-based wage disparities.  Yet the City has offered no substantial evidence that prohibiting inquiries into, and reliance on, wage history will in fact alleviate discriminatory wage disparities—no empirical studies, scholarly articles, or even reliable anecdotes.  Even the expert report that is the centerpiece of the City's argument offers no support for the *ipse dixit* conclusion that "the use of prior salary history . . . promotes wage discrimination," Madden Aff. ¶ 26, and offers *no* opinion at all on the central point that the City must establish to save its Ordinance:  that prohibiting use of wage history will materially remedy discriminatory wage disparities.

Whether the Ordinance will reduce discriminatory wage disparities, much less materially so, is anybody's guess, which is precisely why the City now seeks to backfill the gaping hole in the legislative record through an evidentiary hearing.  Neither a hearing nor discovery is necessary, however, for the Court to consider this facial challenge to the Ordinance.  The City makes no attempt to explain how the supposedly disputed factual issues it identifies are relevant to this challenge.  Even accepting at face value all of the evidentiary materials the City has supplied, those materials fail to carry the City's burden of establishing that the Ordinance is constitutional—and largely do not address the relevant legal questions.  It is also notable that the City fails to renew its prior request for discovery—even though, at the City's repeated urging,

1

the Court permitted the City to "address[ ] the necessity of discovery" in its briefing and authorized the City to file a sur-reply precisely so that it could further support those very arguments. Dkt. 34, at 1 (June 16, 2017). By failing to mention "discovery" at all, the City has waived its request for discovery in connection with the Court's consideration of the preliminary-injunction motion, and presumably has obviated any need for a sur-reply brief on the issue.

The Chamber of Commerce for Greater Philadelphia ("Chamber"), like its members, strongly supports the City's goal of reducing discriminatory wage disparities. But the City's "restrict speech first, find justification later" approach is anathema to the First Amendment. The Court should preliminarily enjoin the Ordinance because the City cannot satisfy any conceivably applicable level of First Amendment scrutiny or justify the Ordinance's extraterritorial reach and hopelessly vague parameters, both the Chamber and its members will suffer the irreparable loss of their constitutional rights in the absence of an injunction, and the balance of equities and the public interest weigh decisively in favor of enjoining the City's unjustified restrictions on core constitutional freedoms.

## I. THE CHAMBER IS LIKELY TO PREVAIL ON THE MERITS BECAUSE THE ORDINANCE IS UNCONSTITUTIONAL.

### A. The Ordinance Fails Strict Scrutiny.

The Ordinance violates the First Amendment because it imposes content-based and speaker-based restrictions on employer speech that plainly cannot withstand strict scrutiny. *See* Chamber Br. 6-10. In fact, the City does not even attempt to defend the Ordinance under strict scrutiny, implicitly conceding that if strict scrutiny applies the Ordinance must fall. It instead seeks to evade strict scrutiny altogether by contending that the Ordinance's speech restrictions are merely incidental to a prohibition on conduct and that, if the Ordinance does directly burden speech, it should be examined as a restriction on commercial speech under *Central Hudson Gas*

& *Electric Corp.* v. *Public Service Commission of New York*, 447 U.S. 557 (1980).  *See* Opp. 5-

10.  Neither response is persuasive because the Ordinance directly targets employer speech and

does so precisely because of the speech's communicative content.  Most importantly, the

Ordinance must fall even under the more permissive *Central Hudson* test that the City prefers

because the City completely fails to establish, as required by *Central Hudson*, that the Ordinance

directly and materially combats discriminatory wage practices and that it is not more extensive

than necessary to do so.

      **1.**      The City attempts to evade *all* First Amendment scrutiny by arguing that the

Ordinance's prohibition on wage-history reliance is directed at conduct, not speech, *see* Opp. 5-

6, and that the Ordinance's prohibition on wage-history inquiries "only incidentally burdens

speech," *id.* at 6.  The City's description of the Ordinance has no footing in reality.

      The City begins by re-writing the Ordinance, flipping the order of its prohibitions to

pretend that restricting wage-history inquiries is secondary to restricting wage-history reliance.

Opp. 1, 5-6.  This revisionist account is neither how the Ordinance is written, nor how its

passage was successfully urged.  The very title of the Ordinance is "Prohibition on *Inquiries into

Wage History*," Phila. Code § 9-1131(2) (emphasis added), which is why the primary unlawful

employment practice proscribed is "[t]o inquire about a prospective employee's wage history,"

*id.* § 9-1131(2)(a)(i).  As the City Council explained, the central purpose of the Ordinance was to

"prohibit employers from *inquiring* about" a specific topic—"salary history."  Nov. 22 Hr'g Tr.

2 (Clerk) (emphasis added); *see also*, *e.g.*, Dec. 8 Hr'g Tr. 134 (Councilman Greenlee)

(Ordinance would be a step forward "by not allowing employers to ask for previous salary"),

*available at* http://bit.ly/2xeNo0E.  Wage-history inquiries are primary in the hiring process, too:

employers first collect pertinent information from or about applicants, and only later use such

information to the extent appropriate.  The language and structure of the Ordinance thus make clear that the reliance prohibition is the supporting player, acting as a backstop to ensure that employers have little incentive to make the forbidden inquiry of others, such as previous employers.

In any event, the City's attempt to reorder the provisions makes no difference because the Ordinance's reliance prohibition directly restricts speech, not conduct.  The City may well be correct that "[p]lainly" not every conceivable restraint on the "use of information implicates free speech guarantees."  Opp. 5.  But that is irrelevant here because, as the Chamber actually argued (at 7-8), the Ordinance imposes restraints on the use of wage-history information *for expressive purposes*—which even the City concedes is a speech restriction under *Sorrell* v. *IMS Health, Inc.*, 564 U.S. 552 (2011).  *See* Opp. 5-6.  Just as the Vermont statute in *Sorrell* prohibited the use of prescriber-identifying information to express a message about the relative benefits of a particular pharmaceutical product in a marketing setting, 564 U.S. at 570-71, the reliance prohibition bars employers from using wage history to *express* a particular message about the value of an applicant's labor in formulating and communicating an appropriate salary proposal.  Moreover, by depriving employers—and only employers—of the benefit of inquiring about wage-history information from other sources, the Ordinance "impose[s] content- and speaker-based restrictions on the availability and use of [that] information" that restrict speech, not conduct.  *Id.* at 571.  And even if viewed as a regulation of conduct, the reliance provision still would impair employer speech because, as the Chamber explained (at 8 n.3) and the City does not dispute, "the conduct triggering [liability] consists of communicating a message" about the applicant's value in the labor market.  *Holder* v. *Humanitarian Law Project*, 561 U.S. 1, 28 (2010).

