**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| THE CHAMBER OF COMMERCE | : | |
| FOR GREATER PHILADELPHIA, | : | |
| individually and on behalf of its members, | : | CIVIL ACTION |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| v. | : | No. 17-1548 |
| | : | |
| CITY OF PHILADELPHIA and | : | |
| PHILADELPHIA COMMISSION ON | : | |
| HUMAN RELATIONS, | : | |
| | : | |
| **Defendants.** | : | |

Goldberg, J.                                                                                  April 30, 2018

<u>**MEMORANDUM OPINION**</u>

Responding to the problem of wage inequality for women and minorities, the City of Philadelphia has enacted an ordinance amending Title 9 of The Philadelphia Code to include provisions on wage equity. The ordinance has two parts. First, it prohibits an employer from inquiring about a prospective employee's wage history ("the Inquiry Provision"); and second, it makes it illegal for an employer to rely on wage history "at any stage in the employment process" to determine a salary for an employee ("the Reliance Provision"). The basic premise of the law's prohibitions is that allowing employers to formulate job offers based on prior salaries that are historically lower for women and minorities perpetuates the wage inequity problem.

Plaintiff, the Chamber of Commerce for Greater Philadelphia ("the Chamber"),[1] on behalf of itself and several of its members including Comcast Corporation, Children's Hospital

of Philadelphia, and Bittender Construction, seeks a preliminary injunction, arguing that both the Inquiry and Reliance Provisions violate the First Amendment's free speech clause.

While the City of Philadelphia's efforts in passing the ordinance are certainly laudable, I conclude that the Inquiry Provision violates the First Amendment's free speech clause. Consequently the Chamber's Motion for a Preliminary Injunction as to that portion of the Ordinance will be granted. Because I conclude that the Reliance Provision does not implicate speech, and thus the First Amendment, the Chamber's Motion as to that portion of the ordinance will be denied.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

As of 2015, women in Pennsylvania earn 79 cents for every dollar a man earns, and African American women earn 68 cents for every dollar a man earns. Phila. Code. § 9-1131(1)(a) (citing United States Census Bureau Report 2015). As I note throughout this Opinion, the existence of this wage gap is not disputed.

The City of Philadelphia has endeavored to diminish the wage gap in Philadelphia through amendment of Title 9 of The Philadelphia Code to include provisions on wage equity ("the Ordinance").[3] The relevant portions of the Ordinance are codified at Philadelphia Code § 9-1131 and state:

§ 9-1131.  Wage Equity.

. . . .

(2) Prohibition on Inquiries into Wage History.

(a) It is an unlawful employment practice for an employer, employment agency, or employee or agent thereof:

(i) To inquire about a prospective employee's wage history, require disclosure of wage history, or condition employment or consideration for an interview or employment on disclosure of wage history, or retaliate against a prospective employee for failing to comply with any wage history inquiry or for otherwise opposing any act made unlawful by this Chapter.

(ii) To rely on the wage history of a prospective employee from any current or former employer of the individual in determining the wages for such individual at any stage in the employment process, including the negotiation or drafting of any employment contract, unless such applicant knowingly and willingly disclosed his or her wage history to the employer, employment agency, employee or agent thereof.

(b) This subsection (2) shall not apply to any actions taken by an employer, employment agency, or employee or agent thereof, pursuant to any federal, state or local law that specifically authorizes the disclosure or verification of wage history for employment purposes.

(c) For purposes of this Section 9-1131, "to inquire" shall mean to ask a job applicant in writing or otherwise, and "wages" shall mean all earnings of an employee, regardless of whether determined on time, task, piece, commission or other method of calculation and including fringe benefits, wage supplements, or other compensation whether payable by the employer from employer funds or from amounts withheld from the employee's pay by the employer.

Id. § 9-1131(2).

Employers who violate the Ordinance are subject to civil and criminal penalties, including compensatory damages, up to $2,000 in punitive damages per violation, and an additional $2,000 and 90 days' incarceration for a repeat offense.  Id. §§ 9-1105(1)(c)-(d), 9-1121(2).

3

Introduced in September 2016, the Ordinance was the subject of a hearing before Philadelphia City Council's Committee on Law and Government on November 22, 2016. After the Committee reported the bill favorably, it was unanimously passed on December 8, 2016. The Ordinance was signed into law by the Mayor of Philadelphia on January 23, 2017 and was scheduled to take effect on May 23, 2017.[4] The Ordinance relies on the following findings:

(a) In Pennsylvania, women are paid 79 cents for every dollar a man makes, according to a United States Census Bureau 2015 report. Women of color are paid even less. African American women are paid only 68 cents to the dollar paid to a man, Latinas are paid only 56 cents to the dollar paid to men, and Asian women are paid 81 cents to the dollar paid to men.

(b) The gender wage gap has narrowed by less than one-half a penny per year in the United States since 1963, when the Congress passed the Equal Pay Act, the first law aimed at prohibiting gender-based pay discrimination, according to the National Committee on Pay Equity.

(c) In August of 2016, Massachusetts became the first state to enact a law prohibiting employers from seeking or requiring a prospective employee's wage history.

(d) Since women are paid on average lower wages than men, basing wages upon a worker's wage at a previous job only serves to perpetuate gender wage inequalities and leave families with less money to spend on food, housing, and other essential goods and services.

Id. § 9-1131(1). Finding (d)—that setting salaries based on previous employment wages perpetuates gender wage inequalities—is the central issue in this case.[5]

On April 6, 2017, the Chamber, filed a Complaint and a motion for a preliminary injunction against the City of Philadelphia and the Philadelphia Commission on Human Relations ("the PCHR") (collectively, "the City"), primarily averring that the Ordinance violates the First Amendment rights of employers. I dismissed the Chamber's original Complaint for lack of standing on May 1, 2017, allowing the Chamber to file an amended complaint. On June 13, 2017, the Chamber filed the Amended Complaint and refiled its Motion for a Preliminary

Injunction ("Motion").  Following extensive briefing, I held oral argument on the Motion on February 1, 2018.[6]

## LEGAL STANDARD – PRELIMINARY INJUNCTIONS
## IN FIRST AMENDMENT CASES

A preliminary injunction is an extraordinary remedy.  Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 800 (3d Cir. 1989).  As such, the granting of preliminary injunctive relief is restricted to limited circumstances.  Id.  In order to obtain a preliminary injunction, a plaintiff must establish four elements:

> (1) the likelihood that the plaintiff will prevail on the merits at final hearing; (2) the extent to which the plaintiff is being irreparably harmed by the conduct complained of; (3) the extent to which the defendant will suffer irreparable harm if the preliminary injunction is issued; and (4) the public interest.

A.T.&T. Co. v. Winback & Conserve Program, Inc., 42 F.3d 1421, 1427 (3d Cir. 1994) (internal citations omitted) (quoting Merch. & Evans, Inc. v. Roosevelt Bldg. Prods., 963 F.2d 628, 632-33 (3d Cir. 1992)).  A party moving for a preliminary injunction must initially "meet the threshold for the first two . . . factors," and only if these "gateway factors" are met, should the district court then consider the remaining two factors.  Reilly v. City of Harrisburg, 858 F.3d 173, 178 (3d Cir. 2017), as amended (June 26, 2017).  The court must then determine "in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief."  Id. at 179.

The United States Court of Appeals for the Third Circuit recently clarified the standard for a preliminary injunction in First Amendment cases in Reilly v. City of Harrisburg, 858 F.3d 173 (3d Cir. 2017), as amended (June 26, 2017).  Typically, to obtain a preliminarily injunction, the plaintiff has the burden of demonstrating a likelihood of success on the merits.  The Third Circuit explained in Reilly that in First Amendment cases, the government bears the burden of

proof as to the constitutionality of a law, thus the plaintiff "must be deemed likely to prevail" unless the government demonstrates the constitutionality of the law. Id. at 180 (quoting Ashcroft v. ACLU, 542 U.S. 656, 666 (2004)). This is because "'the burdens at the preliminary injunction stage track the burdens at trial,'" and for First Amendment purposes the burden of demonstrating the constitutionality of a law rests with the government. Id. (quoting Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418, 429 (2006)).

In light of the above, the analysis in First Amendment cases proceeds as follows. The initial burden of proving that a law restricts protected speech lies with the challenger. Id. at 180 n.5. The burden then shifts to the government to demonstrate the constitutionality of the challenged restriction under the appropriate level of scrutiny. Id. If the government is successful in demonstrating constitutionality, "then the motion for a preliminary injunction fails because there is no likelihood of success on the merits." Id. If the government cannot establish that the law is constitutional, the challenger must still demonstrate irreparable harm. Id.

## LEGAL ANALYSIS

The Chamber argues that both the Inquiry and Reliance Provisions of the Ordinance violate the First Amendment, the Due Process Clause of the Fourteenth Amendment, the Commerce Clause of the United States Constitution, and the Pennsylvania Constitution. Because the Ordinance essentially has two parts, I will analyze each in turn.

**I. Likelihood of Success on the Merits**

**A. The Inquiry Provision**

The parties agree that the Inquiry Provision targets speech, and indeed it does—it forbids employers from asking questions on a specific topic. The question is whether the Inquiry Provision violates the First Amendment. As noted above, the burden for proving the

constitutionality of the Inquiry Provision rests with the City. The parties disagree as to what type of speech the provision regulates and thus what level of scrutiny should be applied in determining the constitutionality of the provision. They also disagree as to the result when scrutiny is applied.

### 1. *What Type of Speech Does the Inquiry Provision Regulate?*

The City urges that wage history inquiries are related to the economic interest of the speaker and thus constitute commercial speech. The Chamber responds that the speech at issue is not commercial speech.

In the seminal case of Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y., 447 U.S. 557 (1980), the United States Supreme Court defined commercial speech as "expression related solely to the economic interests of the speaker and its audience." Id. at 561. Since then, the Court has stated that "core" commercial speech is "'speech which does no more than propose a commercial transaction.'" Bolger v. Youngs Drug Prods. Corp., 463 U.S. 60, 66 (1983) (quoting Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc., 425 U.S. 748, 762 (1976)) (finding that informational pamphlets containing contraceptive advertisements constituted commercial speech).

In U.S. Healthcare, Inc. v. Blue Cross of Greater Phila., 898 F.2d 914 (3d Cir. 1990), the Third Circuit noted that "[c]ommercial speech may be broadly defined as expression related to the economic interests of the speaker and its audience, generally in the form of a commercial advertisement for the sale of goods and services." Id. at 933. The Third Circuit has identified three questions courts should consider in determining whether speech is commercial: (1) "is the speech an advertisement"; (2) "does the speech refer to a specific product or service"; and (3) "does the speaker have an economic motivation for the speech." Id. (citing Bolger, 463 U.S.

at 66-67).  The Third Circuit observed in U.S. Healthcare that "[a]n affirmative answer to all three 'provides strong support for the conclusion that the speech is commercial.'"  Id. (quoting Bolger, 463 U.S. at 67).  This inquiry "rests heavily on 'the common sense distinction between speech proposing a commercial transaction . . . and other varieties of speech.'"  Id. (quoting Zauderer v. Office of Disciplinary Counsel, 471 U.S. 626, 637 (1985)).

Courts have interpreted the definition of commercial speech to include a broad range of commercial-related expression.  See, e.g., Valle Del Sol Inc. v. Whiting, 709 F.3d 808, 818-19 (9th Cir. 2013) (finding a provision making it unlawful for an occupant of a car to solicit or hire a day laborer if the car blocks traffic implicated the day laborers' commercial speech because "the primary purpose of the communication is to advertise a laborer's availability for work and to negotiate terms of such work"); Campbell v. Robb, 162 F. App'x 460, 469-70 (6th Cir. 2006) (finding a statement made by a landlord to a prospective tenant describing conditions of a rental was "part and parcel to a rental transaction" and thus constituted "core" commercial speech); Hyman v. City of Louisville, 132 F. Supp. 2d 528, 541-42 (W.D. Ky. 2001) (finding a doctor's advertisements were proposals of possible employment and thus constituted commercial speech), vacated on other grounds, 53 F. App'x 740 (6th Cir. 2002); Nomi v. Regents for Univ. of Minn., 796 F. Supp. 412, 417 (D. Minn. 1992), (finding that military recruitment "proposes a commercial transaction [with] the purpose of . . . reach[ing] an agreement under which services will be exchanged for compensation," and thus constituted commercial speech), vacated on other grounds, 5 F.3d 332 (8th Cir. 1993).