The reliance prohibition therefore "restrict[s] [the] ability to communicate and/or convey" a particular message, just like the Florida statute invalidated by the *en banc* Eleventh Circuit in *Wollschlaeger* prohibited doctors from relying on a patient's firearms ownership when recording information in a medical file. *Wollschlaeger* v. *Governor of Fla.*, 848 F.3d 1293, 1307 (11th Cir. 2017) (en banc). The City's attempts to distinguish *Wollschlaeger* are thoroughly unpersuasive. In fact, the City concedes that the recordkeeping provision "regulate[d] the content of employer [speech]," Opp. 5 n.3—which is precisely what the reliance provision does in prohibiting employers from formulating and communicating a salary offer that takes into account the applicant's wage history. And whereas the City claims that the Florida statute's anti-discrimination provision is analogous to the Ordinance's reliance prohibition, *id.* at 5, the reliance prohibition does not prohibit disparate treatment of applicants, let alone based on the applicants' gender. Other federal laws and City ordinances do that without raising any of the First Amendment problems that plague the Ordinance. *See*, *e.g.*, 29 U.S.C. § 206(d)(1); Phila. Code § 9-1103. By directly prohibiting *discrimination*, these measures, like the anti-discrimination provision of the Florida statute in *Wollschlaeger*, did what the City failed to do here: they prohibited harmful *conduct*.

The City responds that, if the use of wage-history information is speech, then the use of other types of information to make employment decisions, such as genetic information and criminal records, also constitutes speech. Opp. 6. But even if statutory prohibitions on the use of these other types of information do trigger the First Amendment, that of course is not the end of the analysis. In particular, it does not mean that, like the Ordinance, those statutory provisions too are unconstitutional because they fail sufficiently to advance their objectives or are poorly tailored. On the contrary, these other laws would likely withstand constitutional scrutiny

5

because, unlike the unproved—indeed, largely speculative—connection between race and gender discrimination on the one hand, and wage history on the other, there is a clear and direct link between the governmental interests implicated by these other measures (prohibiting discrimination against persons with genetic abnormalities or criminal histories) and their prohibitions on the use of information (prohibiting reliance on information that an applicant has a genetic abnormality or a criminal record).  Unlike race or gender, the information at issue here— an applicant's wages—is not itself a protected status, nor is relying on that information *itself* discriminatory; instead, the City's theory is that the information reflects *previous* discrimination. That more tenuous calculus presents a different set of facts that distinguishes the Ordinance from these other laws.  Accordingly, the City cannot evade First Amendment scrutiny of its Ordinance by simply declaring that the reliance prohibition regulates conduct, not speech, and then asserting that the inquiry prohibition is merely "incidental" to that restriction on conduct.

    **2.**     The City next argues that, if the Ordinance does directly target speech, it should be examined under *Central Hudson*'s test for commercial speech, rather than strict scrutiny. According to the City, all "speech that relates to the speaker's economic interest" is commercial speech, Opp. 7, and even content-based restrictions on commercial speech are subject to *Central Hudson*.  Both arguments are at odds with controlling authority.

    **a.**     Wage-history inquiries and reliance are not commercial speech because they do not simply "propose a commercial transaction." *Harris* v. *Quinn*, 134 S. Ct. 2618, 2639 (2014) (internal quotation marks omitted).  Although the City purports (at 7) to derive its contrary, far-more-expansive definition of commercial speech from *Central Hudson* itself, the Supreme Court has since clarified that a speaker's "economic motivation for [engaging in speech] would clearly be insufficient by itself to turn [that speech] into commercial speech." *Bolger* v. *Youngs Drug*

*Prods. Corp.*, 463 U.S. 60, 67 (1983).  As the Court has repeatedly stated, "'*the test* for identifying commercial speech'" is whether the speech constitutes the "proposal of a commercial transaction."  *City of Cincinnati* v. *Discovery Network, Inc.*, 507 U.S. 410, 423 (1993) (emphasis in original) (quoting *Bd. of Trs. of the State Univ. of N.Y.* v. *Fox*, 492 U.S. 469, 473-74 (1989)); *see also Harris*, 134 S. Ct. at 2639 (holding that agency dues were not commercial speech because they "do[ ] much more than" "propose a commercial transaction") (internal quotation marks omitted).

The City's out-of-circuit authorities (at 7) provide no basis for departing from the authoritative definition of commercial speech articulated by the Supreme Court.  Two of those cases have no precedential value at all—one is unpublished and the other was vacated on appeal—and the third is consistent with the Supreme Court's definition because, unlike wage-history inquiries and reliance, the speech at issue there "solicit[ed] a commercial transaction."  *Valle Del Sol Inc.* v. *Whiting*, 709 F.3d 808, 818 (9th Cir. 2013).

**b.**     The Chamber also explained (at 11-12) that, even if the Ordinance could be deemed to restrict only commercial speech, strict scrutiny still would apply because "[o]rdinarily, content-based regulations are . . . subjected to strict scrutiny . . . even when the law in question regulates . . . lesser protected speech."  *King* v. *Governor of N.J.*, 767 F.3d 216, 236 (3d Cir. 2014) (citing *R.A.V.* v. *City of St. Paul*, 505 U.S. 377, 381-86 (1992)).  The City responds that *King*'s rule is dicta and that, in any event, the Ordinance falls within an exception to strict scrutiny identified by the Third Circuit in *King*.  *See* Opp. 8-10.  Both contentions are flawed.

*King* and *R.A.V.* mandate the application of strict scrutiny.  Although *King* ultimately applied intermediate scrutiny to a statute prohibiting certain professional speech by licensed

counselors, the Third Circuit did so because it concluded that the speech restriction "fit[ ] comfortably within" an exception to strict scrutiny that applies where "'the basis for the content discrimination consists entirely of the very reason the entire class of speech at issue is proscribable.'" *King*, 767 F.3d at 236-37 (quoting *R.A.V.*, 505 U.S. at 388).  The Third Circuit would not have been required to resort to that *exception* if it had not first held that the content-based restriction at issue would otherwise be subject to strict scrutiny.  *Id.*  Moreover, even if parts of *King*'s analysis could be dismissed as dicta, *R.A.V.* indisputably *held* that strict scrutiny applied to a statute prohibiting "'fighting words'"—a category of speech not subject to First Amendment protection—"that insult, or provoke violence, 'on the basis of race, color, creed, religion or gender."  505 U.S. at 391; *see also id.* at 395-96.  Because *R.A.V.* mandates strict scrutiny where even unprotected speech is subject to certain content-based restrictions, its holding applies *a fortiori* to constitutionally protected commercial speech.  This rule does not "eviscerate *Central Hudson*," as the City suggests (at 8), because strict scrutiny still does not apply to content-neutral restrictions of commercial speech or to content-based restrictions of commercial speech that target a particular risk of fraud.  *R.A.V.*, 505 U.S. at 389; *see also Reed* v. *Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015) (requiring strict scrutiny only where a law "target[s] speech *based on* its communicative content" (emphasis added)).