Here, the Inquiry Provision prohibits Philadelphia-based employers from asking potential hires about their previous wage history.  This inquiry occurs in the context of a job application or job interview, both of which propose a commercial transaction, with the "purpose of . . .

8

reach[ing] an agreement under which services will be exchanged for compensation." Nomi, 796 F. Supp. at 417.  Similar to the day laborer provision in Valle Del Sol, the Inquiry Provision relates to attempts to hire and hiring, and thus "all affected speech is either speech soliciting a commercial transaction or speech necessary to the consummation of a commercial transaction." 709 F.3d at 818.  While a wage history inquiry may not fit as neatly into the commercial speech category as the advertisement for contraceptives in Bolger, it is akin because a wage history inquiry occurs in the context of negotiating a job.  Based upon this precedent, and the activity affected by the Ordinance, I conclude that the Inquiry Provision regulates wage history inquiries, which constitute commercial speech.

### 2. *What Level of Scrutiny Applies?*

The City submits that laws regulating commercial speech are subject to intermediate scrutiny under Central Hudson.  Citing to the Supreme Court's decisions in Sorrell v. IMS Health, Inc., 564 U.S. 552 (2011) and Reed v. Town of Gilbert, 135 S. Ct. 2218 (2015), the Chamber responds that even if the targeted speech is commercial, strict scrutiny, and not Central Hudson's intermediate scrutiny, applies because the Inquiry Provision is content and speaker based.

The Supreme Court announced in Central Hudson that commercial speech receives reduced protection because it transpires in an area traditionally subject to government regulation. 447 U.S. at 562-63; see also King v. Governor of the State of N.J., 767 F.3d 216, 234 (3d Cir. 2014).  Commercial speech is "linked inextricably with the commercial arrangement it proposes," and thus "'the State's interest in regulating the underlying transaction may give it a concomitant interest in the expression itself.'"  King, 767 F.3d at 234 (quoting Edenfield v. Fane, 507 U.S. 761, 767 (1993)).  The type of scrutiny applied to commercial speech has been labeled

"intermediate scrutiny." See id. at 234 (quoting Fla. Bar v. Went for It, Inc., 515 U.S. 618, 623-24 (1995)).

Whether the Supreme Court upended the Central Hudson intermediate scrutiny test in Sorrell and Reed for content-based or speaker-based commercial speech regulations is not abundantly clear. Reed does not address commercial speech. Sorrell references a "heightened scrutiny," but it is just as likely that this is the same as intermediate scrutiny, which is stricter than rational basis scrutiny. See Retail Digital Network, LLC v. Prieto, 861 F.3d 839, 847 (9th Cir. 2017) ("There is nothing novel in Sorrell's use of the term 'heightened scrutiny' to distinguish from rational basis review.").

Moreover, since Sorrell and Reed, circuit courts confronted with content- and speaker-based restrictions on commercial speech have continued to apply Central Hudson's intermediate scrutiny rather than strict scrutiny. See, e.g., Retail Digital Network, 861 F.3d at 846 ("Sorrell did not mark a fundamental departure from Central Hudson's four-factor test, and Central Hudson continues to apply."); 1-800-411-Pain Referral Serv., LLC v. Otto, 744 F.3d 1045, 1055 (8th Cir. 2014) ("The upshot is that when a court determines commercial speech restrictions are content- or speaker-based, it should then assess their constitutionality under Central Hudson."); Educ. Media Co. at Va. Tech, Inc. v. Insley, 731 F.3d 291, 298 (4th Cir. 2013) (declining to determine whether strict scrutiny applied because the challenged regulation failed Central Hudson's intermediate scrutiny); United States v. Caronia, 703 F.3d 149, 165-69 (2d Cir. 2012) (applying Central Hudson to a content- and speaker-based regulation); see also King v. Gen. Info. Servs., Inc., 903 F. Supp. 2d 303, 308 (E.D. Pa. 2012) (observing that in Sorrell, "the Supreme Court stopped far short of overhauling nearly three decades of precedent, which is

clearly demonstrated by the fact that the opinion characterizes commercial speech precedence, including <u>Central Hudson</u> itself, for support").

Other circuit courts have either highlighted a lack of clarity around the commercial speech doctrine post-<u>Sorrell</u>, <u>see</u>, <u>e.g.</u>, <u>Ocheesee Creamery LLC v. Putnam</u>, 851 F.3d 1228, 1235 n.7 (11th Cir. 2017), or addressed it in the context of other types of speech. <u>See</u>, <u>e.g.</u>, <u>King</u>, 767 F.3d at 235 (finding that professional speech receives the same protection as commercial speech and relying on <u>Central Hudson</u> for the standard); <u>ACLU of Ill. v. Alvarez</u>, 679 F.3d 583, 586, 604-08 (7th Cir. 2012) (referencing "several variations of intermediate scrutiny" in various speech contexts and concluding the statute at issue failed to satisfy the elements of any of those standards).

In light of the lack of clarity surrounding this issue, and because I conclude <u>infra</u> that the Inquiry Provision does not pass muster under the <u>Central Hudson</u> framework, I need not determine whether the <u>Central Hudson</u> test has been broadened for content- or speaker-based restrictions. I will thus apply <u>Central Hudson</u>'s intermediate scrutiny to the Inquiry Provision.

### 3. *Application of <u>Central Hudson</u> to the Inquiry Provision*

The City urges that the Inquiry Provision passes muster under the <u>Central Hudson</u> test. With the exception of the City's interest, which the Chamber concedes is substantial, the Chamber contests the Inquiry Provision's ability to satisfy all steps of the <u>Central Hudson</u> test.

The framework outlined in <u>Central Hudson</u> for analyzing commercial speech is as follows:

> For commercial speech to come within [the First Amendment], it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

447 U.S. at 566. A regulation that does not pass muster under this test violates the First Amendment.

The first step, which asks whether the speech concerns unlawful activity or is misleading, is a threshold question. If answered in the affirmative, the analysis ends because commercial speech that concerns unlawful activity or is misleading remains unprotected. See Zauderer, 471 U.S. at 638. Where the speech does not concern unlawful activity and is not innately misleading, the government may regulate the speech only if its restriction satisfies all of the remaining prongs of the Central Hudson test.

"The last two steps of the Central Hudson analysis basically involve a consideration of the 'fit' between the legislature's ends and the means chosen to accomplish those ends." Posadas de Puerto Rico Assocs. v. Tourism Co. of Puerto Rico, 478 U.S. 328, 341 (1986).

    a.   Does the Commercial Speech at Issue Concern Unlawful Activity or Is It Misleading?[7]

The City posits that, "[b]ecause employer wage history queries are 'commercial speech related to [the] illegal activity' of relying upon wage history, they are unprotected speech under Central Hudson." The City explains that similar to provisions contained in anti-discrimination laws, the Inquiry Provision prohibits acquiring information that the "main" provision of the Ordinance (the Reliance Provision) prohibits employers from using. The Chamber responds that because the Reliance Provision is unconstitutional, the Inquiry Provision cannot be justified as related to this other unconstitutional speech restriction. The Chamber also contends that even if the Reliance Provision is a constitutional restriction on conduct, wage history inquiries do not pertain to unlawful activity simply because the Reliance Provision makes it illegal to rely on

wage history in fashioning a salary. Because I conclude below that the Reliance Provision does not constitute a speech restriction, I will address only the Chamber's second argument.

The City relies upon Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations, 413 U.S. 376 (1973), a case that informed the Supreme Court's ruling in Central Hudson. In Pittsburgh Press, the Supreme Court concluded that commercial speech related to illegal activity could be regulated. There, the Court addressed an ordinance that precluded, among other things, (1) discrimination in employment on the basis of a variety of characteristics, including sex; (2) publishing or circulating, or causing to publish or circulate, "any notice or advertisement relating to 'employment' or membership which indicate[d] any discrimination because of sex"; and (3) aiding "in the doing of any act declared to be an unlawful employment practice by this ordinance." Id. at 378. The lower court had found Pittsburgh Press in violation of the Ordinance's third provision for carrying "help-wanted" advertisements in sex-designated columns. Id. at 380.

The Supreme Court agreed that Pittsburgh Press's practice of placing "help-wanted" advertisements for employment in sex-designated columns aided employers in "indicating" illegal sex preferences. Id. at 388. The Court found that this amounted to illegal commercial activity because discrimination in employment was illegal under the ordinance. Id. ("We have no doubt that a newspaper constitutionally could be forbidden to publish a want ad proposing a sale of narcotics or soliciting prostitutes."). The Court further concluded that the provision prohibiting the aiding of discrimination was a permissible speech restriction because "[a]ny First Amendment interest which might be served by advertising an ordinary commercial proposal and which might arguably outweigh the governmental interest supporting the regulation is altogether absent when the commercial activity itself is illegal and the restriction on advertising is

13

incidental to a valid limitation on economic activity." Id. at 389. Significantly, the Court observed that the provision making sex discrimination in employment illegal was unchallenged, as was the provision prohibiting employers from publishing or causing to be published any advertisements "indicating" sex discrimination. Id. at 388-89.

Here, while using wage history to formulate salaries is made illegal pursuant to the Reliance Provision, other uses of wage history are not illegal. For example, acquisition of wage history is allowed in other contexts such as for gathering market information or identifying applicants whom employers can or cannot afford. And, unlike discrimination, the existence of a wage history is not in and of itself illegal. In Pittsburgh Press, the aiding of a discriminatory employment practice necessarily pertained to illegal discriminatory employment practice. Simply because wage history could be relied upon in fashioning a salary in violation of the Reliance Provision does not render all other legal activity related to wage history illegal. See Dunagin v. City of Oxford, 718 F.2d 738, 743 (5th Cir. 1983) (en banc) ("The commercial speech doctrine would disappear if its protection ceased whenever the advertised product might be used illegally."). Additionally, unlike in Pittsburgh Press where the provision rendering discriminatory employment practices was unchallenged, here, the Reliance Provision is challenged. Pittsburgh Press is therefore distinguishable.

The City's reliance upon Nat'l Ass'n of Tobacco Outlets, Inc. v. City of Providence, 731 F.3d 71 (1st Cir. 2013), is also unavailing. In that case, one provision of an ordinance prohibited the sale of tobacco products by way of coupons and multi-pack discounts, and a second provision prohibited licensed tobacco retailers from accepting, redeeming, or offering to accept or redeem coupons providing tobacco products for free or at a discounted price. Id. at 74. Applying the first prong of Central Hudson, the United States Court of Appeals for the First Circuit found that

the second provision of the ordinance regulated illegal activity because the underlying transaction was illegal pursuant to the first provision. Id. at 78. The court explained that the second provision prohibited offering to engage in illegal activity, "that is, sales of tobacco products by way of coupons and multi-pack discounts, which are banned," and consequently such offers could be "freely regulated." Id.

In contrast, to inquire into wage history is not an offer to engage in otherwise illegal activity, as information gathered through a wage history inquiry could be used for many activities other than relying upon it to determine a salary. The underlying commercial transaction is not illegal like the sale of tobacco products through coupons or multi-pack discounts was in Tobacco Outlets. Rather, the underlying commercial transaction here, hiring employees, is lawful. See also Katt v. Dykhouse, 983 F.2d 690, 697 (6th Cir. 1992) ("The proper inquiry under the first prong of the Central Hudson test is whether the *underlying* commercial transaction is lawful.") (emphasis in original).[8]

Finally, a ruling as the City requests would stand Central Hudson on its head. If the City's position were correct, City Council could pass any law with two provisions, one of which impermissibly regulates commercial speech, so long as the other provision renders one use of the underlying commercial speech unlawful. For all of the forgoing reasons, I find that the Inquiry Provision does not concern unlawful activity nor is it misleading, and will thus proceed to the next step of the Central Hudson test.

      b.  Is the City's Interest Substantial?

The parties agree that the City has a substantial interest in promoting wage equity and reducing discriminatory wage disparities.

c.   Does the Inquiry Provision Directly Advance the City's Asserted Interest?