     Nor does the Ordinance fit within the exception to strict scrutiny that applies where "the basis for the content discrimination consists entirely of the very reason the entire class of speech at issue is proscribable."  *King*, 767 F.3d at 236 (internal quotation marks omitted).  The Ordinance does not restrict wage-history inquiries because of "the risk of fraud," which is the governmental interest that "justifies depriving [commercial speech] of full First Amendment protection."  *R.A.V.*, 505 U.S. at 388.  Far from combatting fraud, the Ordinance targets wage

history because the City fears that employers' use of that information could disadvantage certain job applicants. "But the 'fear that people would make bad decisions if given truthful information' cannot justify content-based burdens on speech." *Sorrell*, 564 U.S. at 577 (quoting *Thompson* v. *W. States Med. Ctr.*, 535 U.S. 357, 374 (2002)). Strict scrutiny—which the City makes no attempt to satisfy—therefore applies and compels invalidation of the Ordinance.[1]

**B.     The Ordinance Fails *Central Hudson*.**

The City's strenuous efforts to avoid strict scrutiny are ultimately for naught, because the outcome is the same under its preferred test, *Central Hudson*. That test requires that a restriction on (1) non-misleading commercial speech that is related to lawful activity (2) advance a substantial interest (3) "in a direct and material way" and (4) be "no more extensive than necessary to serve that interest." *Rubin* v. *Coors Brewing Co.*, 514 U.S. 476, 486-87 (1995). While the City plainly has a substantial interest in reducing discriminatory wage disparities, its Ordinance fails each of *Central Hudson*'s remaining prongs.

**1.     Wage-History Inquiries Do Not Concern Unlawful Activity.**

The City asserts that wage-history inquiries "are unprotected speech under *Central Hudson*" because they "relate[ ] to the illegal activity of relying upon wage history." Opp. 11 (internal quotation marks and alteration omitted). But, as the Chamber has already demonstrated, reliance on wage history is itself constitutionally protected speech. *See supra* at 4-

---

[1] Citing *King*, 767 F.3d at 237, the ACLU asserts that the Ordinance is not subject to strict scrutiny because it aims to "protect city workers." ACLU Br. 10. But the public-welfare interest in *King* was relevant only because that case involved professional speech—which "receives diminished protection under the First Amendment" precisely because of "the State's longstanding authority to protect its citizens from ineffective or harmful professional practices." 767 F.3d at 237. That same interest, however, does not justify diminished protection for commercial speech, which is proscribable only because of the risk of fraud or illegal transactions. *See Cent. Hudson*, 447 U.S. at 563-64.

5.  The City cannot justify a restriction on commercial speech by arguing that it is related to another, equally infirm speech restriction.  In *Pittsburg Press*, for example, the Court expressly noted that the speech restriction concerned activity that was made unlawful by "unchallenged" provisions.  *Pittsburgh Press Co.* v. *Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 389 (1973); *see also Katt* v. *Dykhouse*, 983 F.2d 690, 697 (6th Cir. 1992) (it is a "tautology" to say that the speech is unlawful merely because the State has outlawed the speech).  If the City could bootstrap one speech restriction onto another, it could ban entire categories of commercial speech simply by declaring that the activity to which that speech relates is now illegal.

Moreover, even if this Court were to uphold the reliance provision on the ground that it regulates conduct, not speech, inquiries into wage history would still concern lawful activity within the meaning of *Central Hudson*'s first prong because there are other, permissible uses of wage-history information that are unrelated to setting an applicant's salary—such as gathering market information or identifying applicants whom employers cannot afford.  The City does not dispute that these are lawful uses of wage-history information; indeed, the City's own expert had "little doubt" that the Chamber's representations that its members rely on salary history for these lawful purposes are "accurate."  Madden Aff. ¶ 6.

The possibility that wage-history information might also be used to engage in what the City deems to be illegal conduct does not strip wage-history inquiries of First Amendment protection.  As the en banc Fifth Circuit has explained, "[t]he commercial speech doctrine would disappear if its protection ceased whenever the advertised product might be used illegally." *Dunagin* v. *City of Oxford*, 718 F.2d 738, 743 (5th Cir. 1983) (en banc).  So long as the speech at issue can be directed at a legal purpose, it concerns lawful activity within the meaning of *Central Hudson*'s first prong.  *See Educ. Media Co. at Va. Tech. Inc.* v. *Swecker*, 602 F.3d 583, 589 (4th

Cir. 2010) (holding that alcohol advertisements in college newspapers "primarily" intended for an underage audience nevertheless concern lawful activity because they "also reach[ ] of-age readers").

The City's own authorities are not to the contrary because each of those cases pertained to the advertising or promotion of a "commercial activity" that "itself [wa]s illegal." *Pittsburgh Press*, 413 U.S. at 389 (sex discrimination in hiring); *see also Vill. of Hoffman Estates* v. *Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 496 (1982) (illegal drug use); *Nat'l Ass'n of Tobacco Outlets, Inc.* v. *City of Providence*, 731 F.3d 71, 78 (1st Cir. 2013) (illegal product discounts); *Ragin* v. *N.Y. Times Co.*, 923 F.2d 995, 1003 (2d Cir. 1991) (housing discrimination). In other words, the restricted speech "directly further[ed]" illegal activity—and only illegal activity. *Ragin*, 923 F.2d at 1003.

The City therefore cannot invoke the Ordinance's reliance prohibition to short-circuit application of the other elements of the *Central Hudson* framework.