The City maintains that the Inquiry Provision satisfies this prong of the analysis, insisting there is sufficient evidence to establish that the wage gap is the result of discrimination and that City Council's decision to prohibit inquiries into wage history will promote wage equality.   The City first points to the testimony before City Council of Terry L. Fromson, Managing Attorney for the Women's Law Project, for the proposition that the wage gap begins with a woman's first job and grows over time because raises after an employee is hired are calculated based on current salary.   Relying on the testimony of Rue Landau, Executive Director of the PCHR, the City then asserts that based on this initial wage gap, common sense suggests that asking about wage history during the hiring process propagates wage inequality.   The City also points to the affidavit of a labor economics expert, Dr. Janice Madden, and an article published quoting Dr. Victoria Budson, Executive Director of the Women and Public Policy Program at Harvard University's Kennedy School, which I address in greater detail below.   The City concludes that Council "had more than enough expert opinion and information" to conclude that the Inquiry Provision would advance the asserted interest.  (Resp. at 12-15.)

Citing to Turner Broad. System, Inc., v. F.C.C., 520 U.S. 180 (1987) ("Turner II"), King v. Governor of the State of New Jersey, 767 F.3d 216 (3d Cir. 2014), and Florida Bar v. Went for It, Inc., 515 U.S. 618 (1995), the City also urges that City Council's predictive judgment is entitled to deference and that empirical studies demonstrating that the Inquiry Provision will narrow the wage gap are not required.   It avers that based on the record before it, Council properly exercised its predictive judgment.  The City notes that this is especially true here where no other law regulating wage history inquiries is yet in effect and therefore evidence detailing what happens when wage history is withheld does not yet exist.  (Resp. at 15-16; Reply at 8-9.)

In response, the Chamber relies upon Edenfield v. Fane, 507 U.S. 761 (1993), Wollschlaeger v. Governor of Fla., 848 F.3d 1293 (11th Cir. 2017), Rubin v. Coors Brewing Co., 514 U.S. 476 (1995), and Pitt News v. Pappert, 379 F.3d 96 (3d Cir. 2004), all discussed infra, to illustrate that there is insufficient evidence to establish that the harm is real and that the Ordinance will alleviate the alleged harm. The Chamber urges that the City relies upon "[m]ere speculation and conjecture" and fails to provide "at least *some* concrete evidence" that the Inquiry Provision will alleviate the asserted harms. According to the Chamber, there was no evidence before City Council about how often employers rely on wage history in setting salaries or to what extent that practice perpetuates the wage gap, nor was there any empirical or anecdotal evidence to demonstrate that employers rely on wage history to reduce a salary below what they would otherwise offer. Given these deficiencies, the Chamber concludes that no evidence supports City Council's finding that reliance on wage history perpetuates discriminatory gender wage inequalities, nor does any evidence eliminate the real possibility that pay disparities are caused by other factors. (Mot. at 15-16.)

To meet its burden of showing that a law "directly advances" a substantial interest, the City must establish that "the harms it recites are real and that its restriction will in fact alleviate them to a material degree." Edenfield, 507 U.S. at 770-71; see also Turner Broad. Sys., Inc. v. F.C.C., 512 U.S. 622, 664 (1994) ("Turner I") ("When the Government defends a regulation on speech as a means to redress past harms or prevent anticipated harms, it must do more than simply 'posit the existence of the disease sought to be cured.'") (quoting Quincy Cable TV, Inc. v. FCC, 768 F.2d 1434, 1455 (D.C. Cir. 1985)); King, 767 F.3d at 238 (explaining that the government "must show the harms are 'real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way.'") (quoting Turner I, 512 U.S. at 664).

In conducting this analysis, the court "do[es] not review a legislature's empirical judgment *de novo*," but instead "determines whether the legislature has 'drawn reasonable inferences based on substantial evidence.'" King, 767 F.3d at 238 (quoting Turner II, 520 U.S. at 195). "'[T]he quantum of empirical evidence'" necessary to satisfy intermediate scrutiny "'will vary up or down with the novelty and plausibility of the justification raised.'" Id. (citing Nixon v. Shrink Mo. Gov't PAC, 528 U.S. 377, 391 (2000)).

I have carefully reviewed the record before City Council, which consists of testimony from six professionals in Philadelphia as well as anecdotes of two women who have been asked about their wage history during the job application process. In summary, the record is comprised of the following:

- Rue Landau, Executive Director of the PCHR, stated that according to a 2015 United States Census report, women in Pennsylvania earn 79 cents for every dollar a man earns. She described the effect of the 2007-2009 recession on this gap. Ms. Landau concluded that "[i]t stands to reason that the practice of asking an applicant's wage history during the hiring process can perpetuate wage inequality, low wages, and poverty," and pronounced that the Ordinance will "help break the cycle of wage inequality and discrimination."

- Jovida Hill, Executive Director for the Philadelphia Commission for Women, testified that women in Pennsylvania are paid 79 cents for every dollar a man makes, and that the gap for women of color is worse. She provided statistics demonstrating the difference in pay to which this gap can amount for women. Ms. Hill concluded that the Inquiry Provision alone would not resolve pay inequity but would allow a woman a "better chance at improving her salary prospects by removing pay bias."

- Terry L. Fromson, Managing Attorney for the Women's Law Project, testified about the wage gap and stated that wage history is not gender neutral because "[a] woman's prior pay is often set based upon a sex discriminatory assessment of her worth," and thus permitting employers to "rely on prior pay keeps women at a lower rate of pay." Ms. Fromson noted that the "bias inherent in pay" has been acknowledged by the Equal Employment Opportunity Commission Company ("EEOC") Compliance Manual, which states that "[p]rior salary cannot, by itself, justify a compensation disparity" because "prior salaries . . . can reflect sex-based compensation discrimination" and thus perpetuate "inequality in compensation among genders." Additionally, she explained that in 2015 the Chair of the EEOC

encouraged employers to ensure equal pay for equal work by eradicating "discriminatory pay gaps on the basis of prior salary." Ms. Fromson also discussed two cases where allegedly neutral pay schemes that based pay on the immediately prior salary were challenged as discriminatory. One of these cases settled and in the other the court denied summary judgment for the defendant. She concluded that the Ordinance would "significantly reduce the wage gap."

- Barbara Price, the State Public Policy Co-Chair of the American Association of University Women of Pennsylvania, reviewed pay gap data in Pennsylvania by district and the implications of this gap for women. She concluded that "[t]he proposed bill would go a long way to [ensure] workplace fairness and equal pay protection for women."

- Marianne Bellesorte, Vice President of Advocacy at PathWays PA, referenced the wage gap and submitted that one way to address wage inequality is to "ensur[e] that a history of low salaries does not follow a woman into a new workplace." She emphasized that "[i]nequitable wages are compounded when women (or men of color) apply for new jobs and are asked to share their pay history. Instead of starting the new job on an equal footing, they enter with a lower salary because it was based on their previous employment." According to Ms. Bellsorte, "[b]y preventing potential employers from asking for salary history, Philadelphia's workers will gain the ability to earn what their work is actually worth."

- Jeni Wright and Melissa Beatriz Skolnick provided anecdotes regarding their discomfort with being asked about wage history when applying for jobs.

- Rob Wonderling, the President and CEO of the Chamber of Commerce for Greater Philadelphia, testified regarding concerns about the Ordinance, proposing some adjustments. He also described the benefits of considering wage history.

(Resp., Ex. 2.)

I initially note that practically all of the above testimony amplifies a point that really is not in dispute—that there is a gender pay disparity. But other than each witness's theory, no evidence was referenced to support the premise that the Inquiry Provision would reduce that disparity.

Although not before City Council, the City also cites extensively to the conclusions of its labor economics expert, Dr. Janice Madden.[9] Dr. Madden's sixteen-page affidavit sets forth

numerous opinions, most of which are drawn from conclusions based on labor market research.

These conclusions include:

- Labor market researchers are in general agreement that women and/or members of racial and ethnic minorities have received and currently receive lower wages than comparably qualified and performing men and/or members of majority racial and ethnic groups.

- Antidiscrimination laws, including the Civil Rights Act and the Equal Pay Act, have not eliminated the lower wages generally received by women and minority workers relative to men and majority workers of equivalent skill, ability, experience, and performance.

- Starting salaries typically differ by race and gender for workers of equivalent skills and abilities.[10]

- Starting salary differentials are a primary source of subsequent salary differentials by race and gender.[11]

- While salary history correlates with past performance, abilities, experience, and skills, it also correlates with race and gender, resulting in past salaries being systematically lower for women and members of minority racial and ethnic groups with equivalent performance, abilities, experience, and skills to men and majority workers.[12]

- The available evidence shows that when employers do not have access to salary history, they easily obtain information on past performance and skills of applicants and they select hires with this information as effectively as those using salary histories.

- Application and payroll data from firms claiming that past salary histories are necessary to their business are required to test and demonstrate their claims.

(Id., Ex. 5 at 4-5.)  From these conclusions, Dr. Madden formulates her central observations:

Salary histories are tainted because applicants from the majority group have a higher proper salary, given their objective credentials, than do identically qualified applicants from groups subject to discriminatory treatment. Consideration of prior salary in the hiring process is comparable to hiring by using racially or gender-based requirements, not necessary to the job, to screen applicants differently by race or gender.

If there were no wage discrimination in the labor market, then prior salary would correlate with performance and ability for both majority and minority workers. If

there were any such discrimination in the labor market, however, the use of prior salary history in determining whom to hire or in setting salaries would lead to differential hiring and pay for applicants from groups subject to discrimination because of their race, gender, or ethnicity[.]

(Id. at 7.)

Finally, the City points to an article published quoting Dr. Victoria Budson, Executive Director of the Women and Public Policy Program at Harvard University's Kennedy School, in which Dr. Budson states that because research shows that women begin with a lower salary, it is "empirically true" that they will make less when employers base future salaries on that initial lower salary. Acknowledging that no researchers have yet evaluated this claim, Dr. Budson states that "[w]e can't only move things forward once we've tested them," and "[w]hat we know is when women—and particularly women and men of color—get hired, people are more likely to underpay them. And when you peg your offer and salary based on what someone's made in their last employment, you then replicate whatever discrimination people have faced in prior jobs." (Id., Ex. 6.)

The central question regarding the third prong of Central Hudson is how much evidence is necessary to establish that the Ordinance directly advances the City's substantial interest, viewed in conjunction with the deference owed to the legislative body. To answer this question, some foundational review of First Amendment precedent is necessary.

In Edenfield v. Fane, the Supreme Court addressed the constitutionality of the Florida Board of Accountancy's rule prohibiting certified public accountants [("CPA")] from engaging in "direct, in-person, uninvited solicitation" to obtain new clients. 507 U.S. at 764. The Florida Board's stated interests were to protect consumers from fraud or overreaching by CPA's, as well as maintaining CPA independence and safeguarding against conflicts of interest. Id. at 768.

Explaining the standard for the third prong of <u>Central Hudson</u>, the Supreme Court emphasized that the government could not satisfy its burden by relying on "mere speculation or conjecture," but rather, "must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." <u>Id.</u> at 770-71. Applied to the facts, the Court found that the Florida Board had failed to demonstrate that its ban on solicitation would advance the asserted interests in a "material and direct way." <u>Id.</u> at 771. The Florida Board had not presented any studies suggesting that personal solicitation of prospective clients created the dangers of fraud, overreaching, or compromised independence, nor had it presented any anecdotal evidence that supported the Florida Board's theories. <u>Id.</u>

The only suggestion that the Florida Board's rule would help prevent the stated harm came from an affidavit of one of the former chairmen of the Florida Board. <u>Id.</u> In his affidavit, the former chairman concluded the solicitation ban was necessary "to preserve the independence of CPA's performing the attest function, which involves the rendering of opinions on a firm's financial statements," and to prevent "overreaching and vexatious conduct by the CPA." <u>Id.</u> at 764-65. This conclusion was premised on the theory that a CPA who solicits clients "is obviously in need of business and may be willing to bend the rules," and thus if a CPA solicited a client, he would be "beholden" to that client. <u>Id.</u> at 765. The Court found this affidavit contained "nothing more than a series of conclusory statements that add little if anything to the Board's original statement of its justifications."[13] <u>Id.</u> at 771.