**2.     The Ordinance's Speech Restrictions Do Not Directly And Materially Advance The City's Interests.**

The Ordinance does not advance the City's interests "in a direct and material way," *Rubin*, 514 U.S. at 478, because it is at best speculative whether the Ordinance will have any effect on remedying discriminatory wage disparities and the Ordinance only indirectly targets such disparities by restricting employer speech. *See* Chamber Br. 14-18.  The City misunderstands its legal burden with respect to the first deficiency and has no meaningful response on the second.  In the City's view, it is free to restrict any speech that it believes could conceivably perpetuate the effects of discrimination—even employer inquiries into previous job positions and responsibilities—without *any* concrete evidence that the speech actually has that effect.  The City's radical position would eviscerate the First Amendment.

a.      The City misunderstands its constitutional burden in three respects.  *First*, the City suggests that it need only show that the Ordinance "directly" advances its interests, not that the Ordinance does so in a "material way."  *See* Opp. 17.  Even assuming *arguendo* that the Ordinance "directly" advances the City's interests—which it in reality does not, *see infra* at 17— the Supreme Court and Third Circuit have repeatedly required that a speech restriction "in fact alleviate [the asserted harms] *to a material degree*."  *Edenfield* v. *Fane*, 507 U.S. 761, 770-71 (1993) (emphasis added); *see also*, *e.g.*, *Greater New Orleans Broad. Ass'n* v. *United States*, 527 U.S. 173, 189 (1999) (striking down a speech ban that did not "directly and materially further[ ] the asserted interest"); *Pitt News* v. *Pappert*, 379 F.3d 96, 107 (3d Cir. 2004) (Alito, J.) (striking down a speech ban that did not "combat[ ] underage or abusive drinking 'to a material degree'").  The City thus must show that the Ordinance will, in fact, directly and *materially* reduce discriminatory wage disparities.  As explained below, it cannot make either showing.

*Second*, the City asks this Court to undertake something akin to rational-basis review by granting "deference" to all of its "conclusions" and "predictive judgments."  Opp. 17.  The *Central Hudson* standard, however, is "significantly stricter than the rational basis test." *Thompson*, 535 U.S. at 374.  In applying *Central Hudson*, the Supreme Court has repeatedly dismissed regulators' guesswork and conjecture as constitutionally insufficient to justify a speech restriction.  *See*, *e.g.*, *Rubin*, 514 U.S. at 490 (rejecting "anecdotal evidence and educated guesses" that were not "convincing"); *Edenfield*, 507 U.S. at 771-72 (rejecting "conclusory statements that add little if anything to the [government's] original statement of its justifications").[2]

---

[2]  As an example of the type of deference that it believes appropriate, the City cites *Drake* v. *Filko*, 724 F.3d 426 (3d Cir. 2013), but that case upheld a legislature's "reasonable inference"

Indeed, the City's own authorities confirm that, at a minimum, it must have substantial evidence to support its supposed "predictive judgments."  *See King*, 767 F.3d at 238 (asking "whether the legislature has 'drawn reasonable inferences based on substantial evidence'" (quoting *Turner Broad. Sys., Inc.* v. *FCC*, 520 U.S. 180, 195 (1997)).  "Substantial" means just that:  some concrete evidence is required, such as "three years of pre-enactment hearings," *Turner*, 520 U.S. at 187, or the unanimous "empirical judgments" of "a number of well-known, reputable professional and scientific organizations," *King*, 767 F.3d at 238.  Although the precise "'quantum of empirical evidence'" required can vary with the "novelty" of the justification raised, *id.*, the City may not draw inferences based on *zero* empirical evidence.  *See Edenfield*, 507 U.S. at 771-72 (striking down a speech restriction where "no studies" or even "anecdotal evidence" validated the government's assumptions).  This point is not arcane:  only recently the en banc Eleventh Circuit invalidated a Florida statute that restricted speech because the legislature had based its action on "six anecdotes" and "no other evidence, empirical or otherwise."  *Wollschlaeger*, 848 F.3d at 1312.

*Third*, the City is incorrect that it can rely on evidence developed both before and after the Ordinance's enactment.  Opp. 14 n.4.  While the City's post-enactment evidence is insufficient in any event to salvage the Ordinance, *see infra* at 14-17, the Court should not consider that made-for-litigation submission because, in determining whether "the legislature['s]" inferences were "based on substantial evidence," *King*, 767 F.3d at 238 (internal

---

that concealed-carry requirements would serve the public interest only because "legislators could not have known" at the time of enactment—which preceded the Supreme Court's 2008 decision recognizing an individual right to bear arms—"that they were potentially burdening protected Second Amendment conduct."  *Id.* at 437-38.  That rationale is plainly inapplicable here, where the First Amendment's protections for commercial speech have been recognized for decades. *See Cent. Hudson*, 447 U.S. at 566.

quotation marks omitted), it makes little sense to consider materials that the legislature never saw and that did not even exist at the time of the enactment.  Thus, in *King*, for example, the Third Circuit applied *Central Hudson* and looked only to "[t]he legislative record" to determine whether the restriction there was compatible with the First Amendment.  *Id.*; *see also Wollschlaeger*, 848 F.3d at 1312 (same); *Pregnancy Concerns, Inc.* v. *Mayor of Balt.*, 721 F.3d 264, 283 (4th Cir. 2013) (en banc) (holding that post-enactment "materials cannot sustain regulations where there is no evidence in the pre-enactment legislative record").  The Third Circuit's decision in *Phillips* v. *Borough of Keyport*, 107 F.3d 164 (3d Cir. 1997) (en banc)—on which the City relies—is not to the contrary because it examined a content-neutral law under the standard for time, place, and manner restrictions and had no occasion to address whether post-enactment evidence can be considered when evaluating a more constitutionally-problematic content-based law under *Central Hudson*.  *Id.* at 178.

  **b.**  In any event, none of the pre- or post-enactment evidence invoked by the City is sufficient to justify the Ordinance's speech restrictions.  Even accepting for argument's sake the existence of discriminatory race-based and gender-based pay gaps—and accepting further the City's assertion that such gaps can begin with an employee's first job—there is a missing link in the City's inferential chain:  the City simply assumes that relying on wage history necessarily perpetuates the discriminatory wage gap and that prohibiting reliance on wage history will therefore remedy discriminatory pay disparities.  But that assumption is ill-founded because there are many scenarios in which the use of wage history in setting wages would not perpetuate a discriminatory wage gap, including where an employer uses an applicant's salary history to double her current wage in order to lure her away from her employer, where the applicant's prior salary was the product of a lock-step compensation system, or where the disparity between the

wage history of a particular minority applicant and the wages paid to a white male applicant is attributable to non-discriminatory factors such as education, experience, and skill set.