Two years later, in <u>Rubin v. Coors Brewing Co.</u>, the Supreme Court addressed Section 205(e)(2) of the Federal Alcohol Administration Act, which prohibited beer labels from displaying alcohol content for fear of a "strength war" among brewers. 514 U.S. at 478-79. The stated interest was to protect the health, safety, and welfare of the public by preventing brewers

from competing on the basis of alcohol strength, which could lead to greater alcoholism and related social costs. Id. at 485. The government argued that support for its proposition that this stated interest was advanced by the Section 205(e)(2) came from "common sense" because "a restriction on the advertising of a product characteristic will decrease the extent to which consumers select a product on the basis of that trait." Id. at 487. Additionally, the government pointed to history as a guide, stating that the use of labels displaying alcohol content had helped to yield an alcohol strength war. Id. at 487-88. It contended that Section 205(e)(2) had helped to relieve competitive pressures to market beer on the basis of alcohol content, which resulted in beer with lower alcohol content over time. Id. at 488.

Citing to Edenfield, the Court found that the Act did not directly advance the stated purpose because the government's regulatory scheme was irrational, permitting a "malt liquor" label, which signified strength, as well as the disclosure of alcohol content in advertising on cases of wines and spirits. Id. at 486-89. The government, it noted, had relied on "anecdotal evidence and educated guesses" in contending that competition on the basis of alcohol content was occurring. Id. at 490. The Court found that these "various tidbits" could not overcome the irrationality of the scheme. Id. The Court concluded the government had failed to offer "any convincing evidence" that the labeling ban deterred strength wars, stating that "[t]he absence of strength wars over the past six decades may have resulted from any number of factors." Id.

In Pitt News v. Pappert, the Third Circuit considered a section of a Pennsylvania law that banned alcohol advertising by communications media associated with a university, college, or other educational institutions. 379 F.3d at 102. Discussing the government's asserted interest in preventing underage drinking and alcohol abuse, the Third Circuit stated that in order to satisfy the third prong of Central Hudson, the government needed to show that the challenged law

"'alleviate[d]' the cited harms 'to a material degree.'" Id. at 107 (alteration added) (quoting Fla. Bar, 515 U.S. at 624).

Applying this standard, the Third Circuit found that the government had failed to show the law combatted underage or abusive drinking "to a material degree," stating that "[t]he suggestion that the elimination of alcoholic beverage ads from The Pitt News and other publications connected with the University will slacken the demand for alcohol by Pitt students is counterintuitive and unsupported by any evidence that the Commonwealth has called to our attention." Id. The court stressed that the government had not pointed to "any evidence" that the elimination of alcoholic beverage ads from the newspaper would make it more difficult for people to locate places near campus to purchase alcoholic beverages. Id. Rather, the Third Circuit concluded that the government relied on "nothing more than 'speculation' and 'conjecture'" in arguing that the regulation would directly advance the stated interest. Id. at 107-08.

More recently, in Wollschlaeger v. Governor of Florida, and as discussed in greater detail infra, the United States Court of Appeals for the Eleventh Circuit considered whether four provisions of Florida's Firearms Owners' Privacy Act ("FOPA") prohibited expressive conduct in violation of the First Amendment. In concluding that the government had failed to show that the record-keeping, inquiry, and anti-harassment provisions of the Act directly advanced the stated purpose, the Eleventh Circuit pointed out that the Florida legislature relied on "six anecdotes and nothing more" as evidence for the regulations. 848 F.3d at 1312. The Eleventh Circuit observed that while anecdotes can provide evidence, there was "no other evidence, empirical or otherwise" presented by the legislature, and the six anecdotes were insufficient to

show that the harms were "real, [and] not merely conjectural," such that the regulations "will in fact alleviate [the] harms in a direct and material way." Id.

Edenfield, Rubin, Pitt News, and Wollschlaeger instruct that some evidence is required for the legislature to conclude that the law at issue will directly advance the government's substantial interest. Theories and unsupported opinions will not suffice to demonstrate that the asserted harms are real. And in Rubin, the fact that the harm to be regulated may have resulted from "any number of factors," was also an important consideration in determining whether the government had proven that the law in question directly advanced a substantial interest. 514 U.S. at 490.

The City maintains that the evidence before City Council was substantial, and that in any event, City Council is owed deference in its judgment. In an effort to overcome what the Chamber argues is a dearth of evidence, the City cites to a series of First Amendment cases addressing legislative deference.

In Turner Broad, System, Inc., v. F.C.C., ("Turner II"), the first case cited by the City, the Supreme Court addressed sections of a law requiring cable television systems to dedicate some channels to local television stations. 520 U.S. at 185. Because these provisions were content neutral, the Court subjected them to intermediate scrutiny, which required that the provisions advance an important governmental interest and did not burden substantially more speech than necessary to further those interests. Id. The governmental interests were preserving the benefits of free, over-the-air local broadcast television, promoting the widespread dissemination of information from a multiplicity of sources, and promoting fair competition in the market for television programming. Id. at 189.

The Court found there was "specific support" for Congress's conclusion that cable operators had large and increasing market power over local programming markets, citing to evidence that included "extensive testimony" presented to Congress. Id. at 197-98. The Court observed that "[a]fter hearing years of testimony, and reviewing volumes of documentary evidence and studies offered by both sides, Congress concluded that the cable industry posed a threat to broadcast television." Id. at 199. Noting that Congress was owed "considerable deference" in its examination of evidence, its findings and conclusions, and its weighing of conflicting evidence, the Court reviewed the "substantial evidence" and concluded Congress was reasonable in determining this threat existed and that the challenged provisions served the governmental interests "in a direct and effective way." Id. at 196, 199-213 ("Even in the realm of First Amendment questions . . . Congress must base its conclusions upon substantial evidence.").

While the City is correct that Turner II supports its argument that City Council is owed legislative deference, it ignores the magnitude of the record in Turner II. Importantly, the Turner II Court observed that Congress was owed deference in its examination of the evidence, which was "substantial," including "extensive testimony," evidence showing cable industry favoritism for integrated programmers, "extensive" anecdotal evidence about "scores of adverse carriage decisions against broadcast stations," an FCC-sponsored study detailing cable system carriage practices, and "volumes" of documentary evidence. Id. at 196-99 (emphasis added). Such evidence does not exist here.

The City next cites to Florida Bar v. Went for It, Inc., where the Supreme Court held that a Florida Bar rule prohibiting lawyers from using direct mail to solicit personal injury or wrongful death clients within thirty days of an accident withstood scrutiny under the Central

Hudson test. 515 U.S. at 620. The Florida Bar's stated interest was to protect the waning reputation of Florida lawyers by preventing them from engaging in conduct considered intrusive. Id. at 625. The Court found that the Florida Bar's submission of a 106-page summary of a two-year study of lawyer advertising and solicitation provided sufficient evidence to conclude that the harm was real and thus that the rule would directly and materially alleviate the harm. Id. at 626. This summary included statistical and anecdotal data supporting the Florida Bar's position that the Florida public considered direct-mail solicitations in the immediate aftermath of accidents as intrusive on privacy that reflected poorly on the profession. Id. at 626-27 (noting that the "anecdotal record mustered by the [Florida] Bar is noteworthy for its breadth and detail").

In reaching its conclusion, the Court noted that it "d[id] not read [its] case law to require that empirical data come to [it] accompanied by a surfeit of background information." Id. at 628. The Court continued: "Indeed, in other First Amendment contexts, we have permitted litigants to justify speech restrictions by reference to studies and anecdotes pertaining to different locales altogether, or even, in a case applying strict scrutiny, to justify restrictions based solely on history, consensus, and 'simple common sense.'" Id. (citations omitted). Ultimately, the Court found that the Florida Bar had met its burden in demonstrating that its restriction would directly advance the interest of protecting lawyer's reputations. Id. at 631-32.

The City relies on Florida Bar for the proposition that the Supreme Court "has been flexible in the amount and type of evidence required to uphold speech restrictions." While this statement is accurate, the City again ignores the substantial evidence before the Court in that case, where a 106-page summary, including statistical and anecdotal data, of a two-year study of lawyer advertising and solicitation showed that the asserted harm was real. Although anecdotal

evidence was before City Council here, there are no statistics cited or extensive study "noteworthy for its breadth and detail" as was presented in Florida Bar.

Finally, the City points to King v. Governor of the State of New Jersey, where the Third Circuit considered a challenge to a New Jersey statute that prohibited licensed counselors from engaging in sexual orientation change efforts ("SOCE") therapy with clients under eighteen. 767 F.3d at 221. Although the Third Circuit categorized the restricted speech as professional speech, it applied the same standard as required for commercial speech because both receive "diminished" protection. Id. at 224, 235. The substantial governmental interest in King was to protect minor citizens from harmful professional practices. Id. at 237-38.

Citing to Turner II, the Third Circuit emphasized that the court's role is not to review a legislature's empirical review de novo, but to determine whether the legislature had "'drawn reasonable inferences based on substantial evidence.'" Id. at 238 (quoting Turner II, 520 U.S. at 195)). Additionally, the Third Circuit stated that "[t]he quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the jurisdiction raised." Id. (quoting Nixon, 528 U.S. at 391).

The court found that New Jersey had satisfied its burden of showing that the law directly advanced the substantial government interest. Id. The Third Circuit explained that legislatures may rely on empirical judgments of independent professional organizations that possess specialized knowledge, and that the record "demonstrate[d] that over the last few decades a number of well-known, reputable professional and scientific organizations have publicly condemned the practice of SOCE, expressing serious concerns about its potential to inflict harm." Id. ("Such evidence is a far cry from the 'mere speculation or conjecture' our cases have held to be insufficient."). As such, the court determined that conclusive empirical evidence

regarding the harmful effect of SOCE counseling to minors was not needed for the New Jersey legislature to reasonably conclude that SOCE counseling was ineffective and harmful.  Id. at 238-39.

Although the City correctly quotes King, it ignores the fact that the court still looked at whether there was sufficient evidence before the legislature to conclude that the harm of SOCE counseling was real.  In King, that evidence (couched as "legislative findings") was substantial and included: recognition by major professional associations of mental health practitioners and researchers for nearly 40 years that being gay, lesbian, or bisexual is not a disorder; "reports, articles, resolutions and proposition statements" from mental health organizations opposing counseling designed to alter sexual orientation; and a report issued by the American Psychological Association finding that this type of counseling is ineffective and/or causes harm. Id. at 221-22.  As discussed in greater detail below, there was far less support before City Council when it concluded that the harm of discriminatory initial salaries was perpetuated in subsequent salaries thus contributing to the wage gap.

With the above precedent in mind, my focus is on whether City Council relied upon sufficient evidence to conclude that the wage gap is a result of discrimination and whether curtailing inquiry into allegedly discriminatory wage history will alleviate this gap.  The record relied upon by City Council consists of testimony from five professionals who primarily emphasized the wage gap in Pennsylvania.  (Resp., Ex. 2 at 2-16.)  Importantly, this conclusion is not disputed.  These witnesses also opined that the Inquiry Provision of the Ordinance would help to narrow the wage gap.  They referred to a purported bias built into a woman or minority person's very first wage and then took the very large step to conclude that the prohibition of questions regarding wage history will prevent this bias from carrying over to future wages.  The

critical problem for the City is, however, that these avowals are unsubstantiated conclusions. While the witnesses who presented to City Council are experienced in their respective fields, their observations are mostly conjectural in nature. Not one witness pointed to any study, data, statistics, report, or any other evidence to support the proposition that initially depressed wages reflect discrimination. And, none of the testimony addressed why asking about wage history necessarily results in the perpetuation of an initial discriminatory wage. Moreover, no witness cited to evidence that prior wage history inquiry contributes to a discriminatory wage gap.[14]

While the conclusion that a discriminatory wage gap could be affected by prohibiting wage history inquiries was characterized by respected professionals as a logical, common sense outcome, more is needed. Like the Rubin case, the testimony in support of this theory is riddled with conclusory statements, amounting to "various tidbits" and "educated guesses." Importantly, aside from Dr. Madden's affidavit, the information relied upon by the City does not address the possibility that disparate wages could also be based on factors having nothing to do with discrimination, such as qualifications, experience, or any number of other factors.