The City concedes that it has no "empirical studies" substantiating the critical link between reliance on wage history and the perpetuation of a discriminatory wage gap. Opp. 15. The City's expert is unable to fill that void. Professor Madden cites no data, research, or other evidence to support her assertion that "the use of prior salary history in hiring decisions and in setting wages promotes wage discrimination by race and gender." Madden Aff. ¶ 26. Her assertion is plain, unadorned *ipse dixit*. And Professor Madden offers no opinion at all on whether prohibiting "the use of prior salary history," as the Ordinance does, in fact remediates discriminatory pay disparities, which is the ultimate proposition that the City must establish to sustain its Ordinance.[3]

The other support that the City tries to muster for the Ordinance is equally insubstantial. The City's selective excerpts from the Ordinance's legislative history are even more unreasoned than Professor Madden's report. *See* Hr'g Tr. 8 (Landau) ("It stands to reason that the practice of asking an applicant's wage history during the hiring process can perpetuate wage inequality . . . ."); Hr'g Tr. 9 (Landau) ("[The Ordinance] will help to break the cycle of wage inequality and discrimination."); Hr'g Tr. 64 (Fromson) ("I believe [the Ordinance] will significantly contribute to eliminating the gender wage gap."). Those "conclusory statements"—which are unsupported by any empirical evidence, anecdotes, or even explanation—"add little if anything"

---

[3] Earlier in her report, Professor Madden points to a "recent field research project" that, in her view, "provides some evidence on how a law restricting employer access to prior wage history affects companies and employees." Madden Aff. ¶ 16. But the research project does not suggest that reliance on wage history perpetuates discriminatory pay disparities—or that prohibiting reliance would ameliorate such disparities—*because "the race and gender of job applicants were not available." Id.* (emphasis added).

to the City's "justifications" for its speech restrictions. *Edenfield*, 507 U.S. at 771-72 (rejecting similar conclusory statements). And some of that testimony is not even relevant to the issue at hand. In particular, testimony that businesses often calculate salary increases for existing employees as a percentage of current salary, Hr'g Tr. 66-67 (Fromson), does not indicate that an employer's reliance on wage history when making the initial salary determination in any way perpetuates a discriminatory wage gap.

The City's *amici* also cite an EEOC Guidance statement and several judicial decisions. *See* ACLU *Amicus* Br. 16; WLP *Amicus* Br. 19-20. But those authorities all recognize that employers *can* "consider[ ] the prior salary" in making wage determinations as long as they do "not rely solely on it in setting the employee's current salary." EEOC, Compliance Manual, No. 915.003 § 10-IV.F.2.g (Dec. 2000), *available at* https://www.eeoc.gov/policy/docs/ compensation.html; *see also Glenn* v. *Gen. Motors Corp.*, 841 F.2d 1567, 1571 (11th Cir. 1988) ("prior salary alone cannot justify a pay disparity"); *Angove* v. *Williams-Sonoma, Inc.*, 70 F. App'x 500, 508 (10th Cir. 2003) (employers cannot "rely[ ] solely upon a prior salary to justify pay disparity"). That is precisely why, as one of the proponents of the Ordinance testified, "many courts" have recognized that wage history is a legitimate "factor other than sex" under the Equal Pay Act and hence a permissible basis for salary differentials. Hr'g Tr. 66 (Fromson); *see also* Chamber Br. 17 (citing cases). In any event, neither the EEOC Guidance nor the court opinions cited by the City undertake an evidence-based inquiry into whether relying on wage history perpetuates discriminatory pay disparities or whether prohibiting wage-history reliance remediates those disparities. They therefore provide no support for the Ordinance's speech restrictions.

16

In light of this evidentiary void, it is apparent that the Ordinance rests on nothing more than "mere speculation or conjecture." *Edenfield*, 507 U.S. at 770-71. The City itself makes that clear in the opening paragraph of its brief, asserting that "it *stands to reason* that employers' reliance upon employee salary history" perpetuates discriminatory pay disparities. Opp. 1. But restrictions on fundamental First Amendment freedoms must be premised on far more than naked appeals to "reason." *See*, *e.g.*, *Rubin*, 514 U.S. at 487, 490 (rejecting government's reliance on "common sense," "anecdotal evidence[,] and educated guesses" because there was "little evidence" supporting the government's key inference). Concrete evidence, thorough analysis, and "empirical judgments" are required. *King*, 767 F.3d at 238 (emphasis added). They are manifestly lacking here.

**c.** Moreover, even if the City could muster sufficient evidence to support a link between wage-history reliance and pay discrimination, the Ordinance would still violate the First Amendment because the City is not permitted to "achieve its policy objectives through the indirect means of restraining certain speech by certain speakers." *Sorrell*, 564 U.S. at 577. The City responds that the Ordinance advances its policy objectives directly by prohibiting access to "wage history that is tainted by prior discrimination." Opp. 13. But that is simply not the case because the Ordinance prohibits access to *all* wage-history information even when it is not tainted by prior discrimination. And there are far more direct (and less speech-restrictive) means for the City to remedy discriminatory pay disparities, including the enforcement of existing equal-pay laws that impose outright prohibitions on wage discrimination against women and racial minorities. The Ordinance's poorly targeted attack on wage discrimination—prohibiting inquiries into wage history because that history might be tainted by discrimination and might be

used to set a salary that perpetuates that discrimination—"cannot justify content-based burdens on speech." *Sorrell*, 564 U.S. at 577.

> **3.      The Ordinance's Speech Restrictions Extend More Broadly Than Necessary.**

In addition to failing to advance the City's antidiscrimination objective, the Ordinance is not narrowly tailored because its speech restrictions are far "more extensive than necessary" to serve the City's stated purpose. *Lorillard Tobacco Co.* v. *Reilly*, 533 U.S. 525, 556 (2001) (internal quotation marks omitted).  Indeed, the City does not dispute that the Ordinance restricts speech "even when the employer's conduct will not result in a lower offer to the employee," Opp. 20, and it fails to provide a constitutionally adequate justification for any of the numerous respects in which the Ordinance is inadequately tailored.