The two anecdotes provided by Jeni Wright and Melissa Beatriz Skolnick also do not provide sufficient evidence that the Inquiry Provision will directly advance the City's interest in narrowing the wage gap. Ms. Wright testified that she felt uncomfortable when she was asked to list her salaries at her last five jobs because she "[did] not want her most recent salary to be the ceiling for what a prospective employer would pay [her]." Ms. Skolnick testified that she had been asked about her wage history several times while applying for jobs, which made her feel uncomfortable because she believed the only relevant issue was whether she possessed the qualifications. She further testified that she was promised a certain wage at one job and then paid less, and at another job learned she was earning less than her colleagues who were male and

white.  (Id. at 17-18.)  While these anecdotes are perhaps demonstrative of the general wage gap, which again is not in dispute, they do not provide support for the conclusion that such gap is a result of discrimination or that allowing inquiry into wage history perpetuates discriminatory wages.

The article that quotes Dr. Budson also does not assist the City in filling the evidence void.  There, she makes the conclusory statement that because studies show that women start with a lower salary than men, it is "empirically true" that they will make less money when employers base future salaries on that initial lower salary.  But Dr. Budson does not tie her conclusion to discriminatory lower wages or the import of asking about wage history.  She also acknowledges there is no research that has been done to demonstrate what she claims to be "empirically true," and therefore further fails to provide evidence of the alleged harm.  (Id., Ex. 6.)

Finally, Dr. Madden attempts to link numerous inferences that support the conclusion that the Inquiry Provision will reduce discriminatory wage disparities.  These inferences are: (1) starting salaries differ by race and gender for employees of equivalent skills and abilities (Id., Ex. 5 at 8); (2) these salary differences are not explained by legitimate factors such as credentials or qualifications (Id. at 8, 10); (3) starting salaries are a primary source of subsequent salary differentials by race and gender (Id. at 10); and (4) salary history correlates with race and gender, resulting in lower salaries for women and members of minority racial and ethnic groups.  (Id. at 10-11.)

Dr. Madden's first inference is supported by ample data and is not contested.  It is the second and third propositions that require further scrutiny.

As for her second inference, Dr. Madden supplies little support for the supposition that salary differences are not explained by legitimate factors such as credentials or qualifications. Indeed, Dr. Madden acknowledges that salary history can correlate with other factors such as "past performance, abilities, experience, and skills." (Id. at 4.)

Of the six studies to which she cites for the proposition that salary differences are not explained by legitimate factors (discussed supra in endnote 12), only two directly address this conclusion. According to Dr. Madden, the first study, authored by Valerie Wilson and William M. Rodgers III, finds that "the racial wage gap increas[es] when comparing workers with equivalent education, experience, and location." (Id. at 8 n.3.) However, that study does not find that other legitimate factors are never relevant to explain the wage gap. In fact, Wilson and Rodgers observations seem to contradict Dr. Madden's premise: "Differences in observable factors such as education and experience levels can explain more than a quarter of the black-white wage gap for men and over a third of the gap for women." Wilson and Rodgers, supra endnote 12, at 3 (emphasis added). While the study authored by Francine D. Blau and Lawrence Kahn finds that education and experience "explain relatively little of the [] wage gap," it does acknowledge that other factors such as work force interruptions and shorter hours had "salience for understanding the gender wage gap." Blau and Kahn, supra endnote 12, at 49. The four other studies relied upon by Dr. Madden only further point out that the wage gap persists, a fact that is not in dispute, and do not address other legitimate factors that could also be contributing to pay disparity.

Dr. Madden's third inference is that starting salaries are a primary source of subsequent salary differentials. Dr. Madden relies upon two studies, but neither directly supports her conclusion. The first study, by Barry Gerhart, is cited for the proposition that "women's

disadvantage in starting salaries is greater than in current salaries." (Resp., Ex. 5 at 10 n.8.) But the Gerhart study seems to in fact suggest that initial salaries are not primary sources of subsequent salary differentials. Gerhart, <u>supra</u> endnote 11, at 419 (noting that "lower starting salaries for women seem plausible. This disadvantage, however, seems likely to decline over time."). The second study relied upon by Dr. Madden, authored by Christina Quintana-Garcia and Marta M. Elvira, concludes that "women hired externally [at high-tech firms] have lower relative salaries to comparable men than women and men spending their careers within the firm." But this study finds that women in executive roles at certain technology companies who rose internally through the ranks earned higher salaries than women who were hired externally. Quintana-Garcia and Elvira, <u>supra</u> endnote 11, at 132 ("The results suggest that women who are external labor market hires are disadvantaged, in both base and variable compensation, compared with internal placements.") The fact that women who were hired externally received lower salaries, however, does not directly support the conclusion that starting salaries influenced subsequent salaries.

I have carefully reviewed Dr. Madden's affidavit, her impressive credentials, and all of the studies she has referenced. There simply is not "substantial" evidence to support the key inferences needed to substantiate her fourth and final inference—that inquiry into salary history results in lower salaries for woman and minorities.

I recognize and respect the deference owed to City Council, but under First Amendment law this deference is not unlimited and must be carefully viewed in conjunction with whether City Council "'[drew] reasonable inferences based on <u>substantial</u> evidence.'" <u>See</u> <u>King</u>, 767 F.3d at 238 (quoting <u>Turner II</u>, 520 U.S. at 195)) (emphasis added). Here, the professionals who appeared before City Council were able to provide only conclusory testimony regarding

discrimination associated with initial salaries for women and minorities being perpetuated in subsequent salaries. Although the anecdotes provided by Jeni Wright and Melissa Beatriz Skolnick shed light on the effect of the wage gap, they do not make up for the dearth of evidence.

The expert opinions cited to by the City do not fill this void. Dr. Budson goes so far as to acknowledge the lack of evidence supporting what she believes to be "empirically true," (Resp., Ex. 6), and the studies to which Dr. Madden cites do not provide direct support for her critical conclusions. Unlike in <u>Florida Bar</u>, there are no comprehensive studies demonstrating the alleged harm—that the perpetuation of discriminatory salaries in subsequent salaries contributes to a discriminatory wage gap. Nor are there years of testimony and "volumes of documentary evidence and studies" illuminating the harm that supported the legislature's decision as in <u>Turner II</u>. Instead, City Council based its conclusion regarding the harm of "baked in" discriminatory wages on testimony that is more like the "educated guesses" in <u>Rubin</u>.

Comparison to the facts in <u>King</u> amplifies the City's evidentiary deficiencies. In <u>King</u>, the record before the legislative body drew a direct connection between the speech (SOCE counseling) and the harm. In contrast, the record before City Council does not establish a clear connection between the speech (asking about wage history) and the harm (perpetuation of discriminatory salaries in subsequent salaries contributing to a wage gap).

I conclude that there is insufficient evidence to establish the alleged harm of discriminatory wages being perpetuated in subsequent wages such that they contribute to a discriminatory wage gap.[15] Without such evidence, it is impossible to know whether the Inquiry Provision will directly advance the substantial interests of reducing discriminatory wage disparities and promoting wage equity. Consequently, I am compelled to find that the Inquiry

Provision does not directly advance the substantial governmental interests of reducing discriminatory wage disparities and promoting wage equity.[16]

Because I find that the City has not met its burden as to the third prong of <u>Central Hudson</u>, I need not determine under <u>Central Hudson</u>'s fourth prong whether the Inquiry Provision is no more extensive than necessary to further the City's interest. The Inquiry Provision is at odds with the First Amendment, and as such, the City has failed to meet its burden of demonstrating its constitutionality.[17]

## B.  <u>The Reliance Provision</u>

The Reliance Provision makes it unlawful for employers, employment agencies, or employees or agents thereof "[t]o rely on the wage history of a prospective employee from any current or former employer of the individual in determining the wages for such individual at any stage in the employment process, including the negotiation or drafting of any employment contract." Phila. Code § 9-1131(2)(ii). The City asserts that the Reliance Provision regulates only conduct and does not implicate the First Amendment. The Chamber disagrees and argues that speech is restricted and First Amendment scrutiny must be applied. For the reasons that follow, I agree with the City and will not subject the Reliance Provision to First Amendment scrutiny.

The Chamber's primary source of support is <u>Sorrell</u>. There, the Supreme Court addressed Vermont's Prescription Confidentiality Law, which prohibited the sale, disclosure for marketing purposes, and use for marketing purposes of pharmacy records that revealed the prescribing practices of individual doctors (referred to as, "prescriber-identifying information"). <u>Id.</u> at 557. The specific language at issue read:

> "A health insurer, a self-insured employer, an electronic transmission
> intermediary, a pharmacy, or other similar entity shall not sell, license, or

> exchange for value regulated records containing prescriber-identifiable information, nor permit the use of regulated records containing prescriber-identifiable information for marketing or promoting a prescription drug, unless the prescriber consents . . . . Pharmaceutical manufacturers and pharmaceutical marketers shall not use prescriber-identifiable information for marketing or promoting a prescription drug unless the prescriber consents[.]"

564 U.S. at 558-59 (quoting Vt. Stat. Ann. Tit. 18 § 4631(d)).

The law pertained to the process by which pharmaceutical manufacturers marketed a drug to doctors, referred to as "detailing," which entails visiting a doctor's office armed with samples of the drug and explaining the details of that drug. Id. at 557-58. Awareness of a doctor's prescriber-identifying information better enabled a manufacturer in promoting their drug. Id. at 558. Pharmacies received this information when processing prescriptions and many of them sold it to "data miners" who assembled the information and generated reports on prescriber behavior. Id. Data miners then leased their reports to pharmaceutical manufacturers, who utilized them for the detailing process. Id. The law essentially prohibited the sale of prescriber-identifying information and subsequent utilization of the information for detailing purposes.

Among other arguments, Vermont averred that the sale, transfer, and use of prescriber-identifying information constituted conduct, not speech. Id. at 570. Rejecting this contention, the Supreme Court first explained it had previously held that "the creation and dissemination of information are speech." Id. (citing Bartnicki v. Vopper, 532 U.S. 514, 527 (2001) ("[I]f the acts of 'disclosing' and 'publishing' information do not constitute speech, it is hard to imagine what does fall within that category, as distinct from the category of expressive conduct") (some internal quotation marks omitted)); Rubin, 514 U.S. at 481 ("information on beer labels" is speech); Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 759 (1985) (plurality opinion) (credit report is "speech")). Observing there was a "strong argument that prescriber-identifying information is speech for First Amendment purposes," the Court found that

Vermont's law restricting the sale, transfer, and use of such information implicated speech rights. Id. The Court also concluded that in precluding the sale, transfer, and use of prescriber-identifying information by certain speakers, Vermont had "imposed content- and speaker-based restrictions on the availability and use of prescriber-identifying information." Id. at 571.

According to the Chamber, Sorrell supports the proposition that the Reliance Provision restrains wage history information "for expressive purposes" and is thus a speech restriction. It posits that employers are prevented from expressing a message about the "value of an applicant's labor in formulating and communicating an appropriate salary proposal." The Chamber contends that, like in Sorrell, the Reliance Provision imposes "'restraints on the way in which the information might be used' or disseminated," and therefore implicates employers' speech rights. Additionally, the Chamber submits that like the law in Sorrell, the Reliance Provision imposes content- and speaker-based restrictions on the use of information.

Here, unlike Vermont's law, the Reliance Provision prohibits the reliance upon wage history for the purpose of determining a wage. It does not, as in Sorrell, bar the selling of salary information (or any information), or distributing or using it for marketing purposes. Relying on wage history to determine salary is certainly distinct from selling, distributing, or using information for marketing purposes, which all necessarily implicate speech. In short, the Reliance Provision does not fit within the Supreme Court's declaration that "the creation and dissemination of information are speech."