> **a.      The City's acknowledgment (at 20) that the Ordinance restricts speech that does**

not perpetuate discriminatory wage disparities is fatal to its case.  "There is no *de minimis* exception for a speech restriction that lacks sufficient tailoring." *Lorillard*, 533 U.S. at 567.  Yet the City fails to offer *any* justification—and there is none—for restricting inquiries into and reliance on the wage history of applicants whose salaries could not conceivably be tainted by discrimination.  This includes, for example, applicants with lock-step salaries, applicants whose current employers have a public-interest mission or ownership structure that is fundamentally incompatible with wage discrimination—such as civil-rights groups or women- or minority-owned businesses—and applicants whose prospective employers ask about wage history to ascertain the prevailing market wage precisely because they want to *avoid* paying racial minorities and women less than white men.

Nor has the City provided adequate justifications for application of the Ordinance in other settings where the perpetuation of discriminatory wage disparities is implausible.  Where

an employer seeks to entice an applicant by substantially increasing her current salary, the City speculates that the applicant "would certainly" disclose her wage history.  Opp. 20.  But there is no evidence that the applicant would be able to divine the employer's intentions (especially because the employer would be reluctant to disclose those intentions for fear of violating the Ordinance's inquiry prohibition).

With respect to white male applicants, the City asserts that their "salaries may well have been inflated."  Opp. 21.  But the City has no legitimate interest in *reducing* the salary that employers are paying a discrete class of employees—let alone a discrete class of employees equally entitled to the protections of the Fourteenth Amendment and antidiscrimination laws.  In any event, the City's speculation that white males' salaries are "inflated" is belied by the City's legislative findings and expert report, which treat the salaries of white men as a legitimate baseline for measuring a wage gap.  *See* Hr'g Tr. 71; Madden Aff. ¶ 14.  Indeed, closing this "gap" is the ostensible point of the Ordinance, so it is too late for the City to assert that the premise of its law—that white male wages provide the true measure of the desired fairness—is not even accurate, just so that the City can half-heartedly defend the Ordinance's manifest overbreadth.[4]

The Ordinance's imprecise tailoring is exacerbated by its underinclusiveness, which arises from the Ordinance's exception permitting employers to rely on purportedly "tainted"

---

[4] The City's assertion (at 21) that exempting white male applicants from the Ordinance would make them "more popular" is sheer conjecture.  It is far more likely that employers would simply hire the most qualified applicant and peg his *or her* salary to the prevailing market rate paid to white male applicants.  If the City disagrees, it should have commissioned research to substantiate its contrary view, rather than restricting employer speech based on speculation about what might happen if the Ordinance were replaced by a more narrowly tailored substitute.  *See Wollschlaeger*, 848 F.3d at 1313 (explaining that it is "problematic" when a blanket prohibition on speech does not create exceptions where restricting speech would not serve the government's interests).

wage-history information whenever an applicant voluntarily discloses that information. Phila. Code § 9-1131(2)(a)(ii). While underinclusiveness may not be fatal standing alone, Opp. 21, restrictions on commercial speech that are both "severely over- and under-inclusive" cannot withstand First Amendment scrutiny, *Pitt News*, 379 F.3d at 108, because they lack the requisite "fit between the legislature's ends and the means chosen to accomplish those ends." *Lorillard*, 533 U.S. at 555.

The City has likewise failed to explain persuasively why less-speech-restrictive alternatives would be inadequate to achieve its antidiscrimination objective. Although the City need not adopt the "least restrictive means," Opp. 18-19, it must "expla[in] why remedies other than content-based rules would be inadequate." *Sorrell*, 564 U.S. at 575. The Chamber identified three such alternatives: providing job training for women, encouraging employers to conduct voluntary self-evaluations, and more aggressively enforcing existing equal-pay laws. Chamber Br. 19. While the City seeks to muster an explanation in its brief (at 19-20) for why two of those three alternatives are inadequate—it says nothing at all about the job-training alternative—the City was required to consider those alternatives and build an appropriate legislative record *before* enacting the Ordinance's content-based speech restrictions. *See Thompson*, 535 U.S. at 373 (striking down a ban on pharmaceutical advertising where "there is no hint that the Government even considered . . . alternatives"). "If the First Amendment means anything, it means that regulating speech must be a last—not first resort." *Id.* The City gets things precisely backward with its efforts to reverse-engineer a justification for the Ordinance's sweeping, haphazardly targeted speech restrictions.

The Ordinance therefore fails multiple elements of the *Central Hudson* standard.

**C.   The Ordinance Is Unconstitutionally Vague And Its Extraterritorial Effect Violates The U.S. Constitution And Pennsylvania Law.**

After the Chamber filed its brief, the Philadelphia Commission on Human Relations promulgated Regulation 7, which addresses when a wage-history disclosure is "knowingly and willingly" made, Phila. Code § 9-1131(2)(a)(ii), as well as the application of the Ordinance to hiring activity outside the City.  *See* City Ex. 4.  Contrary to the City's assertions (at 22-23), those regulatory provisions do not remedy the Ordinance's unconstitutional vagueness or its unlawful extraterritorial application.

The City argues that the Ordinance is not vague because it is "clear" that the Ordinance's "safe harbor applies if the prospective employee discloses knowingly and willingly."  Opp. 23. But defendants have little ability "to predict" whether a statute is satisfied where, as here, compliance "is measured from [*another*'s] perspective."  *Wollschlaeger*, 848 F.3d at 1321-22. The City's authorities are uniformly inapposite because they reject vagueness challenges where the scienter requirement turned on *the defendant's* state of mind, rather than the state of mind of a third person whose intentions and understandings are unknowable to the defendant.  *See Hill* v. *Colorado*, 530 U.S. 703, 732 (2000); *Hoffman Estates*, 455 U.S. at 499.  Regulation 7.3 does nothing to alleviate this vagueness because it provides that an applicant "knowingly and willingly" discloses her salary history "if the Prospective Employee voluntarily . . . makes the disclosure while knowing . . . that such disclosure may be used in determining any offered salary."  The regulation therefore leaves employers to guess about whether the applicant's disclosure was made "voluntarily" and with the requisite "know[ledge]."

Regulation 7 is equally ineffectual in remedying the Ordinance's unlawful extraterritorial reach.  As the City acknowledges, the Regulation permits application of the Ordinance to interviews that occur outside the City for employment positions in the City.  Opp. 22.  That

direct regulation of hiring activity in other Pennsylvania cities and other States can hardly be termed "incidental," *id.* at 23, given that the very aim of the Ordinance is to restrict employers' speech whenever and wherever they are hiring for a Philadelphia position.  The Ordinance therefore continues to violate the Due Process and Commerce Clauses—as well as Pennsylvania law—by targeting hiring activity that "occur[s] wholly outside the boundaries" of the City and the Commonwealth, *Healy* v. *Beer Inst.*, 491 U.S. 324, 336 (1989), and that is "lawful . . . in other states," *BMW of N. Am., Inc.* v. *Gore*, 517 U.S. 559, 572 (1996).  *See also Commonwealth* v. *Ray*, 272 A.2d 275, 277-78 (Pa. Super. Ct. 1970) (holding that a prohibition on "acquir[ing] a firearm outside of the City, which is brought into the City" without a license, impermissibly "extend[ed]" the City's "authority beyond the city limits").