Pressing its interpretation of Sorrell, the Chamber contends that the way in which wage history may be used is restrained by the Reliance Provision. The portion of Sorrell to which the Chamber cites, however, addresses a different issue—that is, whether Vermont's law regulated access to information and not speech. Concluding that the law did not merely regulate access to

37

information, the Court in dicta observed that "[a]n individual's right to speak is implicated when information he or she possesses is subjected to 'restraints on the way in which the information might be used' or disseminated." Id. at 568 (quoting Seattle Times Co. v. Rhinehart, 467 U.S. 20, 32 (1984)). Even if this language were part of the Court's discussion of conduct (and it is not), the Chamber focuses too narrowly on the language and not on the context of the facts before the Sorrell Court where plaintiffs were deprived of the use of prescriber-identifying information for *marketing purposes*.[18]

The Chamber next points to Wollschlaeger, for the proposition that the Reliance Provision "restricts [the] ability to communicate and/or convey a message." In Wollschlaeger, the Eleventh Circuit considered whether certain provisions of Florida's Firearms Owners' Privacy Act ("FOPA") prohibited expressive conduct in violation of the First Amendment. Four provisions of FOPA were at issue—the record-keeping, inquiry, anti-discrimination, and anti-harassment provisions. 848 F.3d 1302-03. The record-keeping provision prohibited medical professionals from "'intentionally [entering] any disclosed information concerning firearm ownership into the patient's medical record if the practitioner [knew] that such information [was] not relevant to the patient's medical care or safety, or the safety of others.'" Id. at 1302 (quoting Fla. Stat. § 790.338(1)). The inquiry provision stated that medical professionals "'should refrain from making a written inquiry or asking questions concerning the ownership of a firearm or ammunition by the patient or by a family member of the patient, or the presence of a firearm in a private home'" unless they in "'good faith believe[d] that this information [was] relevant to the patient's medical care or safety, or the safety of others.'" Id. at 1303 (quoting § 709.338(2)). The anti-discrimination provision provided that medical professionals "'may not discriminate against a patient based solely' on the patient's ownership and possession of a firearm." Id.

(quoting § 709.338(5)).  Finally, the anti-harassment provision precluded a medical professional "'from unnecessarily harassing a patient about firearm ownership during an examination.'"  Id. (quoting § 709.338(6)).

Addressing whether First Amendment scrutiny—specifically, strict scrutiny—had been triggered, the Eleventh Circuit found that the record-keeping and inquiry provisions restricted the ability of certain speakers "to communicate and/or convey a [certain] message," and thus "no doubt" elicited First Amendment scrutiny.  Id. at 1307.  The Eleventh Circuit also determined that the anti-harassment provision limited speech based on content, triggering First Amendment scrutiny.  Id.  Although the court concluded the record-keeping, inquiry, and anti-harassment provisions were unconstitutional, it found otherwise as to the anti-discrimination provision. Observing that it was of a "slightly different caliber," the court stated that this provision did not "on its face, implicate the spoken or written word."  Id. at 1317.  Instead, the court construed the anti-discrimination provision as applying to non-expressive conduct and found it to be constitutional.  Id. ("When a statute is 'susceptible' to an interpretation that avoids constitutional difficulties, that is the reading we must adopt.") (citing S. Utah Mines & Smelters v. Beaver Cnty., 262 U.S. 325, 331 (1923)).

Here, distinct from Wollschlaeger, relying on wage history to generate a salary does not involve speech the way prohibiting the physical entry of information into a patient log, making a written inquiry, asking a question, or harassing patients through questions or advice do.  Rather, more like the anti-discrimination provision in Wollschlaeger, the Reliance Provision does not "on its face, implicate the spoken or written word."  The Chamber reads the record-keeping, inquiry, and anti-harassment provisions to have prohibited reliance, but those provisions

prohibited significantly more specific actions that implicated speech on their face. To the extent the Reliance Provision is content- or speaker-based, it targets conduct and not speech.

Finally, citing to <u>Holder v. Humanitarian Law Project</u>, 561 U.S. 1 (2010), the Chamber urges that even if the Reliance Provision targets only conduct, it is still subject to First Amendment strict scrutiny because "the conduct triggering [liability] consists of communicating a message." The Chamber again presses that relying upon wage history to fashion a wage communicates a message about the significance of wage history. In <u>Holder</u>, the Supreme Court rejected the argument that a statute prohibiting the provision of "material support" to designated terrorist organizations targeted only conduct. <u>Id.</u> at 28. The Court reasoned that while the law "may be described as directed at conduct," as applied to the plaintiffs, "the conduct triggering coverage under the statute consists of communicating a message." <u>Id.</u> Specifically, that conduct was providing legal training and advice, which the Court characterized as "provid[ing] material support to the [terrorist groups] in the form of speech." <u>Id.</u>

Here, unlike in <u>Holder</u>, the conduct is not executed through speech. Reliance on wage history does not demand speech the way that providing legal advice necessarily does. Furthermore, as addressed above, I find the Chamber's contention that relying on wage history to determine a wage communicates the message of that applicant's value unpersuasive and unsupported by authority.[19]

Because the Chamber has failed to meet its burden of showing that speech is targeted by the Reliance Provision, my analysis of this provision under the First Amendment ends here. The Chamber has failed to demonstrate a likelihood of success on the merits as to the Reliance Provision.[20]

## C. **Is the Ordinance Unconstitutionally Vague?**

The Chamber next argues that the Ordinance violates the First Amendment because it fails to provide fair notice of the activity it prohibits. According to the Chamber, the provision of the Ordinance permitting employers to rely on wage history that is "knowingly and willingly disclosed" is unclear because it provides no guidance as to when this "knowingly and willingly" safe-harbor is satisfied. The Chamber cites again to the Eleventh Circuit's ruling in Wollschlaeger.

The City responds that no definition of "knowingly and willingly" is necessary, but to the extent it is, the PCHR's Regulation No. 7.3 provides one.

Regulation No. 7.3 provides the following:

> As used in Section 1131(2)(b), an action taken voluntarily, with an understanding of the nature and quality of the act. Thus, a Prospective Employee "knowingly and willingly" discloses the employee's salary history in the context of an employment interview if the Prospective Employee voluntarily, and not in response to a question from the interviewer, makes the disclosure while knowing or having been informed that such disclosure may be used in determining any offered salary.

I agree with the City that in light of the definition provided in Regulation No. 7.3, the Ordinance is sufficiently clear as to when salary history has been disclosed "knowingly and willingly." Wollschlaeger is inapposite because there the statute banned "unnecessarily" harassing patients about firearm ownership. As the City aptly states, "[n]ecessity, as opposed to willfulness, is a subjective and highly contextual determination."

## D. **Does the Ordinance's Extraterritorial Effect Violate the United States Constitution or the Pennsylvania Constitution?**

Finally, the Chamber asserts that because the Ordinance applies to any employer that "does business" or "employs one or more employees" in Philadelphia, it "appears to govern all of the employer's hiring practices—no matter where it makes its hiring decisions or where the

prospective employee will work." The Chamber contends that this "reach" violates Due Process, the Commerce Clause, and the Pennsylvania Constitution.

The City responds that City Council did not intend for the Ordinance to extend to jobs without a tie to Philadelphia. Regulation No. 7.1 has since been adopted by the PCHR, defining "Employer" as "any person who does business in the City of Philadelphia through employees" and "who engages in the process of interviewing a Prospective Employee with the intention of considering such Prospective Employee for a position located within the City." The City maintains this language makes it clear that the Ordinance does not apply to hiring for positions located outside Philadelphia. Further, to the extent an interview occurs outside of Philadelphia, for example through Skype, the job must still be located in Philadelphia.

As to the Chamber's Due Process argument, state and municipalities "may not impose economic sanctions on violators of its laws with the intent of changing . . . lawful conduct in other States." BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 572 (1996). I agree with the City that the Ordinance does not seek to impose its policy choices on other jurisdictions, but rather incidentally affects some conduct in those jurisdictions targeted at hiring for jobs located only in Philadelphia.

Regarding the Commerce Clause, the Third Circuit has explained that where a law addresses "'a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.'" Instructional Sys., Inc. v. Computer Curriculum Corp., 35 F.3d 813, 826 (3d Cir. 1994) (quoting Pike v. Bruce Church, Inc., 397 U.S. 137, 142 (1970)). "[T]he only incidental burdens on interstate commerce that implicate the commerce clause . . . are those that discriminate against interstate commerce." Old Bridge Chemicals, Inc. v. N.J.

Dep't of Envtl. Prot., 965 F.2d 1287, 1295 (3d Cir. 1992). "A challenged regulation is discriminatory when it confers advantages upon in-state economic interests, either directly or through imposition of a burden upon out-of-state interests, as against out-of-state competitors." Id. Here, the Ordinance places no burden on out-of-state employers that it does not place on in-state employers, and thus it does not violate the Commerce Clause.

Finally, the Pennsylvania Constitution authorizes a municipality with a home rule charter, like Philadelphia, to "exercise any power . . . not denied by . . . the General Assembly," Penn. Const. art. IX, § 2, and the General Assembly has prohibited the City from "exercise[ing] any powers or authority beyond the city limits." 53 Pa. Stat. § 13133. As explained above, the Ordinance only incidentally affects some conduct beyond Philadelphia, and only if that conduct is directly related to a job in Philadelphia. Unlike the ordinance at issue in Devlin v. City of Philadelphia, 862 A.2d 1234 (Pa. 2004), which affected individuals who did not live or work in Philadelphia, the Ordinance before me pertains only to employers who do business in Philadelphia and are hiring for jobs located in Philadelphia. Thus, the Ordinance does not violate the Pennsylvania Constitution.[21]

## II.  Irreparable Harm to the Chamber

Having concluded that the City has met its burden as to the Reliance Provision but not as to the Inquiry Provision, I must next consider the extent to which the Chamber will suffer irreparable harm absent the requested relief. The burden lies with the Chamber to satisfy this prong. Reilly, 858 F.3d at 180 n.5.

The Chamber submits two ways in which it and its members will be irreparably harmed: (1) their speech will be chilled for fear of substantial civil and criminal penalties; and (2) they will be forced to incur compliance costs in the form of retraining staff and developing new

policies regarding wage determinations and hiring. Quoting <u>Elrod v. Burns</u>, 427 U.S. 347 (1976), the Chamber avers that it is well established that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."

The City counters that because the Chamber is unlikely to succeed on the merits, it cannot demonstrate irreparable harm. Even if the Chamber is likely to succeed on the merits, the City contends that the Chamber has offered only a conclusory declaration that speech will be chilled. Additionally, the City argues compliance costs do not create irreparable harm because such are economic in nature and the Chamber has failed to demonstrate that a judgment in this matter could not be satisfied.

I agree with the City that because the Chamber is unlikely to succeed on the merits of its claim that the Reliance Provision is unconstitutional, it cannot show irreparable harm as to that part of the Ordinance. As to the Inquiry Prong, though, the Third Circuit has reaffirmed the automatic presumption of irreparable harm announced in <u>Elrod</u>. <u>See</u> <u>B.H. ex rel. Hawk v. Easton Area Sch. Dist.</u>, 725 F.3d 293, 323 (3d Cir. 2013) (holding that pursuant to <u>Elrod</u> a restriction which prevents the exercise of the right to freedom of speech "unquestionably constitutes irreparable injury."); <u>but</u> <u>see</u> <u>Conchatta, Inc. v. Evanko</u>, 83 F. App'x 437, 442-43 (3d Cir. 2003) (finding plaintiff had failed to demonstrate a real or threatened deprivation of First Amendment rights).

Here, the Chamber has alleged a real and actual deprivation of its and its members' First Amendment rights through declarations. <u>See</u> Am. Compl., Wonderling Decl. ¶¶ 16, 22 ("If the Ordinance is allowed to stand, it will harm the Chamber's members named in the First Amended Complaint as well as other members within the Chamber's broader membership by preventing them from making wage-history inquiries that they otherwise normally would make and from

relying on wage history in making salary and other relevant employment determinations, as described above."); Cohen Decl. ¶¶ 15-17 ("Comcast will be forced to choose between complying with the Ordinance, on the one hand, and significant liability and the threat of severe sanctions, including imprisonment, on the other hand. The inevitable result will be a substantial chilling of Comcast's constitutionally protected speech."; "As a result of the Ordinance, Comcast's human-resources professionals and other personnel involved in hiring processes and decisions at Comcast will not risk asking an applicant about the applicant's wage history. In fact, they will be deterred from beginning any line of inquiry that approaches the topic of wage history."); Fry Decl. ¶¶ 14-15, 16-19 ("As a result of the Ordinance, those employees involved in hiring processes and decisions at Drexel will not risk asking an applicant about the applicant's wage history in writing or verbally. In fact, Drexel and its employees likely will be deterred even from asking an applicant to identify the factors upon which his or her proposed salary is based because such an inquiry might be viewed as a prohibited inquiry into the applicant's wage history."). The City does not address the sufficiency of these declarations under the irreparable harm standard.