### D.     Striking Down The Ordinance Will Not Call Into Question Other Laws.

Finally, the City asserts that a decision invalidating the Ordinance will endanger employment statutes preventing inquiries about disability, pregnancy, credit history, or criminal record.  Opp. 25.  This is nothing but fear-mongering.

There is a fundamental distinction between the other employment statutes identified by the City and its Ordinance.  Prohibiting inquiries about and reliance on disability, pregnancy, credit history, or criminal record directly and materially advances the governmental interests underlying those measures:  preventing employment discrimination against the disabled, pregnant women, or individuals with bad credit or criminal convictions.  The Ordinance, in contrast, operates in a far less direct manner.  Even though its objective is to prevent gender and race discrimination in employment, it does not prohibit inquiries about and reliance on an applicant's gender and race.  It instead uses salary as a proxy for those classifications.  Yet there is no evidence that inquiries about and reliance on wage history result in discriminatory pay

disparities and thus no basis to conclude that prohibiting such employer speech will further the City's antidiscrimination objective.  As noted above, the forbidden information targeted by the Ordinance is not itself information about a protected status (*e.g.*, pregnancy or disability); it is information that may or may not reflect a previous employer's discrimination and may or may not be used to set a salary that may or may not perpetuate the effects of discrimination—a daisy chain of conjecture that rests on a series of attenuated and unproven assumptions.  *See supra* at 14-16.  Accordingly, invalidating the Ordinance based on the City's failure to establish a link between wage history and gender- and race-based discrimination would not call into question other statutes that restrict employer speech regarding the very characteristic (*e.g.*, pregnancy) that defines the class that the government is seeking to protect (*e.g.*, pregnant women).

Moreover, these other employment laws typically are far more precisely tailored than the Ordinance and include bright-line exceptions that permit inquiries for legitimate business purposes.  *See* Chamber Br. 22-23.  While the City responds that "there is no similar basis here for eliminating certain jobs or inquiries," Opp. 25, that assertion ignores the feasibility of creating bright-line exceptions where there is no substantial risk of perpetuating discriminatory wage disparities—such as where the applicant has a lock-step salary or is a highly compensated executive whom an employer is trying to lure away through a salary increase.  Recognizing the tailoring flaws in the Ordinance's sweeping restrictions would not undermine the validity of other, more carefully crafted antidiscrimination measures.

## II.    THE REMAINING FACTORS WEIGH OVERWHELMINGLY IN FAVOR OF AN INJUNCTION.

The remaining factors of irreparable harm, balance of the equities, and public interest all weigh decisively in favor of injunctive relief.  *See* Chamber Br. 24-25.  In response, the City contends that irreparable harm "must be something more than a conclusory statement" that the

23

Ordinance violates the First Amendment.  Opp. 26.  But as this Court has recognized, the Third

Circuit adheres to "the automatic presumption principle enounced in *Elrod*" v. *Burns*, 427 U.S.

347, 373 (1976), that the "'loss of First Amendment freedoms, for even minimal periods of time,

unquestionably constitutes irreparable injury.'"  *AFDI* v. *SEPTA*, 92 F. Supp. 3d 314, 329, 330

(E.D. Pa. 2015) (Goldberg, J.) (quoting *Elrod*, 427 U.S. at 373).  The case on which the City

relies, *Reilly* v. *City of Harrisburg*, 858 F.3d 173 (3d Cir. 2017), did not purport to alter this

principle, but simply required plaintiffs to demonstrate that, "in the absence of preliminary

relief," they would refrain from engaging in speech they would otherwise undertake, *id.* at 179—

which the Chamber and its members did (at 24) and the City does not dispute.[5]  Nor does the

City dispute that, if the Chamber is likely to prevail on the merits, the balance of harms and the

public interest favor an injunction.  *See ACLU* v. *Ashcroft*, 322 F.3d 240, 251 n.11 (3d Cir. 2003)

("'[N]either the Government nor the public generally can claim an interest in the enforcement of

an unconstitutional law.'").

## III.    THE CITY'S REQUEST FOR A "FULL HEARING" IS BASELESS.

In response to the City's repeated requests for "discovery," the Court ordered the City to

"address[ ] the necessity of discovery" in its opposition briefing and permitted the City to file a

sur-reply brief addressing the Chamber's response on that issue.  Dkt. 34, at 1 (June 16, 2017).

The City's brief, however, does not even mention "discovery," much less argue that imposing

burdensome discovery requests on the Chamber or its members would be necessary or satisfy the

---

[5] Unrecoverable compliance costs constitute a distinct irreparable injury.  *See Hoxworth* v.
*Blinder, Robinson & Co.*, 903 F.2d 186, 206 (3d Cir. 1990).  If the Ordinance takes effect, the
Chamber's members would be required to restructure their hiring practices, retrain their
employees, and spend substantially more time on hiring activities as a direct result of the
Ordinance.  *See* Chamber Br. 24.  The difficulties of quantifying those costs would create
effectively insurmountable obstacles to recovering the costs from the City.

requirements of the Federal Rules.  Opp. 27.  Accordingly, the City has waived any request for discovery of the Chamber or its members and should not be permitted to sandbag the Chamber by raising the discovery issue in its sur-reply brief.  *See Harvey* v. *Plains Twp. Police Dep't*, 421 F.3d 185, 192 (3d Cir. 2005) ("As Harvey neglected to raise this argument in her opening brief, we find it waived."); *In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 762 n.24 (E.D. Pa. 2014) ("[A]n issue raised for the first time in a reply is deemed to be waived.").  Indeed, since a sur-reply was permitted solely to enable the City to reply to the Chamber's responses to the City's request for discovery, it is difficult to see why any sur-reply should be permitted at all.