Accordingly, I find that the Chamber has adequately established irreparable harm as to the Inquiry Provision and need not determine whether the Chamber's alleged compliance costs demonstrate irreparable harm.

## III. Irreparable Harm to the City

The third prong of the preliminary injunction standard requires me to consider "whether granting preliminary relief will result in even greater harm to the nonmoving party." Allegheny Inc. v. DQE, Inc., 171 F.3d 153, 158 (3d Cir. 1999).

The City asserts only that because the Chamber is not likely to succeed on the merits, this factor weighs against it. Because I find that the Chamber is likely to succeed on the merits as to the Inquiry Provision, the City cannot claim a legitimate interest in enforcing an unconstitutional law. See ACLU v. Ashcroft, 322 F.3d 240, 251 n.11 (3d Cir. 2003) ("[N]either the Government nor the public generally can claim an interest in the enforcement of an unconstitutional law.") (quoting ACLU v. Reno, 217 F.3d 162, 180-81 (3d Cir. 2000)). Therefore, I find that the interest in upholding First Amendment freedoms outweighs any harm that may befall the City in granting the preliminary injunction as to the Inquiry Provision.

## IV. Public Interest

The fourth prong requires me to assess whether granting injunctive relief is in the public interest. Winback, 42 F.3d at 1427 n.8. The Third Circuit has recognized that "[a]s a practical matter, if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff." Id.

The City again contends only that because the Chamber is not likely to succeed on the merits, this factor weighs against it.

Many courts have held that there is a significant public interest in upholding First Amendment principles. See Iowa Right to Life Comm'e, Inc. v. Williams, 187 F.3d 963, 970 (8th Cir. 1999) ("[T]he potential harm to independent expression and certainty in public discussion of issues is great and the public interest favors protecting core First Amendment freedoms."); Elam Constr., Inc. v. Regional Transp. Dist., 129 F.3d 1343, 1347 (10th Cir. 1997) ("The public interest . . . favors plaintiffs' assertion of their First Amendment rights."); G & V Lounge, Inc. v. Mich. Liquor Control Com'n, 23 F.3d 1071, 1079 (6th Cir. 1994) ([I]t is always in the public interest to prevent the violation of a party's constitutional rights."); Cate v. Oldham,

707 F.2d 1176, 1190 (11th Cir. 1983) (noting the "strong public interest in protecting First Amendment values"); <u>Ramsey v. City of Pittsburgh</u>, 764 F. Supp. 2d 728, 735 (W.D. Pa. 2011) ("[M]any courts considering requests for preliminary injunctions have consistently recognized the significant public interest in upholding First Amendment principles."). As such, I find that granting the requested injunctive relief is in the public interest.[22]

## V. The City's Request for a Hearing and Discovery

The City requests a hearing on the Chamber's Motion for a Preliminary Injunction, contending it is entitled to present evidence that the Ordinance is constitutional. The City also argues a hearing is required because it contests factual matters contained in the Amended Complaint and relied upon in the present Motion. Specifically, the City points to the Chamber's contentions that the Ordinance will have a "crippling effect" on local business and hiring, will "significantly disadvantage" Philadelphia businesses by depriving them of wage histories, and will impact the Chamber's members because they need wage history information to make appropriate determinations about a candidate's experience and/or the competitive market rate for a salary. The City also presses for a hearing in light of the fact that "this is a matter of extreme public importance."[23]

At oral argument on the Chamber's Motion, I provided the City with a full opportunity to set out exactly what evidence it would offer at the proposed hearing. The City proffered the following:

- Dr. Madden would testify to the substance of her affidavit and "react" to some of the discovery, addressed below, that the City had requested. The City explained that Dr. Madden would also respond to criticisms of her affidavit raised by the Chamber.

- Rue Landau would testify that wage histories are no longer being inquired about in Philadelphia. She would also address prong four of <u>Central Hudson</u> and explain why the alternatives proposed by the Chamber would not work.

- The City would call witnesses from several of the companies that filed declarations.

- The City also indicated it would present a human resources expert, but conceded that this witness had not yet been identified.

(N.T. 2/1/2018 at 8-12, 49-50.)

The Chamber opposes the City's request for a hearing, advocating that the issues before me are purely legal. The Chamber represented at oral argument that if a hearing were granted, it would not call any witnesses. Taking a somewhat inconsistent position regarding the admissibility of Dr. Madden's affidavit (see endnote 9), the Chamber indicated that it did not object to my consideration of Dr. Madden's affidavit. (Id. at 11-12, 28, 50.)

The City relies on Reilly in asserting that a hearing is required. I do not read Reilly to require a hearing. There, the district court improperly placed the burden of demonstrating likelihood of success on the merits on the plaintiff, thus the Third Circuit remanded for the application of the appropriate standard. 858 F.3d at 180. Although the court observed that it was possible the government could have requested a full hearing to present their case, it did not require the district court to hold such a hearing. Rather, the district court was instructed to allow the government the opportunity to meet their burden of showing the ordinance at issue was constitutional. Id.

Here, I have provided the City with ample opportunity to meet its burden. The full record that was before City Council when it enacted the Ordinance has been incorporated for purposes of the Motion before me and carefully examined. The affidavit of Dr. Madden, as well as the article quoting Dr. Budson, have been accepted into evidence and carefully considered. Repetition of the same information and conclusions will not close the gap in the evidence regarding the Inquiry Provision. Additionally, as discussed below, the discovery that the City indicates Dr. Madden would analyze is not relevant to the City's present burden. Similarly, Rue

Landau's proposed testimony would amount to mere recitation of what I have already reviewed and found to be insufficient. Her testimony regarding the fourth prong of <u>Central Hudson</u> would be unnecessary given the shortcomings under the third prong.

The City did not elaborate on what it would ask of the Chamber members that submitted declarations, thus it is impossible to determine whether such testimony would aid the City in meeting its burden.

Regarding the City's contention that a hearing is required because this case presents a matter of public importance, the City has not provided any authority that suggests a hearing is required for this reason, nor has it explained how repetition of facts already before me advances the public interest.

As to the City's contention that factual issues exist, the issues it raises pertain to whether the Chamber's declarants will actually be impacted by the Ordinance, which does not bear on the constitutionality of the Ordinance.[24]  <u>See</u> <u>Bradley v. Pittsburgh Bd. of Educ.</u>, 910 F.2d 1172, 1176 (3d Cir. 1990) ("[A] decision [to enter a preliminary injunction] may be based on affidavits and other documentary evidence if the facts are undisputed and the relevant factual issues are resolved.").

And finally, the City urges that a hearing is needed to present the testimony of a human resources expert. But when asked what this witness would offer, the City inexplicably stated that it had not yet consulted such expert. (N.T. 2/1/2018 at 50.)

For the reasons discussed above, I will deny the City's request for a hearing primarily because the proposed testimony would amount to repetition of the record already before me or presentation of irrelevant evidence.

The City also requests leave to engage in discovery prior to a hearing. At oral argument, the City explained that the following discovery was needed:

- Job applications and/or interview questions from the last ten years used by the companies that submitted declarations in both their Philadelphia offices and offices in other jurisdictions. According to the City, some of these companies have offices in other jurisdictions where bans on wage history inquiries have taken effect and, according to the City, such discovery could reveal how those offices are faring in light of the Chamber's contention that it will be harmed by the Ordinance here;

- Policies, factors, or matrices used by member companies illustrating how they set salaries. The City contended that this information would allow it to show that "employers are relying on salary history to depress the salaries of new job applicants," thus helping the City prove the third prong of Central Hudson. According to the City, this information is necessary for Dr. Madden to render a complete opinion;

- Internal analyses of pay equity performed by member companies because some of those companies contend they have completed such. The City explained that this request pertains to the fourth prong of Central Hudson because a self-evaluation is one of the alternatives proposed by the Chamber;

- Organizational charts of the member companies;

- Depositions of representatives of six of the member companies that submitted declarations. The City acknowledged that while it has the burden of proving the Ordinance constitutional, the Chamber "injected their own practices into the lawsuit by filing . . . declarations and . . . making sweeping statements in the brief. And so . . . we want to test some of those affirmants in the declarations."

(Id. at 15-16, 18-22.)

In response to the City's request for discovery, the Chamber submitted at oral argument that the City's requests are not relevant to the constitutionality of the Ordinance. (Id. at 24-25.)

I will also deny the City's request to engage in the outlined discovery, as such requests stray from the issues before me at this stage of the case, which are the constitutionality of the Ordinance and whether injunctive relief is appropriate. Courts in this circuit increasingly apply a "good cause" standard to requests for expedited discovery, the application of which "depends on the actual circumstances of each case, as well as consideration of certain factors such as a

pending preliminary injunction hearing, the need for the discovery and the breadth of the requests." Better Packages, Inc. v. Zheng, No. 05-4477, 2006 WL 1373055, at *2 (D.N.J. May 17, 2006) (citing Entm't Tech. Corp. v. Walt Disney Imagineering, No. 03-3546, 2003 WL 22519440, at *3 (E.D. Pa. Oct. 2, 2003)); Kone Corp. v. ThyssenKrupp USA, Inc., No. 11-465, 2011 WL 4478477, at *5 (D. Del. Sept. 26, 2011). The test applied "weighs the need for expedited discovery by considering the overall administration of justice against the prejudice to the responding party." Better Packages, 2006 WL 1373055, at *3. "Where the requests are overly broad and extend beyond the needs of the preliminary injunction, leave should be denied." Id. (citing Entm't Tech., 2003 WL 22519440 at *3) (denying a request for expedited discovery where "[m]any of the requests to produce, interrogatories and depositions are overly broad and extend well beyond those issues likely to arise in a preliminary injunction hearing.").

Here, the discovery requests are broad and not pertinent to the constitutionality of the Ordinance, thus the City's alleged need for discovery does not outweigh the burdensome nature of the discovery on the Chamber. First, job applications and/or interview questions used by member companies that have offices in other jurisdictions where wage history inquiries are banned would not help the City meet its burden. If the discovery were to show that those companies are able to operate without asking about wage history, such information does not fill the evidence gap under the third prong of Central Hudson.

If the City were to obtain job applications and interview questions used by the member companies, as well as its second request—policies, factors, and matrices used by member companies—these materials could establish what member companies have already acknowledged: that they use wage history to some degree in formulating job offers. The City seems to simultaneously harbor the belief that the declarants are and are not using wage history

51

inquiries in their hiring practices. To the extent the City believes it will discover that the declarants are not asking about wage history, this of course would not aid the City in demonstrating the third prong of <u>Central Hudson</u>. Rather, it would tend to show that the harm of discriminatory initial salaries being perpetuated in subsequent salaries through wage history inquiries is not in fact a harm. The City attempts to characterize this argument as raising a factual issue, however, the affidavit declarants clearly state that they use wage history in fashioning salaries and will be harmed if the Ordinance takes effect. Indeed, the Chamber conceded at oral argument that its members use wage history data in hiring. (N.T. 2/1/2018 at 25-26.)

The City's request for internal analyses of pay equity is relevant to the fourth prong of <u>Central Hudson</u> and thus would not provide the necessary evidence to satisfy the third prong. As to the City's request for organizational charts, it is unclear how these charts are at all relevant to the City's burden to establish the Ordinance is constitutional. Finally, regarding the City's request to depose representatives of the member companies, the declarations plainly state that the companies use wage history in some fashion and that they will be harmed if the Inquiry Provision takes effect. For the same reasons discussed above, information gleaned from depositions about whether the member companies will actually be impacted by the Ordinance will not provide the necessary evidence for the City to meet its burden in proving that the Ordinance is constitutional.

Because these requests "extend beyond the needs of the preliminary injunction," I will deny the City's request for leave to engage in discovery. <u>See</u> <u>Better Packages</u>, 2006 WL 1373055, at *3. Although I find the City's request for discovery to be inappropriate at this stage

of the case, should this litigation proceed, such discovery could be obtained for the permanent injunction stage.