The City now requests, instead, "a full evidentiary hearing" so that it may "present evidence that the Ordinance is constitutional."  Opp. 27.  But that request, too, simply underscores the City's failure to oppose the Chamber's arguments with whatever evidentiary materials it believes would meet its burden under the controlling legal standards.  The legislative record supporting the Ordinance's speech restrictions and the materials attached to the City's opposition utterly fail to do so.  It is far too late in the day for the City to attempt to develop evidentiary support for the Ordinance at an evidentiary hearing to come some time in the future and based on evidence the City has yet to identify, much less cogently explain how such evidence could affect the resolution of the controlling questions or why the City has not provided that evidence with its opposition.

Moreover, as the City's own authorities explain, a hearing is not required where, as here, a motion for a preliminary injunction does not "turn[ ] on a disputed factual issue."  *Kos Pharms., Inc.* v. *Andrx Corp.*, 369 F.3d 700, 719 n.16 (3d Cir. 2004); *see also Bradley* v. *Pittsburgh Bd. of Educ.*, 910 F.2d 1172, 1175-76 (3d Cir. 1990) ("[A] decision may be based on affidavits and other documentary evidence if the facts are undisputed and the relevant factual

issues are resolved."); *ASI Bus. Solutions, Inc.* v. *Otsuka Am. Pharm., Inc.*, 233 F. Supp. 3d 432, 438 (E.D. Pa. 2017) ("It has long been recognized that a preliminary injunction may issue . . . without a hearing, if the evidence submitted by both sides does not leave unresolved any relevant factual dispute." (internal quotation marks omitted)).[6]

The Chamber's facial challenge to the Ordinance does not turn on disputed issues of fact. The Chamber itself is under no obligation to produce evidence in support of its challenge to the Ordinance or its request for a preliminary injunction. *See Reilly*, 858 F.3d at 180 ("the burdens at the preliminary injunction stage track the burdens at trial, and for First Amendment purposes they rest with the government" (internal quotation marks omitted)). Thus, the question for the Court is whether the City has "me[t] [its] burden of showing that the ordinance is narrowly tailored appropriate to the government interest involved." *Id.* As demonstrated above, even accepting the City's expert report and snippets of legislative history as uncontradicted, the City has not met that burden. *See supra* at 14-16. In other words, the evidentiary support for the Ordinance is insufficient not because the Chamber has pointed to contrary evidence but because the speculation and *ipse dixit* on which the City relies to defend the Ordinance are inadequate, as *a matter of law*, to justify the Ordinance's speech restrictions. The City has no right to supplement its ineffectual legislative record through a hearing designed to generate *post hoc* support for speech restrictions that should have been studied and analyzed by the City *before* it enacted the Ordinance. *See, e.g.*, *King*, 767 F.3d at 238.

---

[6] *Reilly* v. *City of Harrisburg*, 858 F.3d 173, does not disturb this Circuit's longstanding rule that a hearing is only required when a motion for a preliminary injunction implicates disputed facts. The court did not address whether the city was entitled to a hearing and simply remanded the case for further proceedings because the district court had misallocated the burden of proof in denying a preliminary injunction. *Id.* at 180.

None of the purported "factual dispute[s]" identified by the City is material because they pertain to the extent to which the Ordinance will burden the hiring practices of Philadelphia employers—not to whether the Ordinance directly and materially advances the City's antidiscrimination objectives. *See* Opp. 28 (whether employers "can easily obtain information on past performance and skills to evaluate applicants"); *id.* at 28 n.10 (whether employers will be deprived of "important information they rely upon to find employees"); *id.* (whether the Ordinance will have a "crippling impact" on Philadelphia businesses). Now that the Chamber has concededly established Article III standing, *see* Ans. ¶ 18, those harms are no longer at issue because they have no direct bearing on the question whether the Ordinance unconstitutionally restricts employers' speech. That question turns principally on the link between the City's means and ends, *see Reed*, 135 S. Ct. at 2226; *Rubin*, 514 U.S. at 478, rather than the magnitude of the harm to employers. And, if a First Amendment violation is established, the Chamber and its members will necessarily have suffered irreparable harm, *see Elrod*, 427 U.S. at 373, which obviates the need for any inquiry into the degree of the burden imposed by the Ordinance.

The City's request for a "hearing" thus should be seen for what it is: a fishing expedition. The City's expert has provided a wish list of data the City would supposedly need to determine whether the Ordinance will have a direct and material effect on discriminatory wage disparities. Madden Aff. ¶¶ 17-25. That list confirms that the City has no idea how, if at all, its Ordinance will affect such disparities. It is bad enough that the City aimed to restrict speech first and find a justification later. *See IMDB.com, Inc.* v. *Becerra*, -- F. Supp. 3d --, 2017 WL 2859063, at *2 (N.D. Cal. June 27, 2017) ("If there is no reasonable basis for believing a speech restriction is necessary, the government cannot impose one and then hope a justification materializes"). But the City now has compounded its disregard for the First Amendment by attempting to subject the

Chamber and its members to the cost and delay of an evidentiary hearing as the price for vindicating their First Amendment rights.  As other courts have held in denying similar requests, "[t]hat should never happen."  *Id.* at *3.

## CONCLUSION

For the foregoing reasons, this Court should enter a preliminary injunction preventing Defendants from giving effect to or enforcing the Ordinance pending resolution of the merits of the Chamber's claims and deny the City's request for an evidentiary hearing.

Dated:  October 9, 2017                                    Respectfully submitted,

                                                                      /s/ Miguel A. Estrada
Marc J. Sonnenfeld (PA Bar #17210)          Miguel A. Estrada (admitted *pro hac vice*)
Franco A. Corrado (PA Bar #91436)            Amir C. Tayrani (admitted *pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP               GIBSON, DUNN & CRUTCHER LLP
1701 Market Street                                    1050 Connecticut Avenue, N.W.
Philadelphia, PA  19103                            Washington, D.C.  20036
Telephone:  (215) 963-5000                       Telephone:  (202) 955-8500
Fax:  (215) 963-5001                                Fax:  (202) 467-0539
marc.sonnenfeld@morganlewis.com          mestrada@gibsondunn.com
franco.corrado@morganlewis.com             atayrani@gibsondunn.com


*Attorneys for Plaintiff The Chamber of Commerce for Greater Philadelphia*

## CERTIFICATE OF COMPLIANCE

I hereby certify that on this 9th day of October, 2017, a true and correct copy of the foregoing **PLAINTIFF'S REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION AND IN OPPOSITION TO THE CITY'S REQUEST FOR AN EVIDENTIARY HEARING** was filed and served pursuant to the Court's electronic filing procedures using the Court's CM/ECF system.  I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Miguel A. Estrada
Miguel A. Estrada