## VI.  Bond Requirement

Federal Rule of Civil Procedure 65(c) states that "[n]o restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).

Although "the amount of the bond is left to the discretion of the court, the posting requirement is much less discretionary."  Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp., 847 F.2d 100, 103 (3d Cir. 1988) ("While there are exceptions, the instances in which a bond may not be required are so rare that the requirement is almost mandatory.")  In other words, Rule 65(c) "mandates that a court when issuing an injunction must require the successful applicant to post adequate security."  Id.

Neither party has addressed the bond requirement.  However, the Chamber seeks injunctive relief to protect it and its members' First Amendment rights.  The City has not offered any evidence that it will suffer a financial loss as a result of the injunction.  Therefore, I will require the Chamber to post a nominal bond of $100 before the preliminary injunction will issue as to the Inquiry Provision.

## VII.  Conclusion

I conclude that the City's Inquiry Provision violates the First Amendment.  Although the Ordinance represents a significant positive attempt to address the wage gap, the First Amendment compels me to enjoin implementation of the Inquiry Provision.  The Reliance Provision, however, does not offend the First Amendment and remains intact.

I commend the City for pursuing a novel method of attempting to reduce the wage gap, but am bound by the First Amendment's exacting requirements for speech restrictions. For the reasons stated herein, the Chamber's Motion for a Preliminary Injunction is granted in part and denied in part consistent with this Opinion. The City's request for a hearing and leave to engage in discovery is denied.

My Order follows.

Endnotes

[1]    The Chamber of Commerce for Greater Philadelphia is a nonprofit organization "dedicated to promoting regional economic growth and advancing business-friendly public policies."  It represents thousands of member companies across eleven counties in the three states of the Greater Philadelphia region.  (Am. Compl. ¶ 12.)

[2]    Unless otherwise noted, these facts are undisputed.

[3]    The Ordinance amends Title 9 of the Philadelphia Code by adding a new chapter on wage equity.

[4]    The effective date has been ordered stayed by agreement since April 19, 2017, pending resolution of the Chamber's Motion.

[5]    The Ordinance targets both the gender and racial wage gap, however, the parties' arguments are almost entirely about the gender wage gap.

[6]    For the purpose of resolving this Motion, I accept into evidence all attachments to the parties' submissions.

[7]    The parties seem to agree that wage history inquiries are not misleading.

[8]    The other precedent relied upon by the City does not support its position because those cases pertain to regulations of advertising or promotion of activity that directly furthered entirely illegal activity.  See Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 496 (1982) (illegal drug transactions); Ragin v. N.Y. Times Co., 923 F.2d 995, 1003 (2d Cir. 1991) (racial discrimination in housing).

[9]    The City contends that I may consider Dr. Madden's affidavit as evidence supporting the constitutionality of the Inquiry Provision despite the fact that her affidavit was not before City Council.  The Chamber disagrees, averring I cannot rely on post-enactment evidence because my task is to determine whether City Council had "substantial evidence" before it when it passed the Ordinance.

In Phillips v. Borough of Keyport, 107 F.3d 164 (3d Cir. 1997), the Third Circuit observed that "[w]hatever level of scrutiny we have applied in a given case, we have always found it acceptable for individual legislators to base their judgments on their own study of the subject matter of the legislation, their communications with constituents, and their own life experience and common sense so long as they come forward with the required showing in the courtroom once a challenge is raised."  Id. at 178.  The court continued, saying that "[i]f a legislative body can produce in court whatever justification is required of it under the applicable constitutional doctrine, we perceive little to be gained by incurring the expense, effort, and delay involved in requiring it to reenact the legislative measure after parading its evidence through its legislative chamber."  Id.; see also Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt., 721 F.3d 264, 282 (4th Cir. 2013) ("'[C]ourts have routinely admitted

evidence . . . to supplement a legislative record or explain the stated interests behind challenged regulations.'") (quoting <u>11126 Balt. Blvd. v. Prince George's Cnty., Md.</u>, 886 F.2d 1415, 1425 (4th Cir. 1989)); <u>Pruett v. Harris Cty. Bail Bond Bd.</u>, 499 F.3d 403, 410 (5th Cir. 2007) ("<u>Central Hudson</u> does not require that evidence used to satisfy its strictures exist pre-enactment.").

Accordingly, I agree with the City and for the purposes of this Motion will consider post-enactment evidence offered in support of City Council's decision.

[10] Dr. Madden bases this conclusion on her own consulting experience of over forty years. (Resp., Ex. 5 at 10.)

[11] Dr. Madden provides the following citations for this conclusion:

Barry Gerhart ("Gender Differences in Current and Starting Salaries: The Role of Performance, College Major, and Job Title," *Industrial and Labor Relations Review*, 1990, Vol. 43, no. 4, pp. 418-433) studies salaries of professional and managerial workers and finds that women's disadvantage in starting salaries is greater than in current salaries.

Quintana-Garcia and Elvira (Cristina Quintana-Garcia and Marta M. Elvira, "The Effect of the External Labor Market on the Gender Pay Gap among Executives," *Industrial and Labor Relations Review*, 2017, Vol. 70, no. 1, pp. 418-433) study pay among top executives at high-tech firms and find that women hired externally have lower relative salaries to comparable men than women and men spending their careers within the firm.

(<u>Id.</u> at 10 n.8)

[12] Dr. Madden states that studies show "significant and substantial wage differentials by race and gender, which are not explained by credentials." For this proposition she cites to the following:

Blau and Kahn's 2016 study of the gender wage differential from 1980 to 2010 in the U.S (Francine D. Blau and Lawrence Kahn, "The Gender Wage Gap: Extent, Trends, and Explanations," IZA Discussion Paper, No. 9656, 2016). After reviewing the gender wage differential over thirty years and considering the effects of gender differences in skills, gender roles in the household, occupations and industry, they conclude that labor market discrimination continues to contribute to the wage gap.

Weichselbaumer and Winter-Ebmer's international meta analysis (Doris Weichselbaumer and Rudolf Winter-Ebmer, "A Meta-Analysis of the International Gender Wage Gap" *Journal of Economic Surveys*, Vol. 19, July 2005: 479-511) of international gender differentials (a meta analysis is a statistical technique for putting together the results of many statistical studies) over thirty

years also concludes that discriminatory wages persist, even though there has been some decrease in the discrimination.

Stanley and Jarrell (T.D. Stanley and Stephen B. Jarrell, "Gender Wage Discrimination Bias? A Meta-Regression Analysis," *Journal of Human Resources*, 33(4), pp. 947-973, Fall 1998) use a meta analysis of 41 U.S. studies to show that the gender pay gap due to discrimination averaged almost 28 percent.

Wilson and Rodgers have recently completed a study (Valerie Wilson and William M. Rodgers III, "Blackwhite wage gaps expand with rising wage inequality," Washington DC: Economic Policy Institute, September 19, 2016) that finds the racial wage gap increasing when comparing workers with equivalent education, experience, and location.

Altonji and Blank's seminal article on labor market discrimination (Joseph G. Altonji and Rebecca M. Blank, "Race and Gender in the Labor Market," *Handbook of Labor Economics,* 1999, Vol 3, pp. 3143-3259) reviews numerous studies of wage and other labor market differences by gender, race, and ethnicity. They find that the differentials are remarkably persistent.

Black, et al., (D.A. Black, N. Koleskikove, S.G. Sanders, and L.J. Taylor, "The role of location in evaluating racial wage disparity," *IZA Journal of Labor Economics*, 2013, Vol 2 (2)) show, for example, that black men in Philadelphia of equivalent experience and age to white men average about 20 percent lower wages since 1970.

(Id. at 8 n.3.)

13      The Court also addressed a report prepared by the American Institute of Certified Public Accountants on CPA solicitation, concluding the report contradicted the Florida Board's position. Edenfield v. Fane, 507 U.S. 761, 771-72 (1993).

14      Terry Fromson's discussion of the EEOC's Compliance Manual does not provide the necessary evidence. Addressing the Equal Pay Act, the Compliance Manual notes that "prior salaries of job candidates can reflect sex-based compensation disparity." But, the Manual goes on to state that "if the employer can prove that sex was not a factor in its consideration of prior salary, and that other factors were also considered, then the justification can succeed." For example, the employer could show such if it "(1) determined that the prior salary accurately reflected the employee's ability based on his or her job-related qualifications; and (2) considered the prior salary, but did not rely solely on it in setting the employee's current salary." EEOC, Compliance Manual, No. 915.003 § 10-IV.F.2.g (Dec. 2000), https://www.eeoc.gov/policy/docs/compensation.html.

15      I will not address the cases cited by the City for the proposition that it does not need to provide ex-post empirical evidence in support of City Council's decision to pass the Inquiry Provision. This issue is not relevant to my analysis of whether City Council made a reasonable

inference that the Inquiry Provision would directly advance its interest in reducing discriminatory wage disparities or promoting wage equality.

[16]     The parties disagree over whether Edenfield requires that the City show the Inquiry Provision directly advances a substantial interest, or directly advances it in "material way." Because I conclude the Inquiry Provision does not directly advance the City's substantial interests, I need not resolve this distinction.

[17]     Because I find the Inquiry Provision fails under Central Hudson, I need not determine whether it passes muster under strict scrutiny.

[18]     The Chamber's emphasis on the expressive purpose of the use of wage history also appears to pull from another section of the Sorrell opinion. Earlier in the opinion, the Court addressed Vermont's argument that its law was a commercial regulation that imposed only an incidental burden on speech. Sorrell v. IMS Health, Inc., 564 U.S. 552, 567 (2011). Observing that restrictions on speech differ from those on economic activity and nonexpressive conduct, the Court stated that "[i]t is also true that the First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech. That is why a ban on race-based hiring may require employers to remove 'White Applicants Only' signs, why 'an ordinance against outdoor fires' might forbid 'burning a flag,' and why antitrust laws can prohibit 'agreements in restraint of trade.'" Id. (citations omitted). After noting these distinctions, the Court found that the Vermont law imposed "more than an incidental burden on protected expression," pointing out that it was aimed at certain speech based on its content and as spoken by particular speakers, rendering the provisions content- and speaker-based. Id.

         Even if this portion of the Sorrell opinion were about whether the Vermont law prohibited only conduct, it does not provide support for the Chamber's proposition that relying on wage history to fashion a salary amounts to expressive conduct. The provisions in Sorrell targeted the sale, dissemination, and use of information *through marketing*, which, as emphasized above, are wholly different from relying on wage history to create a salary. The Chamber's position that the Reliance Provision precludes employers from "using wage history to express a particular message about the value of an applicant's labor in formulating and communication an appropriate salary proposal" is unsupported by Sorrell.

[19]     The Chamber also argues that even if the provision targets conduct, it is content and speaker based and addresses conduct that is "wholly derivative of expressive activity" and thus implicates the First Amendment. First, the Chamber provides no authority that a provision that is content and speaker based but targets merely conduct requires First Amendment scrutiny. Second, that wage history *could* be obtained through communication with others does not render reliance on wage history to be "wholly derivative" of expressive conduct.

[20]     In passing, the City also states that the Inquiry Provision only "incidentally burdens speech" because the "effectiveness of the reliance provision depends upon preventing employers from asking for the information." The City does not expand upon this statement and I am thus left guessing how it should impact my analysis.

[21] The Chamber also cites to <u>Commonwealth v. Ray</u>, 272 A.2d 275 (Pa. Super. 1970), however, that opinion was vacated. Additionally, the case is inapposite because it addressed a municipal ordinance that conflicted with a state statute, thus the City was found to have exceeded its authority. <u>Id.</u> at 278.

[22] The City and Chamber also discuss whether finding the Ordinance unconstitutional will call into question other long-standing anti-discrimination laws. The parties do not provide authority concerning whether this issue should affect my analysis, however, and I find that it does not. Whether other laws that have not previously been challenged on First Amendment grounds will now face such a challenge does not bear on the constitutionality of the Ordinance before me.

[23] The City asks that if I grant its request for a hearing, I consolidate this Motion with a trial on the merits for efficiency purposes. Because I decline to grant a hearing, I will not consolidate the Motion with a trial.

[24] To the extent the City is challenging whether the Chamber will be irreparably harmed by the Inquiry Provision, such is addressed above.